(63.09%) provides evidence that would not only support a finding of secondary meaning but also fame.[14] [15]

95. In Ostberg's rebuttal report to the Payless survey, four criticisms are raised:

(1) Only women were interviewed concerning the Payless athletic shoe, even though the disputed Payless shoes are sold to both men and women.
(2) The research design of the Ford Survey created an artificial condition, failing to simulate a realistic post-sale situation, with the result that any findings concerning possible confusion of the Payless athletic shoe with the adidas Superstar may be overstated.
(3) The research design included two so-called control cells, which were inappropriate and their implications were misinterpreted.
(4) The data obtained by Dr. Ford were not properly tabulated and were incorrectly interpreted.

96. Ostberg is correct that only women were interviewed in the Payless survey. First, the shoe that was used as a stimulus was a women's shoe and, as such, was shown to women. Second, it was my understanding that it was believed that the majority of Payless shoes bearing the tested stripes and trade dress were women's shoes. Third, a measure of likelihood of confusion among men for shoes bearing four parallel equidistant stripes and/or similar trade dress is evidenced by

---

[14] See Harrods Limited v. Sixty Internet Domain Names, 157 F. Supp. 2d 658, 669 (E.D. Va. 2001) (survey showing 45% of the United States public recognized the trademark supported the conclusion that the mark was famous) and Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev., 955 F. Supp. 605, 613 n.4 (E.D. Va. 1997) (survey showing that over 40% of the United States general public recognized the trademark supported the conclusion that the mark was famous).

[15] Despite serious flaws, the surveys of Alice Passannante and Dr. Roger Tourangeau provide corroborative evidence of secondary meaning and fame for the trade dress of the adidas Superstar athletic shoe. See the February 14, 2007, Declaration and Rebuttal Report of Dr. Gerald L. Ford in the adidas v. Kmart matter.

the prior survey results in the Target matter and subsequent survey results in the Tokyo Park (Tim Tam Kids #SD3318), Kmart (Olympian shoe), Madden (Shooter shoe), and Kmart (Athletech shoe) surveys.

97. Ostberg also argues that leaving the stimulus photograph with the respondent in some manner biased the survey results.[16] In this regard, he is simply incorrect. First, it should be noted that what Ostberg proposes is that the survey stimulus should have been removed from the respondent's view before asking the critical survey questions. This is the exact procedure that caused a court to exclude one of Ostberg's surveys. This exclusion was affirmed by the Second Circuit Court of Appeals. See Starter Corp. v. Converse Inc., 170 F.3d 286, 296-297 (2nd Cir. 1999).[17] Second, leaving the stimulus photograph with the respondent during the survey questions was designed to give the respondent every opportunity to distinguish the Payless shoe from the adidas shoe.

98. As Dr. Pham notes in his expert report in the adidas v. Kmart matter, the Ford Bubala & Associates' surveys provide conservative estimates of likelihood of confusion:

> First, given that (a) the interviews are conducted face to face and (b) each respondent is shown a single picture of a shoe which is left with the respondent throughout the interview, attention to the stimuli in these studies should be relatively high. Therefore, one cannot attribute the observed amount of confusion

---

[16] Notably, Ostberg offers no empirical evidence to support this criticism.

[17] Also see Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 578 (E.D.N.Y. 1999); and Novartis v. Johnson & Johnson-Merck, 129 F. Supp. 2d 351, 366 (D.N.J. 2000).

to a lack of respondents' attention to the stimuli. In fact, in an actual marketplace setting (e.g., consumers walking through a store), many consumers will be exposed to the shoes under conditions of lower attention than those simulated in the Ford surveys, which conceptually should amplify the magnitude of confusion. Second, in the Ford surveys, respondents report their beliefs about the manufacturer's identity while looking at the picture of the shoe. If a substantial percentage of consumers can be confused about the identity of the shoes' manufacturer even while having direct visual access to the shoes, it is likely that an even greater percentage would be confused if they have to rely on their recollection of a previous exposure to the shoes (e.g., in memory-based consideration set formation and evaluation). See Expert Report of Dr. (Michel) Tuan Pham in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Partial Summary Judgment in adidas v. Kmart matter, page 33, ¶69.

