on the Athletech shoe.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.  See Declaration and Rule 26 Report of Dr. Gerald L. Ford, attached hereto as Exhibit D, without exhibits.

43.  Further substantiation of the results obtained in Ford Bubala & Associates' survey of the Athletech shoe are provided by the survey results obtained by Dr. Roger Tourangeau ("Tourangeau").  In the adidas v. Kmart litigation, Tourangeau conducted multiple internet surveys with respect to the Athletech shoe.  The following provides the results of just three of the surveys Tourangeau conducted among sixteen hundred (1,600) internet survey respondents.

44.  In one survey, Tourangeau reports the results of a survey he characterizes as a replication of the Ford Bubala & Associates' survey.  In this survey, Tourangeau reports that on a net basis, after adjusting the survey for mismeasurement error, approximately twenty-six percent (25.7%) of the survey respondents evidenced a likelihood of confusion as to the source, or authorization or approval of the Athletech shoe.  The results presented by Tourangeau, for the replication survey confirm the findings in the Ford Bubala & Associates' survey.  Specifically, that potential purchasers, in a post-sale environment, are likely to be confused or deceived by the belief that the Athletech shoe is put out or authorized or approved by adidas.

45.   In another survey, Tourangeau reports the results of a survey which generally replicates the Ford Bubala & Associates' survey but includes a full-filter question. Notwithstanding Tourangeau's use of the full-filter question (i.e., "Do you happen to know who makes or puts out these shoes?"), approximately seventeen percent (17.1%) of the respondents likely to buy athletic shoes, for athletic or casual use, identified adidas as the source of the Athletech shoe. Tourangeau's results in this survey are again consistent with the results obtained in the Ford Bubala & Associates' likelihood of confusion survey relative to the Athletech shoe and thus provide additional validation and further evidence of likelihood of confusion with respect to the source.

46.   Finally, in another survey, notwithstanding Tourangeau's use of the question "Is this shoe actually made or put out by (ANSWER TO Q2) or by some other company" among male respondents likely to purchase an athletic shoe, for athletic or casual use, approximately one-third (33%) of the respondents, in response to this question, reported that they believed that adidas actually made or put out the Athletech shoe.  Once again these survey results provide validation and further evidence of a likelihood of confusion.

47.   It is my opinion that although many of Tourangeau's surveys suffer from serious flaws in survey design, survey questions, and survey universe, the results of each of the Tourangeau surveys provide additional empirical evidence confirming the likelihood of confusion evidenced in the results

obtained in the Ford Bubala & Associates' survey and provide additional support for a finding of likelihood of confusion with respect to the Athletech shoe.

KMART OLYMPIAN SHOE SURVEY



48.    In January 2006, at the request of counsel for adidas, I designed and caused to be conducted a pilot survey to address the issue of likelihood of confusion, if any, of the Olympian shoe, with respect to the source, or authorization or approval of the Olympian shoe emanating from Footstar, Inc., and being sold by Kmart Corp.

49.    The Olympian survey results evidence that, on a net basis, after adjusting the survey data for mismeasurement error based upon a control cell (i.e., the Olympian shoe with three non-parallel stripes, no shell toe, no mustache, and no flat sole), approximately twenty-nine percent (28.70%) of the relevant universe of male potential purchasers of athletic shoes, for athletic or casual use, expressed the belief that the Olympian shoe was either made or put out by adidas or was being put out with the authorization or approval of adidas due to the stripes on the Olympian shoe.

50.   The Olympian survey results also evidence that, on a net basis, after adjusting the survey data for mismeasurement error based upon the control questions ("Why do you say that?" and "What else, if anything, makes you say that?"), approximately twenty-six percent (25.92%) of the relevant universe of male potential purchasers of athletic shoes, for athletic or casual use, expressed the belief that the Olympian shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the stripes as the reason for their belief.[10]

51.   It is my opinion that the results of the Olympian survey support a finding of likelihood of confusion.  That is, male potential purchasers of athletic shoes, for athletic or casual use, are likely to be confused or deceived by the belief that the Olympian shoe either comes from or is being put out with the authorization or approval of adidas, due to the stripes on the Olympian shoe.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.  See Declaration and Rule 26 Report of Dr. Gerald L. Ford, attached hereto as Exhibit D, without exhibits.

---

[10]    The survey results also evidence likelihood of confusion due to appearance elements in addition to stripes (e.g., flat sole, shell toe, and mustache).