99. Next, Ostberg argues that the two control cells were inappropriate.[18] Here Ostberg appears to lack an appreciation for an appropriate control cell. As noted by Professor Diamond:

> It is possible to adjust many survey designs so that causal inferences about the effect of a trademark or an allegedly deceptive commercial become clear and unambiguous. By adding an appropriate control group, the survey expert can test directly the influence of the stimulus...Respondents in both the experimental and control groups answer the same set of questions. The effect of the allegedly deceptive message [or the allegedly confusing trademark] is evaluated by comparing the responses made by the experimental group members with those of the control group members...Both preexisting beliefs and other background noise should have produced similar response levels in the experimental and control groups. In addition, if respondents who viewed the allegedly deceptive commercial [or the allegedly infringing trademark] respond differently than respondents who viewed the control commercial [control trademark], the difference cannot be the result of a leading question, because both groups answered the same question...

---

[18] Again, Ostberg offers no empirical evidence to support this criticism.

> Shari Seidman Diamond "Reference Guide on Survey Research," in the Federal Judicial Center's <u>Reference Manual on Scientific Evidence, Second</u>, pages 257-258.

As Professor Diamond also notes:

> In designing a control group study, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed...Nor should the control stimulus share with the experimental stimulus the feature whose impact is being assessed. If, for example, the control stimulus in a case of alleged trademark infringement is itself a likely source of consumer confusion, reactions to the experimental and control stimuli may not differ because both cause respondents to express the same level of confusion.
>
> . . .
>
> Every measure of opinion or belief in a survey reflects some degree of error. Control groups and control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question.
> [footnotes omitted]
> Shari Seidman Diamond, "Reference Guide on Survey Research," in the Federal Judicial Center's <u>Reference Manual on Scientific Evidence, Second</u>, pages 258-260.

100. Finally, Ostberg argues that the survey responses were improperly tabulated or interpreted. This criticism appears to have been made mute by the 9th Circuit decision in this matter.

<u>KNIGHT</u>

101. In October and November, 2002, Mr. John Knight, head of Global Market Research for adidas, was responsible for a qualitative study on stripes conducted for adidas. As I understand it, this qualitative study included discussions with approximately thirty (30) individuals in each of five (5) cities (i.e., Dallas, Denver, Minneapolis, Orlando, and Phoenix). As Mr. Knight has testified, in adidas America, Inc., and adidas-

Salomon AG v. Steve Madden, Ltd., and Steve Madden Retail, Inc., and in adidas America, Inc., and adidas-Salomon AG v. Payless ShoeSource, Inc., the 2002 stripe study was a qualitative study, not a quantitative study, and, as such, was not designed to be representative or quantifiable. Mr. Knight's testimony is consistent with the Qualitative Research Consultants Association:

> The results of qualitative research cannot be statistically projected across a target population. That's because the methods used to recruit participants and explore issues in qualitative research tend to be quite different, by design, from the methods that a projectable quantitative study might involve. However, when decisions must be made that require quantification, qualitative research is often used in advance to help plan effective quantitative studies, or as a follow-up method to help interpret quantitative results or explore selected topics in greater depth.

<u>Conclusion - Knight Study</u>

102. It is my opinion, based upon my review of the study done by Knight, that the Knight study provides no empirical data with respect to the trademark or source identifying significance of stripes on clothing or shoes and, in particular, the Knight study does not provide any empirical data with respect to whether or not Defendant's shoes identified herein are likely to cause confusion, deception or mistake with respect to shoes emanating from the source adidas, in particular, due to the stripes or other trade dress features of Defendants' shoes.

<u>QUALIFICATIONS</u>

103. I hold a Bachelor's Degree in Advertising (B.A.) from San Jose State University, a Master's Degree in Business Administration (M.B.A.) from the University of Southern

California, and a Doctoral Degree in Business Administration (D.B.A.) from the University of Southern California.

104. During my twenty-five year academic appointment, my teaching responsibilities included both graduate and undergraduate level courses in a variety of subject areas. My teaching responsibilities included courses in marketing (e.g., marketing, marketing management, advertising, promotion, consumer behavior, and marketing research) and management (e.g., principles of management; business policy and strategy; business policies, operations, and organizations; and integrated analysis).

105. I am a member of the American Marketing Association (AMA), the American Academy of Advertising (AAA), the American Association of Public Opinion Research (AAPOR), the Council of American Survey Research Organizations (CASRO), and the International Trademark Association (INTA).