FORTUNE DYNAMIC SHOE SURVEY



52.   In April, 2005, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, with respect to the source, or authorization or approval of the shoe being sold by Fortune Dynamic, Inc.

53.   The Fortune survey results evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon the control cell (i.e., the Fortune shoe with three non-parallel stripes, no shell toe, and no flat sole), approximately twenty percent (19.90%) of the relevant universe of female potential purchasers of athletic shoes, for athletic or casual use, expressed the belief that the Fortune shoe was either made or put out by adidas or was put out with the authorization or approval of adidas due to the look or appearance features (i.e., trade dress) and, in particular, the stripes on the Fortune shoe.

54.   The Fortune survey results also evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon the control questions (i.e. "Why do you say that?" and "What else, if anything, makes you say that?"),

approximately nineteen percent (19.44%) of the relevant universe of female potential purchasers of athletic shoes, for athletic or casual use, expressed the belief that the Fortune shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the look or appearance features of the Fortune shoe as the reason for their belief. The majority of these respondents identified the stripes on the Fortune shoe as the reason for their belief. A review of the Fortune survey results evidences that approximately nineteen percent (18.98%) of all survey respondents expressed the belief that the Fortune shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made specific reference to the stripes on the Fortune shoe as the reason for their belief.

55. It is my opinion that the results of the Fortune survey support a finding of likelihood of confusion. That is, female potential purchasers of athletic shoes, for athletic or casual use, are likely to be confused or deceived by the belief that the Fortune shoe either comes from or is being put out with the authorization or approval of adidas, due to the look or appearance features of the Fortune shoe and, in particular, the stripes on the Fortune shoe. It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas. See

Declaration and Rule 26 Report of Dr. Gerald L. Ford Re:  Fortune Dynamic, Inc., attached hereto as Exhibit E, without exhibits.

<u>BUM SHOE SURVEY</u>



56.  In December 2002, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, of the Mikal shoe, with respect to the source, or authorization or approval of the Mikal shoe emanating from B.U.M. International, Inc., and being sold by Target.

57.  The Mikal survey results evidence that, on a net basis, after adjusting the survey data for mismeasurement error based upon a control cell (i.e., the Mikal shoe with no stripes), approximately nineteen percent (18.99%) of the relevant universe of male and female potential purchasers of shoes for boys one (1) to seven (7) years of age, expressed the belief that the Mikal shoe was either made or put out by adidas or was being put out with the authorization or approval of adidas due to the stripes on the Mikal shoe.

58.  The Mikal survey results also evidence that, on a net basis, after adjusting the survey data for mismeasurement error based upon the control questions ("Why do you say that?"

and "What else, if anything, makes you say that?"), approximately seventeen percent (16.67%) of the relevant universe of male and female potential purchasers of shoes for boys one (1) to seven (7) years of age, expressed the belief that the Mikal shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the stripes as the reason for their belief.

　　59.  It is my opinion that the results of the Mikal survey support a finding of likelihood of confusion.  That is, male and female potential purchasers of shoes for boys one (1) to seven (7) years of age, are likely to be confused or deceived by the belief that the Mikal shoe either comes from or is being put out with the authorization or approval of adidas, due to the stripes on the Mikal shoe.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.  See Declaration and Rule 26 Report of Dr. Gerald L. Ford, attached hereto as Exhibit F, without exhibits.

<u>TOKYO PARK - TIM TAM KIDS SHOE #SDA311 SURVEY</u>



60.  In August 2004, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, of the Tim Tam Kids shoe #SDA311, with respect to the source, or authorization or approval of the Tim Tam Kids shoe #SDA311 being sold by Tokyo Park Ltd.

61.  The Tim Tam Kids shoe #SDA311 survey results evidence that, on a net basis, after adjusting the survey data for mismeasurement error based upon a control cell[11] (i.e., the Tim Tam Kids shoe #SDA311 with three non-parallel stripes), approximately twenty-two percent (22.14%) of the relevant universe of male and female potential purchasers of shoes for children one (1) to five (5) years of age, expressed the belief that the Tim Tam Kids shoe #SDA311 was either made or put out by

_____

[11]    The survey was originally designed to be comprised of 216 test cell interviews and 216 control cell interviews.  After 216 test cell interviews had been completed and 90 control cell interviews had been completed, the parties reached a settlement. Although only 90 of the 216 control cell interviews were completed, the control cell results are generally consistent with the control cell results in the survey in the adidas v. Target, E.S. Originals and B.U.M. International matter (B.U.M. children's shoe).

adidas or was being put out with the authorization or approval of
adidas due to the stripes on the Tim Tam Kids shoe #SDA311.