106. As a partner with Ford Bubala & Associates, I have been retained by a variety of firms engaged in the consumer product, industrial product, and service sectors of the economy to provide marketing consulting and research services. Approximately one-half of Ford Bubala & Associates' consultancies in which I have participated have involved the design and execution of marketing research surveys.

107. As previously noted, during the past thirty-two years, I have been retained in a number of litigation-related consultancies involving intellectual property matters, including matters before federal and state courts, the Trademark Trial and

Appeal Board of the U.S. Patent and Trademark Office, and the International Trade Commission. I have designed and executed surveys relating to intellectual property matters, including false advertising, trademark, patent, and other related matters. I am familiar with the accepted principles of survey research, as well as the tests for trustworthiness of properly conducted surveys or polls.[19]

108. During the past twenty-seven years, I have addressed a variety of groups on the subject of surveys or polls and their use in the measurement of the state of mind of consumers, with respect to Lanham Act matters. Specifically, I have spoken at meetings of the American Bar Association, the American Intellectual Property Law Association, the American Marketing Association, the International Trademark Association, the Marketing Research Association, the Intellectual Property Law Institute of Canada, and the Practising Law Institute.

109. I have also written on the subject of the design and execution of litigation-related surveys in Lanham Act matters. Specifically, in 1987, I completed a paper entitled "Trademark Surveys: Universe, Questions, and Future Approaches," which was published in the Summer 1987 edition of <u>New Matter</u>, the journal of the Intellectual Property Section of the California State Bar. This paper was subsequently reprinted in the 1992 <u>International Trademark Association 114th Annual Meeting</u> proceedings. In 1993, I wrote a paper entitled "Responding to Trademark Surveys," which was published in the Spring 1993

---

[19] Supra note 1.

proceedings of the American Bar Association's <u>Patent, Trademark, and Copyright Law: Litigation and Corporate Practice</u> course materials. This paper was reprinted in the International Trademark Association's <u>"Successful Strategies in Trademark Litigation" Forum</u>, Tokyo, Japan, 1993. In 1997, I wrote a paper entitled "Dilution Surveys - New Challenges," which was published in the 1997 Practising Law Institute course handbook, <u>Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner</u>. This paper was reprinted in the International Trademark Association's course materials for a seminar, <u>Dilution and Famous Marks for Advanced Trademark Practitioners</u>, 1998. In 1998, I wrote a paper entitled "Dilution Surveys Update 1998," which was published in the Practising Law Institute course handbook, <u>Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner</u>. In 1999, I wrote a paper entitled "Lanham Act Related Surveys, The Year in Review & Emerging Issues," which was published in the 1999 Practising Law Institute course handbook, <u>Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner</u>. An edited version of this paper, "Lanham Act Surveys - The Year in Review," was reprinted in the NAD/International Trademark Association's <u>False Advertising Forum</u>, course materials, 2000. In 2000, I wrote a paper entitled "Lanham Act Surveys: Two Years in Review," which was published in the <u>International Trademark Association 122nd Annual Meeting</u> proceedings. Also, in 2000, I wrote a paper entitled "Lanham Act Surveys: 2000," which was published in the 2000 Practising Law

Institute course handbook <u>Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner</u>. In 2001, I wrote a paper entitled "Lanham Act Surveys: 2001," which was published in the 2001 Practising Law Institute course handbook <u>Strategies for Litigating Copyright, Trademark & Unfair Competition Cases</u>. In 2002, I wrote a paper entitled "Lanham Act Surveys: 2002," which was published in the 2002 Practising Law Institute course handbook <u>Strategies for Litigating Copyright, Trademark & Unfair Competition Cases</u>. In 2003, I wrote a paper entitled "Survey Evidence - Successful Challenges Since Daubert" which was published in 2003 in the <u>International Trademark Association 125th Annual Meeting</u> proceedings. Also in 2003, I wrote a paper entitled "Lanham Act Surveys: 2003," which was published in 2003 in the <u>American Intellectual Property Law Association</u> annual proceedings. This paper, "Lanham Act Surveys: 2003," was reprinted in the <u>78th Intellectual Property Institute of Canada</u> proceedings, 2004. In 2004, I wrote a paper entitled "Lanham Act Surveys: 2004," which was published in the <u>Law Education Institute National CLE Conference</u> proceedings, 2005. Most recently, I wrote a paper entitled "Lanham Act Surveys: 2005," which was presented at a meeting of the Intellectual Property Law Section of the State Bar of Georgia. This paper, "Lanham Act Surveys: 2005" was reprinted in the <u>NAD Annual Conference</u> proceedings, 2006, and in the <u>Law Education Institute National CLE Conference</u> proceedings, 2007.