      62.  The Tim Tam Kids shoe #SDA311 survey results also
evidence that, on a net basis, after adjusting the survey data
for mismeasurement error based upon the control questions ("Why
do you say that?" and "What else, if anything, makes you say
that?"), approximately twenty-two percent (22.41%) of the
relevant universe of male and female potential purchasers of
shoes for children one (1) to five (5) years of age, expressed
the belief that the Tim Tam Kids shoe #SDA311 was either made or
put out by adidas or put out with the authorization or approval
of adidas and, when asked the control questions, made reference
to the stripes as the reason for their belief.

      63.  It is my opinion that the results of the Tim Tam
Kids shoe #SDA311 survey support a finding of likelihood of
confusion.  That is, male and female potential purchasers of
shoes for children one (1) to five (5) years of age, are likely
to be confused or deceived by the belief that the Tim Tam Kids
shoe #SDA311 either comes from or is being put out with the
authorization or approval of adidas, due to the stripes on the
#SDA311 shoe.  It is also my opinion that the results of the
survey in the instant matter, as well as the results of other
surveys I have designed and caused to be conducted in other
adidas matters, evidence secondary meaning with regard to
parallel stripes and the source adidas.  See survey synopsis,
attached hereto as Exhibit G.

TOKYO PARK - TIM TAM KIDS SHOE #SD3318 SURVEY



64.   In September 2004, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, of the Tim Tam Kids shoe #SD3318, with respect to the source, or authorization or approval of the Tim Tam Kids shoe #SD3318 being sold by Tokyo Park Ltd.

65.   The Tim Tam Kids shoe #SD3318 survey results evidence that approximately forty-five percent (44.91%)[12] of the relevant universe of male and female potential purchasers of shoes for children six (6) to nine (9) years of age, expressed the belief that the Tim Tam Kids shoe #SD3318 was either made or put out by adidas or was being put out with the authorization or approval of adidas due to the stripes on the Tim Tam Kids shoe #SD3318.

_____

[12]    The survey was originally designed to be comprised of 216 test cell interviews and 216 control cell interviews.  After 216 test cell interviews had been completed, the parties reached a settlement.  Although no control cell interviews were conducted, control cell estimates are provided by the control cell results in the adidas v. Tokyo Park (Tim Tam Kids shoe #SDA311) and the adidas v. Target, E.S. Originals and B.U.M. International (B.U.M. children's shoe) matters.

66.  The Tim Tam Kids shoe #SD3318 survey results also evidence that based upon the control questions ("Why do you say that?" and "What else, if anything, makes you say that?"), approximately twenty-nine percent (28.71%) of the relevant universe of male and female potential purchasers of shoes for children six (6) to nine (9) years of age, expressed the belief that the Tim Tam Kids shoe #SD3318 was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the stripes[13] as the reason for their belief.

67.  It is my opinion that the results of the Tim Tam Kids shoe #SD3318 survey support a finding of likelihood of confusion.  That is, male and female potential purchasers of shoes for children six (6) to nine (9) years of age, are likely to be confused or deceived by the belief that the Tim Tam Kids shoe #SD3318 either comes from or is being put out with the authorization or approval of adidas, due to the stripes on the #SD3318 shoe.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.  See survey synopsis, attached hereto as Exhibit H.

---

[13]    The survey results also evidence likelihood of confusion due to appearance elements in addition to stripes (e.g., flat sole, shell toe, and mustache).

## STEVE MADDEN SHOOTER SHOE SURVEY



68.  In October 2002, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, with respect to the source, or authorization or approval of the Shooter shoe with four parallel stripes sold by Steve Madden.

69.  The Shooter shoe survey results evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon control cell 1 (i.e., the Shooter shoe with no stripes), approximately seventeen percent (17.49%) of the relevant universe of male potential purchasers, of this type of shoe being sold by Steve Madden, expressed the belief that the Shooter shoe was either made or put out by adidas or was put out with the authorization or approval of adidas due to the stripes on the Shooter shoe.

70.  The Shooter shoe survey results also evidence that on the basis of the control questions ("Why do you say that?" and "What else, if anything, makes you say that?"), in control cell 1, approximately eighteen percent (18.43%) of the relevant universe of male potential purchasers, of this type of shoe being

sold by Madden, expressed the belief that the Shooter shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made specific reference to the stripes on the Shooter shoe as the reason for their belief.