110. As noted earlier, since 1998 I have served as a member of the Editorial Board of <u>The Trademark Reporter</u>, the

scholarly legal journal on the subject of trademarks, published by the International Trademark Association.

111. I have been qualified and accepted as an expert in marketing and marketing research in more than fifty (50) trials before federal and state courts and administrative government agencies.

112. Attached hereto as Exhibit V is a list of cases in which I have provided trial and/or deposition testimony since 1992.

113. Attached hereto as Exhibit W is a copy of my professional history, describing my qualifications and professional background.

## MATERIAL CONSIDERED

114. Material considered, in the instant matter, includes: the Amended Complaint and Answer to Amended Complaint; Third Amended Complaint; Answer, Affirmative Defenses, and Counterclaims to Third Amended Complaint; Expert Report of Marian Friestad, Ph.D.; Expert Report of Scott Galloway; Affidavit of Henry D. Ostberg, Ph.D., and attached exhibits; Dr. Ostberg's code sheet, tabulation specifications, validation questionnaire, and related correspondence, supervisor instructions, data file in electronic form; Rebuttal Report of Henry D. Ostberg Reviewing a Survey Conducted by Dr. Gerald L. Ford; Expert Report of Dr. Erich Joachimsthaler in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Partial Summary Judgment in adidas v. Kmart matter; Expert Report of Dr. (Michel) Tuan Pham in Opposition to Defendants' Motion for

Summary Judgment and in Support of Plaintiffs' Motion for Partial Summary Judgment in adidas v. Kmart matter; Report of Dr. Roger Tourangeau in adidas v. Kmart matter; Report of Alice Passannante in adidas v. Kmart matter; "Stripes" Phase 1 Research -- Summary of Results, a two-page report by John Knight; Deposition Transcript of John Knight, adidas America v. Steve Madden, March 5, 2003; Deposition Transcript and Exhibits of John Knight, adidas America v. Payless Shoesource, February 18, 2004; adidas "Stripes" Research Video, Final Version, November 21, 2002, Wild Matters Productions 2959, TRT: 30 minutes, VCR; adidas, 3-Stripes Man-on-the-street Interviews, Raw footage w/timecode, Phoenix 3-4, Dallas 5, Orlando 2, DVD; adidas, 3-Stripes Man-on-the-street Interviews, Raw footage w/timecode, Phoenix 2, Orlando 1, DVD; adidas, 3-Stripes Man-on-the-street Interviews, Raw footage w/timecode, Dallas 3, Phoenix 1, Denver 2, DVD; adidas, 3-Stripes Man-on-the-street Interviews, Raw footage w/timecode, Los Angeles, DVD; adidas, 3-Stripes Man-on-the-street Interviews, Raw footage w/timecode, Minneapolis 1-2, Minneapolis 3-4, DVD; adidas, 3-Stripes Man-on-the-street Interviews, Raw footage w/timecode, "Stripes" Research Video, Minneapolis 5, Denver 1, DVD; adidas, 3-Stripes Man-on-the-street Interviews, Raw footage w/timecode, Dallas 4, Dallas 2, Dallas 1, DVD; Findings and Recommendation/Order by United States Magistrate Judge John Jelderks, October 8, 2002; Order by United States District Judge Ancer L. Haggerty, January 6, 2003: Order by United States

Magistrate Judge John Jelderks, April 11, 2003; <u>adidas America v. Payless ShoeSource, Inc.</u>, 2006 U.S. App. LEXIS 170 (9th Cir. 2006).

<u>COMPENSATION</u>

115. Ford Bubala & Associates' fees for this engagement consist of billable time and expenses. Standard time is billed at the rate of $450.00 per hour for the services of a Partner and $200.00 per hour for the services of a Research Associate. Deposition and trial time are billed at the rate of $600.00 per hour plus expenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 12th day of March, 2007, in Huntington Beach, California.

3/12/07
Date

Dr. Gerald L. Ford