71.  Further, the survey results evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon control cell 2 (i.e., the Shooter shoe with three non-parallel stripes), approximately eighteen percent (18.01%) of the relevant universe of male potential purchasers, of this type of shoe being sold by Madden, expressed the belief that the Shooter shoe was either made or put out by adidas or was put out with the authorization or approval of adidas due to the stripes on the Shooter shoe.

72.  The Shooter shoe survey results also evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon the control questions ("Why do you say that?" and "What else, if anything, makes you say that?") in control cell 2, approximately sixteen percent (15.69%) of the relevant universe of male potential purchasers, of the type of shoe being sold by Madden, expressed the belief that the Madden shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the stripes on the Madden shoe as the reason for their belief.

73.  It is my opinion that the results of the Shooter shoe survey support a finding of likelihood of confusion.  That

is, male potential purchasers of this type of shoe being sold by
Madden are likely to be confused or deceived by the belief that
the Shooter shoe either comes from or is being put out with the
authorization or approval of adidas, due to the stripes on the
Shooter shoe.  It is also my opinion that the results of the
Shooter shoe survey, as well as the results of other surveys I
have designed and caused to be conducted in other adidas matters,
evidence secondary meaning with regard to parallel stripes and
the source adidas.  See Rule 26 Report of Dr. Gerald L. Ford -
Steve Madden Four Stripe Shoe, attached hereto as Exhibit I,
without exhibits; and see Rebuttal Control Survey Report of Dr.
Gerald L. Ford - Steve Madden Four Stripe Shoe, attached hereto
as Exhibit J, without exhibits.

STEVE MADDEN NANCIE AND NORTHH SHOE SURVEY





74.   In August 2002, at the request of counsel for adidas, I designed and caused to be conducted two pilot surveys to address the issue of likelihood of confusion, if any, with respect to the source, or authorization or approval of two models of shoes (i.e., the Nancie, a slip-on shoe, and the Northh, a lace-up shoe), each with two parallel stripes, sold by Steve Madden.

75.   The Nancie two stripe survey results, for the slip-on Madden shoe, evidence that, after adjusting the survey data for mismeasurement error based upon a control cell (i.e., the Madden two stripe slip-on shoe with no stripes), approximately twenty-two percent (21.97%) of the relevant universe of female potential purchasers, of the type of slip-on shoe being sold by Steve Madden, expressed the belief that the Nancie two stripe slip-on shoe was either made or put out by

adidas or was put out with the authorization or approval of
adidas, due to the stripes on the Nancie two stripe slip-on shoe.

76.  The survey results for the Nancie two stripe slip-
on shoe also evidence that based upon the control questions ("Why
do you say that?" and "What else, if anything, makes you say
that?") approximately twenty-three percent (22.92%) of the
relevant universe of female potential purchasers, of the type of
slip-on shoe being sold by Steve Madden, expressed the belief
that the Nancie two stripe slip-on shoe was either made or put
out by adidas or was put out with the authorization or approval
of adidas, and when asked the control questions made specific
reference to the stripes as the reason for their belief.

77.  The Northh two stripe survey results, for the
lace-up Madden shoe, after adjusting the survey data for
mismeasurement error based upon a control cell (i.e., the Madden
two stripe lace-up shoe with no stripes and no parallel lines of
holes), evidence that approximately twenty-three percent (22.92%)
of the relevant universe of female potential purchasers, of the
type of lace-up shoe being sold by Steve Madden, expressed the
belief that the Northh two stripe lace-up shoe was either made or
put out by adidas or was put out with the authorization or
approval of adidas, due to the stripes on the Northh two stripe
lace-up shoe.

78.  The survey results for the Northh two stripe lace-
up shoe also evidence that based upon the control questions ("Why
do you say that?" and "What else, if anything, makes you say
that?"), approximately twenty-two percent (21.88%) of the

relevant universe of female potential purchasers, of the type of lace-up shoe being sold by Steve Madden, expressed the belief that the Northh two stripe lace-up shoe was either made or put out by adidas or was put out with the authorization or approval of adidas, and when asked the control questions made specific reference to the stripes as the reason for their belief.

79.  It is my opinion that the results of the Madden two stripe shoe surveys support a finding of likelihood of confusion.  That is, the relevant universe of female potential purchasers, of the type of slip-on and lace-up two stripe shoes being sold by Steve Madden, expressed the belief that the Madden two stripe slip-on and lace-up shoes were either made or put out by adidas or were put out with the authorization or approval of adidas, due to the stripes on the Madden two stripe slip-on and lace-up shoes.  It is also my opinion that the results of the surveys in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.  See Rule 26 Report of Dr. Gerald L. Ford - Steve Madden Two Stripe Shoe, attached hereto as Exhibit K, without exhibits.

80.  In total, eleven (11) surveys were conducted by Ford Bubala & Associates at the request of counsel for adidas over the approximate four-year period from December 2001 through January 2006.  Approximately fourty-two hundred (4,246) interviews were conducted in these eleven (11) surveys.  The consistency in finding measured levels of likelihood of

confusion, given the differences in the shoes tested, is a
testament to the strength of the adidas Three-Stripe Mark.  The
surveys conducted in the previously discussed matters provide
consistent empirical support for the finding that two or four
parallel diagonal stripes on athletic or casual shoes, like the
shoes tested, are likely to cause confusion with respect to the
source, or authorization or approval of such shoes with adidas
due to the stripes.

LIKELIHOOD OF CONFUSION WITH RESPECT TO OTHER PAYLESS SHOES

81.  Based upon the prior surveys that I have caused to
be conducted on behalf of counsel for adidas, I believe that
there is empirical support for a finding of likelihood of
confusion with respect to a number of models of Payless shoes.

82.  It is my considered opinion, based upon my
education, background, and professional experience, and based
upon my review and analysis of results of the survey conducted in
this matter, as well as surveys conducted in the other matters
discussed above, that there is empirical evidence that supports a
finding of likelihood of post-sale confusion or likelihood of
initial-interest confusion with respect to the source, or
authorization or approval of a number of models of Payless shoes
with the source adidas.

83.  Based upon the results of Payless, Target, and
Kmart Olympian surveys, as well as the other surveys reported
herein, it is my considered opinion that these surveys support a
finding that potential purchasers of athletic shoes, for athletic
or casual use, are likely to be confused or deceived by the

belief that the Payless shoes shown in Exhibit L either come from or are being put out with the authorization or approval of adidas due to the stripes or other appearance features of these shoes. See Exhibit L, Payless shoe model numbers:  382, 3121, 3589, 3601, 9828-PAR, 13375, 13467, 14334, 16982, 17494, 21436, 23375, 23661, 29600, 31221, 31772, 34838, 41905, 41908, 42022, 44929, 46799, 47003, and 47004.

84.    Based upon the results of the Kmart Athletech survey, as well as the other surveys reported herein, it is my considered opinion that these surveys support a finding that potential purchasers of athletic shoes, for athletic or casual use, are likely to be confused or deceived by the belief that the Payless shoe shown in Exhibit M either comes from or is being put out with the authorization or approval of adidas due to the stripes on this shoe.  See Exhibit M, Payless shoe model number: 38784.

85.    Based upon the results of the Madden Shooter survey, as well as the other surveys reported herein, it is my considered opinion that these surveys support a finding that potential purchasers of this type of shoe are likely to be confused or deceived by the belief that the Payless shoe shown in Exhibit N either comes from or is being put out with the authorization or approval of adidas due to the stripes on this shoe.  See Exhibit N, Payless shoe model number:  19355.

86.    Based upon the results of the Tokyo Park Tim Tam Kids shoe #SD3318 survey and the B.U.M. shoe survey, as well as the other surveys reported herein, it is my considered opinion

that these surveys support a finding that potential purchasers of
shoes for children are likely to be confused or deceived by the
belief that the Payless shoes shown in Exhibit O either come from
or are being put out with the authorization or approval of adidas
due to the stripes or other appearance features of these shoes.
See Exhibit O, Payless shoe model numbers:  3041, 10287(A),
10287(B), 12070, 13266, 17148, 18684, 21417, 23893, 25438, 29425,
39155, 40098, 41350, 42006, and 46661.

    87.  Based upon the results of the Tokyo Park Tim Tam
Kids shoe #SDA311 survey, as well as the other surveys reported
herein, it is my considered opinion that these surveys support a
finding that potential purchasers of shoes for children are
likely to be confused or deceived by the belief that the Payless
shoes shown in Exhibit P either come from or are being put out
with the authorization or approval of adidas due to the stripes
on these shoes.  See Exhibit P, Payless shoe model numbers:
02479, 12168, 21427, 29701, 29822, 30051, 30052, 33457, 36783,
40521, 40523, 44957, and 44958.

    88.  Based upon the results of the Madden Nancie and
Northh surveys, as well as the other surveys reported herein, it
is my considered opinion that these surveys support a finding
that potential purchasers of this type of shoe are likely to be
confused or deceived by the belief that the Payless shoes shown
in Exhibit Q either come from or are being put out with the
authorization or approval of adidas due to the stripes on these
shoes.  See Exhibit Q, Payless shoe model numbers:  PAR-11203,
PAR-11223, PAR-11224, PAR-11225, 22743, 23800, 24728, 26018,

26019, 26638, PAR-29510(A), PAR-29510(B), Predictions 31079, and Predictions 31077 (Black Stripe).

LIKELIHOOD OF CONFUSION WITH RESPECT
TO ELEMENTS OF OTHER PAYLESS SHOES

89.  Based upon the prior surveys that I have caused to be conducted on behalf of counsel for adidas, I believe that there is empirical support for a finding that diagonal parallel stripes on a number of models of Payless shoes are likely to cause confusion with the source adidas.

90.  It is my considered opinion, based upon my education, background, and professional experience, and based upon my review and analysis of results of the survey conducted in this matter, as well as surveys conducted in the other matters discussed above, that there is empirical evidence that supports a finding of likelihood of post-sale confusion or likelihood of initial-interest confusion with respect to the source, or authorization or approval based upon the stripes on a number of models of Payless shoes.

91.  Based upon the results of the Tokyo Park Tim Tam Kids #SDA311 and the Kmart Athletech surveys, as well as the other surveys reported herein, it is my considered opinion that these surveys support a finding that potential purchasers of athletic shoes, for athletic or casual use, or potential purchasers of children's shoes are likely to be confused or deceived by the belief that the Payless shoes shown in Exhibit R either come from or are being put out with the authorization or approval of adidas due to the stripes on these shoes.  See Exhibit R, Payless shoe model numbers:  02193, 09222, 09225,

10604, 10648, 13262, 14011, 26401, 29315, 34309, 34865, 35437, 35438, 39465, 39467, 39468, 44580, and 44581.

92.    Based upon the results of the Madden Shooter and Madden Nancie and Northh surveys, as well as the other surveys reported herein, it is my considered opinion that these surveys support a finding that potential purchasers of shoes of the type tested are likely to be confused or deceived by the belief that the Payless shoes shown in Exhibit S either come from or are being put out with the authorization or approval of adidas due to the stripes on these shoes.  See Exhibit S, Payless shoe model numbers:  19451, 19452, 19547, 21008, 21010, 21034, and 41148.

93.    Based upon the results of the Payless, Kmart, Olympian, Fortune Dynamic, Target, Tokyo Park Tim Tam Kids #SD3318, and B.U.M. surveys, as well as the other surveys reported herein, it is my considered opinion that these surveys support a finding that potential purchasers of athletic shoes, for athletic or casual use, or potential purchasers of children's shoes are likely to be confused or deceived by the belief that the Payless shoes shown in Exhibit T either come from or are being put out with the authorization or approval of adidas due to the stripes on these shoes.  See Exhibit T, Payless shoe model numbers:  3047, 3066, 03144, 03156, 07153, 12524, 12525, 13390, 13715, 14858, 16087, 18622, 20049, 20576, 20577, 20766, 20780, 22316A, 22316B, 22570, 23402, 23845, 23846, 23887, 23888, 24172, 24379, 24380, 24443, 24486, 24624, 24727, 24883, 25741, 25742, 25763, 25833, 25834, 25835, 25836, 26499, 26501, 26575, 26576, 26754, 27257, 27888, 29427, 29933, 30047, 31460, 31663, 31753,

31759, 31870, 32015, 34907, 35663, 35904, 37105, 37106, 37107,
38502, 39317, 41351, 44478, and 44980.

DR. OSTBERG

Conclusion - Dr. Ostberg

         94.  It is my considered opinion, based upon my
education, background, and professional experience, that although
the Payless secondary meaning survey suffers from a number of
serious defects, which result in an underestimate of secondary
meaning for the trade dress of the adidas Superstar athletic
shoe, the results of the Payless secondary meaning survey,
nonetheless, clearly support a finding of secondary meaning.
Specifically, the results of the Payless survey are clear and
unambiguous.  Among all respondents who were asked the Payless
survey's secondary meaning question, approximately sixty-three
percent (63.09%) reported, after exposure to photographs of an
adidas shoe bearing the claimed trade dress, that they recognized
the appearance and design of the shoe as one being made by one
specific company.  See Rebuttal Report of Dr. Gerald L. Ford,
attached hereto as Exhibit U.  This level of recognition of the
Superstar trade dress at approximately sixty-three percent