```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF OREGON

 3  ADIDAS AMERICA, INC.,       )
    ADIDAS-SALOMON AG,          )
 4                              )
            Plaintiffs,         ) No. CV-01-1655-KI
 5                              )
         vs.                    ) April 1, 2008
 6                              )
    PAYLESS SHOESOURCE, INC.,   ) Portland, Oregon
 7                              )
            Defendant.          )
 8  ------------------------------

 9

10

11

12

13                  PRETRIAL CONFERENCE

14               TRANSCRIPT OF PROCEEDINGS

15           BEFORE THE HONORABLE GARR M. KING

16          UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25
```

Exhibit 1 - Page 1 of 262

```
 1
                        APPEARANCES
 2
    FOR THE PLAINTIFFS:  William H. Brewster
 3                       R. Charles Henn, Jr.
                         Kilpatrick Stockton, LLP
 4                       1100 Peachtree Street, Suite 2800
                         Atlanta, GA  30309
 5
                         Stephen M. Feldman
 6                       Perkins Coie, LLP
                         1120 N. W. Couch Street, 10th Floor
 7                       Portland, OR  97209-4128

 8  FOR THE DEFENDANT:   William A. Rudy
                         R. Cameron Garrison
 9                       Travis W. McCallon
                         Lathrop & Gage, LC
10                       2345 Grand Boulevard, Suite 2800
                         Kansas City, MO 64108
11
                         Phillip S. Lorenzo
12                       Lathrop & Gage, LC
                         370 Seventeenth Street
13                       Republic Plaza, Suite 4650
                         Denver, CO 80202
14
                         William B. Crow
15                       Schwabe Williamson & Wyatt, PC
                         1211 S. W. Fifth Avenue
16                       Suites 1600-1900
                         Portland, OR  97204
17
                         John Shaeffer
18                       Spillane Shaeffer Aronoff Bandlow
                         1880 Century Park East
19                       Suite 1004
                         Los Angeles, CA  90067
20
    COURT REPORTER:      Nancy M. Walker, CSR, RMR, CRR
21                       United States District Courthouse
                         1000 S. W. Third Avenue, Room 301
22                       Portland, OR  97204
                         (503) 326-8186
23


24
                 Proceedings recorded stenographically,
25                  computer-aided transcription
```

Exhibit 1 - Page 2 of 262

1          MR. RUDY:  My only response, Your Honor, is when

2     I hear words like "hyperbole" --

3          THE COURT:  Well, I'm really tired of you guys

4     arguing, so let's get together.

5          MR. RUDY:  Okay.  Well, I think if we look at the

6     actual shoes and separate out what adidas' counsel

7     indicated that is color or size variations, and put those

8     together, the number of lots will reduce, but not by a

9     lot.  There are still going to be a large number of

10    shoes.  And if allowed to, I can make that demonstration.

11         THE COURT:  Well, I still don't know what I'm

12    going to do on that, but I hoped to get a little help,

13    and this has been helpful, hearing your argument.

14         But what we'd better do at this point is just go

15    through and make the decisions and rulings we need to

16    make at the pretrial conference.  You're going to need to

17    figure out how you're going to present your respective

18    cases to the jury.  I'm going to figure out what the

19    verdict form will look like.

20         My preference, I'll be frank with you, is to have

21    a more general verdict form with some instructions that

22    direct the jury how to approach their evaluation and to

23    come to the conclusions that are set forth in a general

24    verdict form.  So I'll be looking at that.  But I am

25    concerned about if adidas is arguing that there is

Exhibit 1 - Page 3 of 262

1    infringement or dilution or whatever with regard to all
2    of these lots, they're going to have to prove that to the
3    jury.  We'll see what they do in their case in chief.
4         Okay.  Let's take the complex case form and just
5    kind of walk through that.
6         Preadmission of and use of trial exhibits, I will
7    tell you that it is not possible to preadmit all of these
8    trial exhibits.  Number one, there are just too many of
9    them.  Number two, I've been in trial, then was out of
10   town, and then I'm in trial all of this week.  And in the
11   time that we've had these, we're not able to read all of
12   your objections and to rule on those.
13        The other reason that I'm not going to do that is
14   you've marked numerous exhibits.  And my experience is
15   that many, many exhibits get marked and boxes get wheeled
16   in here, and about two percent of those are necessary to
17   offer or two percent of them get offered.  I don't know
18   if you expect the jury to read all of these exhibits you
19   see up here.  I don't know if you expect all of those to
20   go to the jury.
21        Do you expect all of these to go into the jury
22   room?  Do you expect all of your exhibits that you've
23   marked to go into the jury room?
24        MR. BREWSTER:  Your Honor, for plaintiff adidas,
25   I would expect most of them.  We've gone through and

Exhibit 1 - Page 4 of 262

1          MR. RUDY:  He's ready to go any time.  I know.

2          Your Honor, we had a concern about many of the

3    plaintiff's exhibits not having a corresponding

4    sponsoring witness or not appearing to.  We're happy to

5    work these out.  We don't want these things just entering

6    the court record --

7          THE COURT:  All right.  You talk to them.  Find

8    out how they authenticate them, if they feel they're

9    self-authenticating.  And then afterwards, give me a list

10   of authentication issues, and we'll resolve those in

11   advance.

12         When you get the list of exhibits, be prepared to

13   advise counsel and the Court whether you object to any of

14   those exhibits.  If we have time, we'll take it up

15   outside the presence of the jury.

16         If we don't have time, we'll just start the

17   examination of the witness.  You can offer the exhibit.

18   You can object.  And I'll rule, just like a real trial.

19         Okay.  If you want the podium for your opening or

20   closing, just let Mary know, and she'll give it to you.

21         Do any of you have a problem examining from

22   counsel table?  Do you want a podium to examine from?

23         MR. RUDY:  No problem for me, Your Honor.

24         MR. BREWSTER:  No, Your Honor.

25         THE COURT:  Okay.  Let's go to the motions.

Exhibit 1 - Page 5 of 262

1           Okay.  The first motion is document 692.  This is
2    adidas' motion in limine to exclude evidence and argument
3    inconsistent with the Court's summary judgment opinion
4    and order.  Then we'll also consider No. 709, which is
5    Payless' motion to exclude evidence regarding the
6    December 21st, 2007 opinion.
7           I'm going to just tell you my thoughts on this,
8    and these thoughts are basically going to control the
9    findings and orders that I make.
10          Let's deal first with the question of either
11   party making any reference to the Court's opinion or
12   findings.  You may not do that, unless you find some
13   reason why reference to that order has to come in, which
14   we can then take up outside the presence of the jury.  I
15   can't think of any reason at this time.
16          Adidas argues the need to refer to the order to
17   set out legal standards.  That will be done by
18   instructions.
19          Now, with regard to adidas' motion to exclude,
20   adidas argues any evidence and argument related to the
21   dismissed affirmative defenses or counterclaims is not
22   relevant.  Payless argues that some of the evidence is
23   relevant to determining the strength of adidas' trademark
24   and Payless' intent, that it honestly believed that the
25   '94 agreement allowed use of straight-edged stripes, and

Exhibit 1 - Page 6 of 262

1    obviously other intent factors, that it believed it was

2    not infringing.

3        If Payless attempts to backdoor these dismissed

4    defenses, rather than use them as I am now going to allow

5    them to use them, I'll instruct the jury very

6    specifically that the legal defense has been removed from

7    the case.

8        I am going to allow Payless to bring in factors,

9    even if it smells of laches -- I shouldn't say

10   "smells" -- if it's an issue that was raised as part of

11   the laches defense or otherwise, to determine the

12   strength of adidas' trademark and Payless' intent.  It

13   will come in for those general purposes.

14       But Payless will have to pose the issues in the

15   proper context, with a proper foundation.  For example,

16   they may only talk about a failure or delay in

17   prosecuting when it is clear that they are inquiring

18   about Payless' intent; for example, that it -- that this

19   delay caused Payless to reasonably believe that adidas

20   didn't object to their use of stripes, so forth and so

21   on.

22       We'll have to take that up on an item-by-item

23   basis at trial.  You're going to have to set the scene,

24   lay the foundation.  With your expert, you may even say,

25   "I want to talk to you about adidas' (sic) intent."

Exhibit 1 - Page 7 of 262

1   That's pretty broad.  But make it clear that that's the

2   case.  Because if you slip into something that makes it

3   seem like you're trying to use that affirmative defense

4   that's out of the case, then I will instruct the jury

5   about that issue.

6        If adidas wants a limiting instruction, you

7   should prepare a neutral instruction and submit it to me.

8   I don't know that I'll have to give it, but make sure

9   that it's a neutral instruction.

10       Now, there are a number of parts of that motion

11  that Payless did not object to, and I'll go through those

12  just for the record and rule on those.

13       Let's see.  That's No. 4, adidas abandoned its

14  claims.  There was no objection to excluding that

15  evidence, so it will be excluded.

16       No. 6, that adidas has engaged in

17  anti-competitive practices, Payless doesn't object to

18  excluding this evidence and argument, so it will be

19  excluded.

20       No. 8, that the settlement agreement precludes

21  adidas from asserting its claims, you have no -- Payless

22  has no objection to excluding that evidence, so it will

23  be excluded.

24       No. 9, adidas failed to satisfy any of its

25  obligations under the agreement, no objection, so that

Exhibit 1 - Page 8 of 262

1    limine to exclude evidence concerning point-of-sale

2    confusion.  That's document 694.  The argument is that

3    adidas does not allege point-of-sale confusion.  It only

4    alleges initial interest or post-sale confusion.

5    Therefore, no testimony should be allowed regarding

6    point-of-sale confusion.

7           Payless does point out some references to adidas'

8    Complaint, which alleges point of sale and some potential

9    testimony, including Dr. Pham's expert witness report

10   that refers to -- or raises issues related to

11   point-of-sale confusion.

12          I think Payless can bring about -- or bring out

13   such things as labeling, packaging, marketing, as

14   relevant to its lack of intent to confuse consumers.

15          I'm going to deny this motion generally.  You can

16   raise specific objections at trial regarding

17   point-of-sale confusion, but there are some point-of-sale

18   issues, matters, evidence that can be brought in on the

19   issue of intent.

20          So any question on that?

21          MR. RUDY:  None here, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          Okay.  Motion or document No. 696, adidas' motion

24   in limine to exclude evidence concerning oral advice of

25   counsel not disclosed during discovery, tell me

Exhibit 1 - Page 9 of 262

1    specifically what -- well, what do you believe Payless

2    intends to offer that you've made this motion?  You do

3    have a reference to their briefing on the motion to seal

4    portions of the opinion, which is a general statement

5    about their offering additional or more substantial

6    evidence of the confidential shoe reviews and oral

7    advice.

8            What have they submitted by way of documents or

9    what do you understand they're going to offer by way of

10   oral testimony on this issue?

11           MR. BREWSTER:  Your Honor, by definition, there

12   are not documents.  The argument is that they're going to

13   talk about oral advice.  The basis for this was the

14   fact -- the quoted passage from the motion to seal

15   elements that refers to their plan to put on

16   significantly more evidence of the legal advice, of

17   additional and more substantial disclosures.  So that was

18   where the source of this comes from.

19           Their responsive brief here suggested that that

20   fear was well-founded, in the sense that it outlines all

21   manner of testimony that they expect to have come in

22   about their advice of counsel willfulness defense, in the

23   responsive brief, high and low, on the number of things

24   that apparently are going to come in now.

25           Your Honor, I would direct your attention to what

Exhibit 1 - Page 10 of 262

 1   I think are, in these many pages of briefing, the two

 2   definitive points of comparison:  Interrogatory No. 16,

 3   which is on page 4 of our brief, which was the

 4   interrogatory that requested that they identify these

 5   communications, including oral communications.  Only four

 6   were identified.  All of those were before 2001.  So

 7   there is a very limited response to that.

 8        Compare that to the paragraph that Payless has,

 9   the last full paragraph on page 4 of their brief, where

10   they say, "Well, adidas asked this question about the

11   communications we had regarding infringement between

12   counsel and the company."  And then the sentence that I

13   think the Court needs to evaluate on its face is where

14   Payless says that "It," being adidas, "does not request

15   any information regarding the basis of those communicated

16   opinions, the more detailed substance of opinions, and

17   the process that led to that advice or why they include

18   only some of the lots at issue or how the review

19   procedures and terminology were derived."

20        Every one of those four or five elements would be

21   an oral communication between Payless' counsel and the

22   company about whether or not there was infringement.

23   Every single thing it says it wants to bring in -- every

24   single thing it says it wants to bring in would be

25   covered by that.

Exhibit 1 - Page 11 of 262

1         THE COURT:  All right.  Mr. Rudy, what do you

2    intend to offer?  What do you feel you're entitled to

3    offer on this subject?

4         MR. RUDY:  Your Honor, we believe we're entitled

5    to offer enough information -- To help the Court

6    understand how this came into being, by virtue first of

7    counsel's mention of this comment in the reply in support

8    of the motion to seal, we said we would submit or put

9    into the record significantly additional information.

10        What we meant by that was in terms of documentary

11   evidence, nothing not already produced.  We intend to

12   rely only on documentation evidence that has been

13   produced to explain how the shoes came into being and

14   also to correct some misperceptions held by the Court and

15   I think counsel.

16        For instance, there was mention in your order

17   that only 40 shoe lots were reviewed.  In fact, it was

18   70.  There was a particularly concerning comment that the

19   reviews did not take place until after the shoe hit the

20   marketplace.  And we're going to tell the jury that, in

21   fact, with the exception of just a small handful, all

22   shoe reviews were performed before the shoe was placed on

23   the shelf at Payless and explain what the reasoning was

24   behind the shoe review.

25        Now, as far as this motion goes, I think it's

Exhibit 1 - Page 12 of 262

 1    premature.  If, in fact, they were barred from taking

 2    discovery or if we plan to use documentary evidence that

 3    had not been produced timely, they would have a point.

 4    But there is nothing of the kind in play, even with

 5    respect to what we planned on, in the excerpt he read,

 6    and other things I had mentioned presenting to the jury

 7    in terms of testimonial evidence.

 8          And our position, with respect to this motion, is

 9    that they're complaining about a phantom body of evidence

10    that we can't point to, that we can't put our hands on,

11    which is a body of evidence they could have gone into in

12    the deposition and chose not to.

13          For instance, they could have, during the

14    deposition, asked Mr. Horace to provide information about

15    how he's familiar with stripe issues and how they first

16    developed their opinions regarding two and four stripes.

17    He was there to answer a question like that.  They could

18    have asked, what is his extensive -- does he have

19    extensive experience in stripe design and shoe disputes?

20    They could have asked that, or about his knowledge of

21    third-party ornamentation and trademark issues.

22          A whole body of information they could have asked

23    about, they didn't; and we plan to use that information

24    and present it to the jury.  We think we have a right to

25    do that.

Exhibit 1 - Page 13 of 262

1          (A recess is then taken.  The Court, counsel, and

2     the parties reconvene.)

3          THE COURT:  Okay.  Let's talk first about the

4     issue of damages.  Adidas has stated it will not seek

5     disgorgement of Payless' profits as the measure of its

6     actual damages; is that correct?

7          MR. HENN:  That's correct.

8          THE COURT:  So you're going to be arguing for a

9     reasonable royalty standard on the issue of actual

10    damages?

11         MR. HENN:  Correct, on the issue of actual

12    damages.

13         THE COURT:  And then if the jury makes a finding

14    of willfulness, you're going to be arguing for damages

15    based upon Payless' profits?

16         MR. HENN:  A disgorgement of profits, correct.

17         THE COURT:  And is it your position that the jury

18    has to make that determination, the amount of damages?

19    They make the willfulness determination, clearly.  But

20    your position is that the jury decides the amount of

21    profits?

22         MR. HENN:  That's correct.

23         THE COURT:  And your position is that there

24    should be no evidence of apportionment?

25         MR. HENN:  Correct.

Exhibit 1 - Page 14 of 262

145

Opening Statement - Plaintiff

1  the people who are the least, but a broad range of

2  people, that there is a significant likelihood of

3  confusion.

4       So after you've been here for a few weeks and you

5  can distinguish yourself between three stripes and four

6  and two pretty readily, the context that's important is

7  going to be what do other consumers see out in a

8  post-sale environment.

9       This post-sale confusion has important

10 consequences for adidas, really for any brand, but for us

11 particularly in this case.  They may seem intuitive;

12 hopefully they will, after they're explained by two of

13 our experts, Dr. Joachimsthaler, who I've already

14 referred to, who will come in and talk about brands and

15 their associations with those, and then Dr. Michel Pham,

16 who is a professor at Columbia.  He's an expert in

17 cognitive psychology, how people shop, what they see,

18 what they perceive, what they remember.

19      And the first major issue that adidas has with

20 these are the concerns about a negative association in

21 the post-sale context, perceptions about poor quality.

22 You will understand that consumers believe that Payless

23 shoes are of poor quality.  You will see that from

24 Payless documents.  You will hear that from Payless

25 employees, who are talking about Payless customers.  You

Exhibit 1 - Page 15 of 262

Opening Statement - Plaintiff

1          Payless' position, what they're going to say to

2     you is that they believe that because this agreement

3     prohibited three stripes and two and four with serrated

4     edges, that two and four without serrated edges was okay,

5     that they were allowed to do that, that that was

6     permissible.

7          Well, you're going to have to see what kind of

8     evidence there is on that.  And, interestingly, Payless

9     did a memo right after this agreement and they circulated

10    it internally.  And it said, "We have these limitations

11    on us.  We can't sell three stripes.  We can't sell two

12    and four serrated edges.  We will get in big trouble if

13    we do."

14          And then the next paragraph didn't say anything.

15    There wasn't a paragraph that said, "But we're allowed to

16    sell two and four stripes if they're not serrated."  It

17    wasn't there.  It didn't exist.  It didn't exist in '94.

18          After they got sued in this case, you'll start

19    hearing conversation about "Hmm, maybe we should argue

20    that the agreement allowed this.  Maybe we should say

21    there is something implicit in the agreement."

22          There is nothing explicit.  The agreement doesn't

23    provide for that.  There is no defense there.  But look

24    at that 1994 memo.  If they had this great expansive

25    right to sell two- and four-striped shoes, you would have

Exhibit 1 - Page 16 of 262

Opening Statement - Plaintiff

1    expected it to be there.

2         With this evidence of the rights that adidas has,

3    the obvious copying and willfulness on the part of

4    Payless, what will be the evidence that you will hear

5    about why Payless says its conduct wasn't willful?  The

6    principal evidence you will hear, the explanation will be

7    "We relied on our lawyers.  They told us we could do it,

8    that it was okay."

9         What lawyers?  You're going to hear principally

10   from two.  One of them will not appear here.  He's not

11   coming on behalf of Payless.  We took his deposition.

12   He's not coming here.

13        The other one is a lawyer who worked at the law

14   firm that almost all of those lawyers work at.  He worked

15   on this litigation for a couple of years.  He was counsel

16   of record in this case until last week.  And he's going

17   to come in and testify about what he thought were the

18   rights that they had.

19        We're going to be asking questions like "Was

20   there any empirical work that did you, any surveys or

21   research to support your conclusion?"  You will hear

22   there was none.  We will look for the lengthy analysis

23   and memo that permitted Payless to do this:  Here's the

24   analysis.  Here are the facts.  Here's the background.

25   Here is the legal rule.  Here's our conclusion.  You will

Exhibit 1 - Page 17 of 262

272

Liedtke - D

1   Q. And what do you mean by that?

2   A. Well, we want to keep the Superstar fresh.  You want

3   to continue to keep it at a highly desirable rate so we

4   can, you know, get our -- get people, not only the

5   aficionado desiring it, but also the contemporary

6   letterman, the core letterman, the value addict.  This is

7   a shoe that should be desired by all people.

8        But to do that, you've got to keep a handle on

9   the number of pairs you put in the marketplace, and

10  you've got to continue to allow more volume or allow less

11  volume.  And right now, I told you we're kind of pinching

12  back on the Superstar in the U.S. to allow less volume.

13  But we'll open that up again to allow more.

14       What that allows for us to do is to keep our

15  price point where we want is, which is $70, and to allow

16  consumers to reach to that price point.  And it's

17  available in many different distribution channels.  So

18  that's what I meant by that.  It's a science.  It's an

19  art, not a science.

20  Q. I've just realized this chart ends in 2006.  You

21  didn't stop selling the Superstar in 2006, did you?

22  A. I hope not.  No, we did not.  It's been selling, you

23  know, up until this morning, I'm sure.

24  Q. What is the role of the Superstar in the adidas line?

25  A. It is, as I said, it is -- if it is not the iconic

Exhibit 1 - Page 18 of 262

1    Q.  What -- what does this brand tracking study say about the

2    brand consideration position of adidas?

3    A.  Well, this -- this actually says that adidas is seen as one

4    of the leading brands in the survey.  So you can see that we're

5    well up there, at about 70 percent.  And we're -- there's

6    really separation between Nike and -- Nike and us at the top,

7    and then a lot of the others kind of grouped further away.

8         So, really, it says that -- that the brand is really

9    strong, and is one of the leading brands.

10   Q.  If you could go over to the next page, at page 11, there's

11   a chart at the top.

12        What does -- does this research say about the brand

13   involvement position of adidas?

14   A.  Yeah.  This -- this again says that the involvement, the

15   level of connection to the brand is very high.  You can see

16   that at certain points we actually exceed Nike on a couple of

17   these measures, and we're very close.  And, again, this is one

18   where we get a lot closer to Nike, typically.

19        But you can also see the big separation between us and

20   some of the other competitor brands like Reebok and Puma,

21   within the study.

22   Q.  And can you remind us, again, what is meant by the personal

23   connection?

24   A.  Personal connection is -- is, again, that -- do they feel

25   close to the brand?  It's my kind of brand.  It's definitely my

Exhibit 1 - Page 19 of 262

451

1    they're copying the form of the shoe itself.  So that's pretty

2    clearly -- the one in your hand is clearly the Cross-Country

3    shoe.  But some of the other examples I've seen are the

4    Superstar.  Which, you know, you're copying not only the

5    stripes but the look of the shoe, the shell toe.  Which, again,

6    is one of the things that people most often refer to in that

7    type of product.

8           So I think that -- you know, that -- that can create

9    some confusion.  Maybe not at the point of sale, but maybe

10   walking around.  And -- and I think that's one of the -- the

11   bigger challenges here for us, as well.  Is that it -- it

12   becomes difficult for us to control the product that we have

13   out in the marketplace because, in part, desirability or

14   coolness -- you know, we talk with teens a lot about, you know,

15   what's cool, and things like that.

16          Some of that is based on scarcity.  You know, you kind

17   of want what not everybody else has.  And teens like -- we call

18   it the fit in/stand out dynamic.  On the one hand you want to

19   fit in and be like everybody else and sort of accepted, and on

20   the other hand, you want to stand out.  So you want to have

21   something that maybe allows you to look a little bit different.

22          If everybody has something, then your chances of

23   standing out are not so great.  So I think in that way, it's --

24   it can be -- we don't have the control over how you can do

25   that.  And certainly some of what we do is do Superstars in

Exhibit 1 - Page 20 of 262

498
Joachimsthaler - D

1          And, number three, I was asked, what, in my

2     opinion, is the damage that results from the conduct of

3     Payless on the adidas brand?

4     Q. Dr. Joachimsthaler, could you indicate for us the

5     materials that you reviewed in connection with developing

6     your opinions?

7     A. Yes.  I reviewed a wide variety of material, which I

8     normally do when I work on a particular case or any brand

9     for a litigation or otherwise.  One thing I relied on is

10    I relied on six or more studies -- I can't even remember

11    well -- empirical studies with consumers by another

12    expert.  His name is Jerry Ford.  Those are studies,

13    empirical studies, we call them, sort of research,

14    consumer research studies on confusion.

15          I also -- there are also other confusion studies

16    I relied on.  There was one by a gentleman in a court

17    case related to this with Kmart called Tourangeau.  There

18    was one study, also a confusion study, that came up with

19    certain conclusions.  That one was empirical studies.

20          Then I relied on the Icon study you may have

21    heard of yesterday or seen yesterday.  The Icon study is

22    one of those very, very important research studies that

23    studied the strength of a brand, what are the perceptions

24    people have in America with Reebok, adidas, and all the

25    other major brands.  And those studies go in real depth

Exhibit 1 - Page 21 of 262

521

Joachimsthaler - D

1  this particular piece of research reflect about the

2  adidas brand?

3  A. That is -- that brand, that study shows that the

4  number one most widely recognized sports brand now, among

5  10- to 65-year-olds, is adidas, which is amazing.  Of

6  course, Nike comes after us.  But that's what that says.

7  Q. If I could ask you to look over at page 7 of this,

8  what does this sporting goods brand study reflect as to

9  the recognition among youth?

10  A. Yes.  A very important part in the field of

11  sportswear is also to see how the brand is with young

12  consumers.  Here it says what's the awareness among 10-

13  to 15-year-olds.  And you can see the most recognized

14  brand among young people here, very young people, is

15  adidas, again followed by Reebok and then Nike.

16  Q. If I could have you to look at Exhibit 496-B, just

17  the front of this for now, can you identify for the jury

18  what this particular exhibit this?

19  A. Yes.  That's the GenWorld study.  The GenWorld study

20  is done by -- a youth study that's done by an advertising

21  agency called BBDO.  They study the youth market in

22  particular, and that's what this study is about.

23  Q. Over on page 21 -- I'll ask you to look at that --

24  how does adidas rank in terms of these teen brands?

25  A. So what this study shows is that -- it says what are

Exhibit 1 - Page 22 of 262

Joachimsthaler - D

1    the top 10 brands among young consumers, teens in this

2    case.  And it shows that Sony is number one, Nokia is

3    number two, adidas is number three.  So adidas is the

4    third of the top 10 brands among teen consumers, very

5    remarkable.

6    Q. Exhibit 496-D, can you tell us what that is?

7    A. Yes.  That's a book -- I apologize.  This is in

8    German.  It's the 500 most well-known brands in the

9    world.  And the subtitle of that particular book is

10   actually "From adidas to Zippo."  You know Zippo.

11        And that book covers what are the, globally, the

12   500 brands.  You know, Interbrand is the top 100.  This

13   one is the top 500, and adidas is one of the top brands

14   in that book.

15   Q. Dr. Joachimsthaler, what are your conclusions as to

16   the current strength of the adidas brand?

17   A. From my point of view, adidas is a very, very strong

18   brand.  It has very, very high awareness and visibility

19   with the right people, you know, young people, but also

20   older people, very much a very broad slice of life, all

21   kinds of people.  That's one thing, awareness.

22        The second thing is adidas has what I call very

23   strong associations, you know, those things in that

24   proverbial box in people's head.  There is a very

25   consistent set of associations:  quality, innovation,

Exhibit 1 - Page 23 of 262

Joachimsthaler - D

```
 1   performance, technology, athleticism, that sort of thing.

 2   That's the second most important dimension.

 3        The third one, I call it perceived quality,

 4   because having quality is so important.  It's almost like

 5   one of the most important aspects of a brand.  So very

 6   high on perceived quality, among the best athletic shoe

 7   brands.  That's the fourth area.  And the -- I'm sorry,

 8   the third area.

 9        And the fourth area is what I call loyalty and

10   emotional attachment.  A lot of people say, "I like

11   adidas.  I am connected to that.  I may never use it, but

12   I kind of like it.  It's sort of a brand -- it's a brand

13   for me."

14        So four dimensions, that makes a strong brand:

15   very high awareness; very high associations, those

16   attributes; a very high perceived quality; very high

17   loyalty or emotional attachment.  That's what makes the

18   brand a very strong brand.

19   Q. Dr. Joachimsthaler, turning from brand strength to

20   the role of three stripes, what is the role of visual

21   symbols in marketing?

22   A. Roles of visual symbols are extremely important.  We

23   mentioned earlier the example of television.  In today's

24   television, we see a lot of things, we learn a lot of

25   things with the eyes.  We like to say a picture is worth
```

Exhibit 1 - Page 24 of 262

529
Joachimsthaler - D

1   three-stripe.  So based on four stripes, they said, "Yes,

2   that's an adidas shoe."

3           So that is a -- that suggests there is a large

4   recognition for stripes, three stripes and four stripes,

5   that is confused with adidas.

6   BY MR. BREWSTER:  (continuing)

7   Q. Dr. Joachimsthaler, let's turned to the last issue,

8   and that is your opinions as to the damage to the adidas

9   brand by Payless selling this.  What are your conclusions

10  in that regard?

11  A. The damage, the way I look at the damages is again in

12  those four major areas that make up the strength of a

13  brand.  I mentioned -- I talked about awareness and

14  visibility.  That was the first dimension.

15          In terms of sheer awareness and visibility, you

16  have more shoes out there that are four-stripe shoes

17  from -- from Payless.  That dilutes, if you will, the

18  adidas brand, because there are shoes out there that

19  simply are not adidas shoes, but wear the four stripes

20  instead of the three stripes.  That dilutes -- that just

21  dilutes the awareness of a brand.

22          You know, this is like, in my opinion, when you

23  do something like that, create something that just looks

24  like the original, like the three stripes, that's like

25  free riding on awareness and visibility that another

Exhibit 1 - Page 25 of 262

530

Joachimsthaler - D

1    brand has developed for a long, long period of time.  And

2    that's the first part.

3             So the second part I mentioned, if you remember,

4    I said associations and the attributes, what a brand

5    stands for.  And I said that adidas stands for

6    performance, innovation, and technology.  Payless does

7    not stand for those things.  They never intended to.  In

8    fact, they may stand for a lot of other things than

9    technology, performance, athleticism, and innovation.

10            So by having Payless shoes that are confused,

11   like being adidas shoes, who don't have the same

12   performance, technology, and innovation associations, it

13   just damages the brand.  This is so obvious.  It just

14   does because -- because those -- those levels of quality

15   and levels of performance, innovation are just not the

16   same that adidas has produced.  That's the second one.

17            The third area is again this area of perceived

18   quality.  Perceived quality, as I said, is extremely

19   important.  The quality levels of Payless shoes, four

20   stripes, are nowhere -- nowhere near what adidas is

21   trying to create as adidas in their repertoire.  That

22   undermines the things.

23            Quality is so important.  When you lose quality,

24   you know, you can lose everything.  Think about Lacoste

25   years ago, when Lacoste had a real good shirt.  But then

Exhibit 1 - Page 26 of 262

Joachimsthaler - D

1    it was sold all over the place, and it not always was the

2    same quality.  And those Lacoste shirts with that

3    alligator on the top literally disappeared from the

4    American market, at one point in time so popular, and

5    then they lost it all.  They are trying to come back now.

6          But that's how quality happens.  And for adidas

7    to have Payless shoes that are not the same quality, but

8    confused as adidas shoes, that -- that is nagging at the

9    substance of that particular brand.  And you have to be

10   very careful.  You don't want to go back to the dark ages

11   of adidas.  You want to make sure that you manage your

12   brand as strongly as possible.

13         And the fourth area, as I mentioned earlier, is

14   this area of loyalty and emotional connection.  You know,

15   yesterday you heard a lot of adidas executives talk

16   about, you know, how people have an emotional connection

17   or personal connection with the brand.  That's what

18   happens with adidas and with Nike and many other great

19   brands.

20         When there are other brands out there that are

21   not adidas brands, but they are confused as such, it

22   undermines that bond and that relationship, that

23   emotional connection on loyalty that people have with

24   that particular brand.

25         So, you know, adidas is like -- it's almost like,

Exhibit 1 - Page 27 of 262

533

Joachimsthaler - D

1    emotional attachment and loyalty.

2         Those are four very real damages that the adidas

3    brand experiences as a function of the conduct of

4    Payless.

5    Q. Dr. Joachimsthaler, have you had anybody come up to

6    you and say that they actually experienced confusion with

7    respect to these Payless shoes?

8    A. No.

9    Q. What role would that kind of anecdotal evidence have

10   in the analysis that you've done?

11   A. None.  I would not -- I would not rely on somebody

12   walking up to me and telling me something about adidas

13   and then I make a conclusion about what I was asked to

14   do.

15        I mean, I try to be as objective as possible and

16   I try not to rely on an occasional hearsay or somebody

17   talking to me or my daughter telling me about her latest

18   preference about something or not.  I have to be

19   objective.  And so I rely on like the Ford studies or the

20   Interbrand studies, on big consumer data that show me

21   what the results are.

22   Q. Well, Dr. Joachimsthaler, you mentioned that

23   Interbrand work.  If there is an impact from the sale of

24   these shoes on awareness, association, perceived quality,

25   and loyalty, why doesn't this show up yet in the

Exhibit 1 - Page 28 of 262

Joachimsthaler - X

1    second-to-the-last page, and just the top five lines.

2            Thanks.

3    BY MR. MARTIN:  (continuing)

4    Q. And as of 2006, adidas had a brand valuation of

5    $4.29 billion?

6    A. Yeah, that's what this says, with a very slight

7    increase from the previous year.

8    Q. And it was the 71st most valuable brand in the world?

9    A. Yes, that's what it is.

10   Q. And you would agree, would you not, that that

11   $4.29 billion was a reasonable estimate of the value of

12   the adidas brand as of 2006?

13   A. Yeah, that's -- yes.

14   Q. And, in fact, from 2006 to 2007, the value of the

15   brand has gone up 11 percent, hasn't it?

16   A. Yes, thanks to good marketing of the company and the

17   growth in the industry.

18   Q. And from 2000 -- in 2000, Interbrand valued the

19   adidas brand at $3.79 billion, right?

20   A. 3.7?

21   Q. Yes, $3.79 billion, correct?

22   A. What year is that?

23   Q. 2000.

24   A. In the year 2000, yeah, I don't have that evidence

25   right here.

Exhibit 1 - Page 29 of 262

Joachimsthaler - X

1  Q. And you would agree, would you not, that the

2  $3.79 billion was a reasonable estimate of the value of

3  the brand back in 2000?

4  A. Again, I don't have that evidence here, but if you

5  say so.

6  Q. And that would show an increase in the value of the

7  brand of about $500 million from 2000 to 2006?

8  A. Yes, that would be.  It would be much bigger for

9  Nike.  It would be much bigger.

10  Q. Now, were you here for Mr. Brewster's opening?

11  A. Excuse me?

12  Q. Were you here for for Mr. Brewster's opening

13  statement?

14  A. No, I was not.  I'm sorry.

15  Q. And if Mr. Brewster testified that the pertinent

16  period -- or if Mr. Brewster stated that the pertinent

17  period for purposes of this lawsuit, for Payless sales of

18  its shoes, was 2000 to 2006, and that during that period

19  Payless sold $300 million worth of striped shoes --

20  A. How many?  How many?

21  Q. $300 million worth of striped shoes.  Are you aware

22  of that?

23  A. I read this in the original Complaint, but I don't

24  know the exact numbers.

25  Q. Okay.  And so during the same period that the value

Exhibit 1 - Page 30 of 262

553

Joachimsthaler - X

1    period of time, in one country.  That just doesn't make

2    sense.

3    Q. It's just not that big of a deal, then?

4    A. Excuse me?

5    Q. It's not just that big of a deal, then, in the

6    overall scheme of thing?

7    A. Oh, for a brand, the actions of Payless is a very big

8    deal.

9    Q. It's a very big deal, but it's not reflected in the

10   big number?

11   A. Yeah.  Are you listening?  120 countries, a global

12   brand value, 100 top brands, versus one country, one

13   distribution channel, just the proportions are just

14   totally off the mark here.

15   Q. Well, is it a big deal or isn't it?

16   A. It is a very big deal.  If you were to give me the

17   U.S. numbers and the performance of adidas in retail, in

18   retail, not overall, in retail, in the United States,

19   perhaps even by a particular segment of consumers, then

20   you probably have a chance of looking at some of these

21   numbers.

22   Q. Have you reviewed those numbers --

23   A. No.

24   Q. -- in coming up with your conclusions in this case?

25   A. No.

Exhibit 1 - Page 31 of 262

Joachimsthaler - X

1   Q. Why didn't you review those?

2   A. Because those numbers do not really exist.

3   Q. You can't determine the retail sales in the United

4   States for adidas?

5   A. Of course you can.

6   Q. Okay.  So we can't rely upon the big numbers, the

7   Interbrand studies, the Icons, the others, the big

8   studies, to try to evaluate whether this brand erosion in

9   equity that you referred to earlier has occurred?  Is

10  that your testimony?

11  A. You can rely on the extensive quantitative research.

12  I mentioned to you six studies alone, seven or more

13  studies that you can rely on, because these are quality

14  studies done --

15  Q. We're not talking --

16  A. No.  Excuse me.

17  Q. Perhaps I --

18        THE COURT:  All right.  Stop.  Let's start over.

19        You ask a question.

20        You go ahead and answer it.

21        You let him answer it.

22        THE WITNESS:  Thank you.

23        -- in the specific context of Payless four-stripe

24  shoes, as I relied on.  But it's very difficult to make a

25  projection from -- from that to a larger global study and

Exhibit 1 - Page 32 of 262

Joachimsthaler - X

1    a general study done by Interbrand.  It's just

2    impossible.

3    BY MR. MARTIN:  (continuing)

4    Q. And you haven't, yourself, done any kind of analysis

5    to determine any kind of quantitative analysis or

6    qualitative analysis, to determine if adidas has lost its

7    ability to set any kind of premium price points for its

8    shoes, have you?

9    A. That was a long question.

10   Q. Okay.  You haven't done any kind of independent

11   analysis to determine if adidas has lost any type of

12   ability to set premium price points for --

13   A. Premium price points?

14   Q. Yes, sir.

15   A. No.  And as I said in my testimony, the four areas of

16   damage that I have evaluated and I have testified just

17   earlier wasn't just about the price points.  So why do

18   you ask me to -- to have -- if I have done a study in

19   that?

20   Q. I believe that one of your -- isn't one of the

21   measures of perceived quality of a brand equity the

22   ability to set premium price points for your products?

23   A. Yes.  But there are so many factors that influence

24   the price point.  It's just one of many factors.

25   Q. And you haven't done any type of analysis to

Exhibit 1 - Page 33 of 262

556

Joachimsthaler - X

1    determine whether adidas has lost that ability, have you?

2    A. Lost the ability of setting a premium price?

3    Q. Yes, sir.

4    A. No.

5    Q. And you're not aware of any lost repeat sales that

6    adidas has suffered?

7    A. No.

8    Q. You're not aware of any decrease in brand loyalty --

9    any decrease in brand loyalty that adidas has suffered?

10   A. Again, I wouldn't rely on some particular

11   information.  Again, I relied on the research

12   that -- that consumers are confused who see four stripes,

13   3,000 consumers, several studies, between the period of

14   2002 and 2005.

15          I don't want to rely on just one particular

16   evidence.  I try, as an expert, I try to bring as much as

17   possible, a lot of research to bear with consumers, from

18   quality research studies.

19   Q. Okay.  And the only thing you relied upon, then, in

20   this case to form your opinions regarding dilution,

21   erosion, damage, were the Ford studies; is that correct?

22   A. No, no.  As -- if you'll recall, at the beginning of

23   our testimony --

24   Q. Maybe I can short-circuit this by reframing my

25   question.

Exhibit 1 - Page 34 of 262

Joachimsthaler - X

```
 1   A. Okay.

 2   Q. You relied on the likelihood of confusion studies --

 3   A. Studies.

 4   Q. -- exclusively, correct?

 5   A. Yes.

 6   Q. And those were studies that you did not perform?

 7   A. No.

 8   Q. And you're not -- what is a member of the brand

 9   community?

10   A. A member of the brand community?

11   Q. Yeah.  I've heard you use that term before, member of

12   the brand community.  What is that?

13   A. Oh, I've been in the business of studying brands and

14   writing about it, helping clients, building strong

15   brands, for the last -- since 1988 or something like

16   that, so almost 20 years now.  And there is a community

17   of academics, practitioners, and researchers and people

18   who -- who work in that field for -- in my profession,

19   for a long time.  And that's loosely a way of saying I'm

20   part of that.

21   Q. Maybe my question -- I think we're getting confused

22   here.  Maybe I wasn't very clear.

23       Members of the brand community for adidas, those

24   would be people that would purchase adidas products or

25   potentially purchase adidas products?
```

Exhibit 1 - Page 35 of 262

Joachimsthaler - X

1   A. Sorry.  That's another community.

2   Q. Is that a brand community?

3   A. Yeah.  Today the technical term is brand community.

4   That's right.  There is a Harley community, aficionados

5   of Harley-Davidson.  There is an adidas community.  And

6   these are people -- this is not necessarily a community

7   that live in the same place, but these are people that

8   share in the same values, adidas values:  the Olympic

9   spirit, competition, athleticism, quality, innovation,

10  athletic shoe wear, athletic apparel wear.  It's a global

11  community of people.

12  Q. And you're not aware that adidas has lost any number

13  of this brand community as a result of the sale of

14  Payless shoes, are you?

15  A. No.  That would be impossible, really, to -- to --

16  Q. You're not aware of any instance where somebody was

17  walking down the street and they see a Payless two- or

18  four-striped shoe and think it's an adidas shoe, are you?

19  A. No, of course not.  I don't know what the question

20  is.  I would never rely, as an expert, on some occasional

21  person walking down the street.

22  Q. Go ahead.

23  A. Sorry.  I don't know.  I mean, I'm trying to be

24  as -- I try to work as hard as I can to really use facts

25  and research in order to approach my -- my work here.

Exhibit 1 - Page 36 of 262

Joachimsthaler - ReD

 1    And I would not just rely on some anecdotal information

 2    that I learned off the street somewhere.

 3    Q. And you're not aware of any instance where somebody

 4    went into a Payless store because they saw a -- to buy a

 5    striped shoe because they saw an adidas three-striped

 6    shoe out on the street?

 7    A. Of course not.  You mention --

 8    Q. And you're not aware of any instance where somebody

 9    saw a two- or four-striped Payless shoe, either in a

10    store or an advertisement, and associated that shoe with

11    an adidas shoe, are you?

12    A. No, of course not.  You know, you look at the

13    research, Counselor.

14    Q. Okay.  No further questions, Dr. Joachimsthaler.

15            THE COURT:  Redirect?

16            MR. BREWSTER:  Yes, Your Honor, just a few

17    things.

18

19                    REDIRECT EXAMINATION

20    BY MR. BREWSTER:

21    Q. Dr. Joachimsthaler, you had been asked by Payless

22    counsel about how much your company had been paid for the

23    work that you and others have done in this case.  Did you

24    have a chance at the break to call back to the office and

25    get that information?

Exhibit 1 - Page 37 of 262

Klein - D

1  Q. Let's do the same kind of thing.  Let's pull up the

2  first shoe there, just so we have one example to talk

3  about, 13390.

4      Again, as a designer, knowing what you know about

5  the Country Ripple, what is your reaction to the shoe in

6  Exhibit 979?

7  A. As a designer?  It's pretty easy to design it,

8  because you just knock off the adidas Country ripple.  I

9  mean, it's direct, everything from the toe overlay to the

10 way the outsole wraps up on the toe, adding an additional

11 stripe to it, but using the same exact silhouette and

12 outsole execution, overlay, everything.  It's the Country

13 Ripple with four stripes.

14 Q. All right.  Let's take a look at Exhibit 504.  It's

15 not the greatest picture.  I think I've got one here.

16     Can you tell us what that is?

17 A. That's the Samoa.

18 Q. Tell us a little about the Samoa.

19 A. In the eighties, it was a training shoe that we made

20 that became extremely popular.

21 Q. Has it been around since then?

22 A. Yeah, continually since the eighties.

23 Q. In terms of our channels, where is adidas selling

24 this shoe?

25 A. The exact same thing.  Like we do, you know, high-end

Exhibit 1 - Page 38 of 262

Klein - D

1  Same question again:  As a designer, what is your

2  reaction in terms of the similarity of this shoe to the

3  adidas Tuscany?

4  A. It's pretty much knocked it off exactly the same.

5  They went and used the wrap on the outsole.  And instead

6  of where we partnered up with Goodyear, they put the

7  Champion logo.  They added an additional stripe.  They

8  used the deco stitching on there.

9       You changed it on my screen.  Can we pull that

10  one up again?

11       But, I mean, the same heel tabs, same shape of

12  the shoe, same heel execution I was telling you about,

13  the driving thing, they knocked it off pretty much one

14  for one.

15  Q. Having gone through some of the shoes that are at

16  issue in the case, as the head of design for Originals,

17  how does what Payless is doing, if at all, affect what

18  you're trying to do in the Originals division?

19  A. Well, I mean, honestly it just makes it tough, when

20  we're going through and trying to, you know, carve out

21  our position in the market, and then you have a company

22  that's pretty synonymous for lower price point footwear

23  having the same exact models, just adding a stripe or

24  removing a stripe, kind of like makes it difficult to,

25  you know -- to do what we're trying to do.

Exhibit 1 - Page 39 of 262

Klein - D

1        If we have a shoe that like sells for, like, at

2    times upwards of $100, especially on that Superstar

3    execution, you know, of our vintage, the one that we

4    protect, and they're -- you know, they have like a pretty

5    low price point, at least compared to where we would come

6    in at, you know, what's going to make someone, you know,

7    want to go in and have that $85 shoe if they see someone

8    or if you walk by a Payless store and you see the same

9    shoe in there for like, you know, drastically cheaper,

10   not even on sale?

11       You know, it just makes it difficult.  I mean,

12   you can't -- because it takes a lot of work to go through

13   and e,ither find the trend, come up with the idea, you

14   know, to be the first one to the market with something.

15   And then if someone just comes through behind you, makes

16   it like as cheap as possible and, you know, doing exactly

17   what we've put all the hard work into, it's -- you know,

18   it's kind of defeating, you know.

19       MR. HENN:  Thank you, Your Honor.  I'll pass the

20   witness.

21       THE COURT:  All right.  We'll be in recess, then,

22   for our lunch recess.

23       We do have a matter, I think, at 1:00 today, so

24   we'll start up at 1:30, if you'd be back shortly before

25   that.

Exhibit 1 - Page 40 of 262

Page 613

1 infringement --

2 A.  Yes.

3 Q.  -- on the shoes that adidas contends infringe the Superstar

4 trade dress?

5 A.  Yes.

6 Q.  Do you know what that Superstar trade dress is, as the lead

7 designer in America for the Originals division, in which this

8 shoe falls?

9 A.  I believe so.

10 Q.  Okay.  What are the four elements of that trade dress?

11 A.  Three stripes, shell toe, the heel tab.  That's the four.

12 And the price tag -- I mean, whatever --

13        We don't use trade dress.  So, I mean, if you want me

14 to identify what you would identify as Superstar, it would be

15 three stripes, the heel tab, the shell toe, the silhouette, and

16 the cup sole.

17 Q.  Okay.  Thank you.

18        Let me put up a picture of the Campus.

19        Now, the similarities you pointed out between the

20 Campus shoe and the Payless shoe, that you're not happy with,

21 were they're both made of suede.  Correct?

22 A.  Correct.

23 Q.  And, again, adidas doesn't have a trademark or a monopoly

24 on the use of suede on sneakers, does it?

25 A.  No.

Exhibit 1 - Page 41 of 262

1 Q.  Okay.  And the stripes, which we've already talked about.

2 A.  That they --

3 Q.  That adidas has three, and the Payless shoes have a

4 different number of stripes?

5 A.  Correct.

6 Q.  And you also mentioned the cup sole.  That's this area here

7 (indicating)?

8 A.  Correct.

9 Q.  And adidas doesn't have a trademark on that either, does

10 it?

11 A.  The cup sole, no.

12 Q.  And so the only part of this shoe that adidas has a

13 trademark on is just that?  Correct?

14 A.  Correct.

15 Q.  That's the only part of this shoe that adidas contends

16 Payless is not allowed to make.  Right?

17 A.  In regards to the Campus, that I'm aware of, yes.

18 Q.  I'm going to try to do these in roughly in the same order.

19 I may fail at that, and I apologize for that.

20        Let's take a look at -- this is the Country Ripple?

21 A.  Correct.

22 Q.  Now, this is -- again, this is one of adidas' Iconic brands

23 or Iconic shoes?  I think you described it as that?

24 A.  Yes.

25 Q.  And once again, you pointed out what you believe are some

Exhibit 1 - Page 42 of 262

1 similarities between this shoe and some of the Payless shoes?

2 A.  Yes.

3 Q.  Okay.  One of them was the toe over lam.  Is that this

4 section here?

5 A.  Yes, the toe overlay.

6 Q.  Once again, adidas doesn't have a trademark on that;

7 doesn't have any right to keep other people from using that

8 design, does it?

9 A.  No.

10 Q.  In fact that toe design is used on shoes all the time?

11 Sometimes sneakers, sometimes dress shoes?  It's a very common

12 toe design, isn't it?

13 A.  Yes.

14 Q.  And adidas doesn't even own that design?

15 A.  No.

16 Q.  Okay.  The other -- one of the other features you talked

17 about that you think -- well, strike that.

18        One of the other design elements in this shoe that you

19 said you believed Payless intentionally copied was the outsole

20 wrap.

21        That's this area here, again?

22 A.  Yeah, that was one of them.

23 Q.  All right.  And, again, that's not a design that adidas has

24 trademarked?

25 A.  No.

Exhibit 1 - Page 43 of 262

Page 616

1 Q.  It's not a design that adidas owns?

2 A.  No.

3 Q.  And it's not a design that adidas has any right to keep

4 other people from using, is it?

5 A.  I don't believe we do.

6 Q.  Okay.  Same thing with this heel mustache, once again?

7 A.  Yep.

8 Q.  That's not a design that adidas owns?

9 A.  No.

10 Q.  It's not a design adidas has trademarked?

11 A.  No.

12 Q.  And it's not a design that adidas has any right to keep

13 other shoe manufacturers from using, is it?

14         MR. HENN:  Objection, your Honor, to the questions

15 about adidas's rights.  This witness isn't a lawyer.  That's

16 calling for a legal conclusion.

17         THE COURT:  Overruled.

18 BY MR. ROCHE:

19 Q.  Do you want me to restate it?

20 A.  No.  Yeah, it's --

21 Q.  Adidas doesn't have any right to keep other shoe

22 manufacturers from using that heel design, does it?

23 A.  No.  No.

24 Q.  And adidas doesn't have -- one of the other things you

25 mentioned on this shoe is the silhouette.  It's a low-profile

Exhibit 1 - Page 44 of 262

Page 617

1 silhouette, I think you said.

2 A.  Um-hmm.

3 Q.  Adidas hasn't trademarked the low-profile silhouette

4 depicted here, has it?

5 A.  No.  This isn't really low-profile.  But, no.

6 Q.  And adidas doesn't have any right to keep other shoe

7 manufacturers from making shoes with that silhouette, does it?

8 A.  No.

9       My -- my point was -- is when you use all of those,

10 add them all up, and look at the stripes on the side of the

11 shoe, it looks exactly like it.

12 Q.  I think the next one you talked about was the Samoa.

13 That's this shoe.  Correct?

14 A.  Yep.

15 Q.  Now, one of the things that you said you thought Payless

16 intentionally copied was this toe bumper.  That's this black

17 section, here?

18 A.  I thought they intentionally copied the entire shoe.

19 Q.  Okay.  But one of the things you think adidas -- Payless

20 intentionally copied is that toe bumper.  Right?

21 A.  Correct.

22 Q.  And adidas hasn't trademarked that?

23 A.  No.

24 Q.  Adidas doesn't own that design?

25 A.  No.

Exhibit 1 - Page 45 of 262

Page 618

1 Q.  Adidas doesn't have any right to keep other shoe

2 manufacturers from using exactly that design, does it?

3 A.  No.

4 Q.  You also mentioned that you think Payless intentionally

5 copied this serrated eye stay.  That's this section, here?

6 A.  Correct.

7 Q.  Right?

8 A.  Correct.

9 Q.  Adidas doesn't own that design feature, does it?

10 A.  No.

11 Q.  Adidas doesn't have a trademark on that design feature?

12 A.  No.

13 Q.  And adidas doesn't have any right to keep other people from

14 using that design, does it?

15 A.  No.

16       The problem is when they use all of those together,

17 the look resembles exactly what you're seeing here.

18 Q.  And with respect to the sole, this whole section here -- I

19 don't think I need to draw it in -- again, that's not something

20 that adidas has a trademark on?

21 A.  Nope.

22 Q.  Adidas doesn't own that design feature?

23 A.  Nope.

24 Q.  And it doesn't have the right to keep other shoe

25 manufacturers from using that design, does it?

Exhibit 1 - Page 46 of 262

1 A.  The technique, no.

2 Q.  And, again, the overall silhouette, I think, is something

3 you mentioned.

4         Adidas doesn't have any right to keep other shoe

5 manufacturers from using that silhouette, does it?

6 A.  I don't know.  No.

7 Q.  Can probably guess where I'm going next.  This is the

8 Prajna.

9 A.  Yes.

10 Q.  Adidas doesn't sell that shoe any longer, does it?

11 A.  I'm not sure.

12 Q.  Now, one of the things that you were upset about when you

13 saw the Payless shoes was you felt that they copied this

14 stitching pattern, here?

15 A.  Again, I thought they copied the entire shoe.

16 Q.  But one of the things you were upset about was your belief

17 that Payless intentionally copied this stitching pattern.

18 Right?

19 A.  Yes.

20 Q.  Adidas doesn't have a trademark on that stitching pattern?

21 A.  No.

22 Q.  Adidas doesn't own that stitching pattern, does it?

23 A.  Nope.

24 Q.  And adidas doesn't have any right to keep other shoe

25 manufacturers from using that stitching pattern, does it?

Exhibit 1 - Page 47 of 262

Page 620

1 A.  Not that I'm aware of.

2 Q.  You talked also about the lacing pattern, here.

3 A.  Correct.

4 Q.  You thought the lacing pattern on the Payless shoe was

5 similar to the lacing pattern on the Prajna?

6 A.  Very similar.

7 Q.  Adidas doesn't have a trademark on that either?

8 A.  No.

9 Q.  It doesn't have any right to exclude other shoe

10 manufacturers from using that lacing system?

11 A.  Not that I'm aware of.

12 Q.  That's the Mei (indicating)?

13 A.  Yes.

14 Q.  And you talked about the tongue fold.  That's this piece

15 here, is it not?

16 A.  Yeah.

17 Q.  That's a feature or a design element of the Mei?  Or am I

18 saying it wrong?  Is it "May"?

19 A.  "My," "may."

20 Q.  That feature of the Mei is not something that adidas has

21 trademarked?

22 A.  I am not sure this is a Performance shoe in the Originals.

23 Q.  Oh, this isn't a shoe that's part of your group?

24 A.  No.

25 Q.  Okay.  Do you know whether or not any feature of the Mei

Exhibit 1 - Page 48 of 262

Page 621

1 has been trademarked?

2 A.  I don't know.

3 Q.  We'll save that one for somebody else, then.

4       Is this part of your group?

5 A.  Yes, it is.

6 Q.  Now, the similarities that you pointed out in this shoe

7 involved the wrap-on outsole.  Is that this area here?

8 A.  Yeah.  Although we were looking at a different shoe.  But

9 this is the evolution of that shoe.

10 Q.  Okay.  But that's one of the similarities that you took

11 offense to.  Right?

12 A.  Yeah.

13 Q.  Okay.  Adidas hasn't got that trademarked?

14 A.  Not that I'm aware of.

15 Q.  Adidas doesn't have any right to exclude other shoe

16 manufacturers from using exactly that feature, does it?

17 A.  No.

18 Q.  The heel tab is this area over here?

19 A.  Correct.

20 Q.  Again, adidas didn't trademark that?

21 A.  Not that I'm aware of.

22 Q.  Adidas doesn't own that design element?

23 A.  Not that I'm aware of.

24 Q.  And adidas doesn't have any right to exclude other shoe

25 manufacturers from using that design feature, does it?

Exhibit 1 - Page 49 of 262

1 A.  Not that I'm aware of.

2 Q.  Do you have any understanding of how many of those shoes

3 Payless has sold?

4 A.  A lot.  I don't know exactly, no.

5 Q.  You know it's in the millions, though.  Correct?

6 A.  No.

7 Q.  Just a lot?

8 A.  Lots.  I'm not specific.

9 Q.  You don't know of a single person who bought any of those

10 shoes thinking they were going to get an adidas shoe, do you?

11 A.  No.

12 Q.  You don't know of anybody who was confused by those shoes,

13 into believing they were made by adidas?

14 A.  I couldn't say.  I couldn't answer that question.

15 Q.  You don't know of anyone personally, do you?

16 A.  I don't, no.

17 Q.  You don't know of a single person who saw any of those

18 shoes on the street and mistakenly thought they were adidas

19 shoes, do you?

20 A.  I've had -- I know a lot of people who have been mistaken

21 by four-stripe Superstars and thought they were Superstars.

22 Q.  None of them are going to come in here and testify and say

23 that's what happened.  Are they?

24 A.  I don't know.

25 Q.  And you don't know of a single person who decided not to

Exhibit 1 - Page 50 of 262

Page 650

1 this product.

2 Q.  Let's pull up Exhibit 777.  And ask if you have seen this

3 Payless shoe.

4 A.  I have.

5 Q.  And based on your experience, what's your reaction to that

6 shoe?

7 A.  I know how much we put into our product on the right [sic].

8 It was very distinctive, in terms of all other running shoes at

9 that time.  And for us, as I said, to have that level of

10 innovation, to be ahead of the rest of our competition is very

11 important to us.

12        There were some very, very distinct features on our

13 shoe.  If you look at -- actually our shoe's a little dark.

14 But if you look carefully, the material the shoe is composed

15 of -- both in the forefoot and in the heel -- is a very open

16 mesh.  It's long oval shapes.  That's not usual in a running --

17 in a mesh running shoe.

18        You would generally find that we use tighter knit

19 meshes for strength, as the foot is moving.

20        We put a lot of work into the mesh, here, so it was

21 two layers of mesh.

22        So the strength came from an underlayer.  And over the

23 top, there were these very open pieces.

24 Q.  Mr. Pierpoint, they can't see what you're pointing onto on

25 the screen.

Exhibit 1 - Page 51 of 262

Page 651

1          MR. BREWSTER:  Do you mind, your Honor, if I hand up

2 the shoe?

3          THE WITNESS:  Of course.  Thank you.  (Handed shoe.)

4          So very, very open pieces.  And this was unusual at

5 the time, as I said.

6          And if you look both in the Payless picture and in the

7 Payless shoe itself, you can see that the shape is copied

8 directly.  Not only the shape, but its uniformity of which it

9 appears, the pattern and during which it appears.

10          That was very unique, at the time, for -- for any

11 running shoe.  And so the -- just the general material is

12 directly copied.

13          And if I carry on, obviously, we have the stripes,

14 again, in a very similar location.

15          Our -- the centerpiece of our shoe, here -- if you

16 look on the photo on the left, the centerpiece of the shoe is

17 kind of -- has a shine to it.  That's because it was -- it was

18 a plastic element.  And each of those were constructed as

19 ventilation chambers.  So the shape of the plastic elements

20 would draw air into the shoe and pass it around the foot to

21 keep the foot cool.

22          So this was a very unique piece.  And the stripes,

23 then, being in the center of that.

24          The fact that that piece is directly copied here -- so

25 the stripes in the same way -- our piece was engineered to

Exhibit 1 - Page 52 of 262

1 conduct airflow.  But this is a mimic of the copy, to just look

2 the same.  But that same piece there, which is material here,

3 in the same proportions, the same look on the shoe.

4        I could go on to talk about the very specific of the

5 toe guard here.  If you look at the adidas product, the

6 plastic-shaped piece of the toe -- what we call the toe

7 guard -- is copied directly.  And even looking at the -- the

8 tab on the heel, every design feature on this shoe is -- is

9 exactly the same as the design features we did.  And we worked

10 very hard on this shoe to make it unique and look very

11 different, on -- on a wall of running shoes, from our

12 competitive brands.  Even to the very point that -- you can see

13 very clearly on the -- on the shoe on the left, the logo on the

14 tongue is oval in shape.

15        That's not usual, even for our brand.  That was

16 something that we tried to make this very distinctive, and it

17 carried the name of the technology in the shoe, Clima Cool,

18 which was part of our marketing campaign.

19        And, again, you can see the exact dimensions of the

20 oval shape were used on this product to make it look the same.

21        The only -- I could go on.  I mean, the profile of the

22 midsole is the same, if you look at the angle of the shoe.

23 But, obviously, a lot went into the creation of our shoe.  A

24 lot of prototyping, engineering.  And then for it to just be

25 blatantly copied, as this (indicating).

Exhibit 1 - Page 53 of 262

1          It's important that -- for us, that as a consumer

2 takes part in a purchase, that it doesn't end there.  Their

3 experience with that product is very important to us, so that

4 it breeds loyalty; so that they will come back to our brand

5 again.

6          So when we go through so much effort and so many teams

7 get involved in -- in a creation of a product from start to

8 when it ends up on a shoe shelf in front of your eyes; and all

9 of the efforts that we go through and then the marketing that

10 we put behind it in showing the consumers that message; working

11 with athletes so they'll be proud to choose our brand and wear

12 it on the field of play, when they play their sport -- there's

13 so much that goes into it from us.  And then for somebody to

14 just come along behind and copy, just mimic a -- at a very

15 superficial level everything that we've put into a product just

16 destroys it, everything that we try and do and how we try and

17 sustain our brand credibility.

18          For consumers, then, who have taken part and have

19 purchased our product, and then to be surrounded or to see

20 products like this (indicating) -- I mean, I have to wonder

21 what it makes them feel as they see, then, products that

22 surround them and then maybe mass produced, so that they --

23 excuse me -- that they really flood the market and are all

24 around them.  It -- it destroys everything that we try and do.

25 And so many of the people that I work with try and do -- that

Exhibit 1 - Page 54 of 262

Page 867

1 settlement agreement with them.

2 Q. And that agreement deals with two and four stripes,

3 correct?

4 A. Yes, it does.

5 Q. Do you see any Krystal K shoes on this demonstrative?

6 A. No, I do not.

7 Q. Have you ever seen any Krystal K shoes in the

8 marketplace or in your enforcement files?

9 A. I haven't seen Krystal K anything, let alone shoes.

10 Q. Do you see any Suave shoes on this chart?

11 A. No, I do not.

12 Q. Have you ever encountered any Suave shoes in the

13 marketplace?

14 A. I have not.

15 Q. Let's talk about Payless, now that we've talked about

16 everyone else.

17        When you first joined adidas, this case was

18 pending, right?

19 A. Yes, that's correct.

20 Q. And what -- what happened in the case after you

21 arrived?

22 A. When I joined in 2004, the case was, again, in

23 legalese, stayed, which I think Mr. Heilbronner spoke

24 about yesterday, where the case was sort of on hold, not

25 proceeding through the judicial system while there was an

Exhibit 1 - Page 55 of 262

1 appeal that was pending.

2 Q. And after the appeal was over, what happened next?

3 A. The case was then what's called remanded back to this

4 court, which means essentially reinstated and started up

5 again.  So once the appeal issue was resolved, the case

6 got moving again.

7        And at that point we -- at the time that I joined

8 and while the case was stayed, the shoes that were at

9 issue were the Superstar imitation, the Mei, and the

10 Prajna imitations.  When the case was reinstated, we then

11 requested from Payless to see their other two- and

12 four-striped shoes, any documentation and samples that

13 they had; and additional shoes were added to the case.

14 Q. Let's take a look at Exhibit 548, have you identify

15 this for us.

16        MR. HENN:  And, Antonio, if you'll just flip

17 through while Ms. Backman identifies this exhibit for us.

18 BY MR. HENN:  (continuing)

19 Q. Just the exhibit.  You don't have to talk about

20 individual shoes.

21 A. Okay.  You'll see at the bottom, it's titled "Accused

22 Footwear."  So it's the footwear that we have accused of

23 infringement in this case.

24 Q. And then while he's flipping through, I'm not going

25 to show you each individual picture, but is it your

Exhibit 1 - Page 56 of 262

Page 882

1 Q. Do you know that for sure?

2 A. Again, I believe that there are additional receipts.

3 Q. That isn't what I asked you.  Do you know for sure?

4 A. That is my recollection, yes.

5 Q. And how many?

6 A. I don't recall off the top of my head.

7        MR. HENN:  Your Honor, I object.  It's a

8 multi-page exhibit.  She's only being shown the first

9 page.

10       THE COURT:  Yes.  I'll sustain the objection.

11       We're going to take our recess at this point.

12 We'll be in recess until 1:15 today.  I want to start up

13 at 1:15, so be back here at about 10 after 1:00.

14       (The jury leaves the courtroom.)

15       THE COURT:  If there is any issue about

16 production of documents, talk about it over the lunch

17 hour.

18       MR. LORENZO:  Your Honor, I do have a matter,

19 since the jury is out of the courtroom.

20       I believe that on direct, the questions and

21 answers opened the door to an inquiry about the appeal

22 and what happened on appeal.  The jury now knows that the

23 case was stayed because an appeal happened.  I noticed

24 Mr. Heilbronner was very careful not to do that.

25       THE COURT:  Well, I thought your side got rather

Exhibit 1 - Page 57 of 262

1 close to things.  And I'm going to tell both of you that

2 you may submit a proposed instruction on the issue of the

3 1994 settlement agreement and the effect of that

4 agreement.  I want to have a proposed instruction from

5 both of you.  I think the jury needs to know that the

6 1994 settlement agreement does not prohibit adidas from

7 asserting the claims in this case.  And you've stipulated

8 to that as a fact.

9          Payless can argue the agreement as it affects its

10 intent.  So I think the jury needs to know that the

11 settlement agreement evidence relates solely to intent

12 and is not a bar.  So submit your proposed instruction on

13 that.

14          I didn't hear anything that made me think that we

15 got into the Ninth Circuit opinion in any way.  What are

16 you talking about?

17          MR. LORENZO:  Well, my ears perked up.  And

18 you've got the realtime; I don't.  I could be

19 mistaken -- I don't think I am -- that in describing the

20 procedural history and what Ms. Backman did when she got

21 to adidas --

22          THE COURT:  I heard nothing at all about the

23 Ninth Circuit opinion.

24          MR. LORENZO:  Well, she didn't use the words

25 "Ninth Circuit," but she said the case was up on appeal,

Exhibit 1 - Page 58 of 262

Page 884

1 which would cause the jury to think, who appealed?  What

2 happened?  Why?

3          THE COURT:  Well, it might cause them to think.

4 Do you want an instruction on that?

5          MR. LORENZO:  No.  I'd like to inquire on cross.

6          THE COURT:  Are you making a motion?

7          MR. LORENZO:  I'm just asking, may I inquire on

8 cross?

9          THE COURT:  Well, everybody needs to be careful.

10          No, you may not inquire about the appeal on

11 cross.  We have a motion in limine on that subject.

12          Okay.  We'll see you at 1:15.

13          THE CLERK:  Court is in recess.

14          (A lunch recess is then taken.)

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1 - Page 59 of 262

1 Q. And what it had to say about two- and four-stripe shoes

2 was -- specifically what it had to say was no two or four

3 double-serrated stripes with contrasting colors. Isn't that

4 correct? Do you want me to pull that up and have it to --

5 A. I have the agreement here. If you just want to tell me

6 what paragraph.

7 Q. Yeah. If you want to look at the bottom of page 3, top of

8 page 4.

9 A. 2 and 3, maybe?

10 Q. Yes. The bottom of -- I misspoke. The bottom of paragraph

11 3, which is at the bottom of the first page and on to the top

12 of the second page.

13 A. So Payless agrees that it will not order or sell athletic

14 shoes bearing two or four parallel double-serrated stripes.

15 Q. That's what it provides for, doesn't it?

16 A. That is that portion of that sentence of the agreement,

17 yes.

18 Q. We've looked earlier at Exhibit 2510, the third amended

19 complaint filed about 20 months ago, and it doesn't contain a

20 claim that adidas breached -- or that Payless breached the '94

21 agreement, does it?

22 A. No, it does not.

23 Q. You were asked by Mr. Henn about the K-Swiss agreements.

24 Do you recall?

25 A. I do, yes.

Exhibit 1 - Page 60 of 262

1025

Ford - D

1    with the survey.

2    Q. Dr. Ford, would you start by telling the jury what

3    you were asked to do generally in this matter.

4    A. Sure.

5        I was asked to design and conduct a survey to

6    measure the likelihood of confusion, likelihood of

7    post-sale confusion, if any, with respect to the

8    Payless -- one of the Payless shoes that is alleged to

9    incorporate the trade dress of the Superstar, as well as

10   the adidas three-stripe mark.

11   Q. Let me get us to pull up Exhibit 561-A and have you

12   identify that for us.

13   A. Sure.

14       That's the adidas Superstar, bearing its trade

15   dress components:  the shell toe, the predominantly flat

16   sole, three parallel stripes, and a heel patch sometimes

17   called a mustache.

18   Q. And, Dr. Ford, did you test all of the Payless shoes

19   that allegedly incorporate this Superstar trade dress?

20   A. No, sir.  By the time this case fully materialized, I

21   think there were 54 shoes that were accused of

22   incorporating the Superstar trade dress.  So one Payless

23   shoe that incorporated flat sole, shell toe, and parallel

24   stripes was tested.

25   Q. And can you identify Exhibit 561-B, please?

Exhibit 1 - Page 61 of 262

Ford - D

1   A. That was the shoe that was tested.

2   Q. We'll pull up Exhibit 588 and have you identify that

3   for the jury, please.

4   A. That's a composite of all 54 of the Payless shoes

5   that are alleged to infringe the Superstar trade dress.

6   Q. Dr. Ford, you said you were asked to design and

7   conduct a survey to address the issue of likelihood of

8   post-sale confusion.  What did you mean by post-sale

9   confusion?

10  A. Post-sale confusion is confusion that occurs after

11  the point of sale, when someone would encounter, for

12  example, someone wearing a Payless shoe, when traveling

13  on an airplane or standing in line at the bank, and look

14  at that shoe and believe that that shoe either came from

15  or was authorized by adidas.  That would be an example of

16  post-sale confusion.

17  Q. In a post-sale confusion survey, do you need to know

18  anything about who shops at Payless in terms of such

19  things as their age or other demographic information?

20  A. No, because post-sale confusion occurs after the

21  point of sale.  So the actual demographic characteristics

22  of Payless shoppers would not be relevant to that issue.

23       MR. HANSEN:  Objection, Your Honor, legal

24  conclusion.

25       THE COURT:  I'm sorry?

Exhibit 1 - Page 62 of 262

1027

Ford - D

1          MR. HANSEN:  Legal conclusion, Your Honor.

2          THE COURT:  Overruled.

3   BY MR. BREWSTER:  (continuing)

4   Q. Based on your survey experience, Dr. Ford, what other

5   forms of confusion are there?

6   A. Generally there are two other forms of confusion.

7   There is initial interest confusion and point-of-sale

8   confusion.

9   Q. And what is your understanding of initial interest

10  confusion?

11  A. Generally, as I understand it, initial interest

12  confusion represents a situation where a consumer -- this

13  is before the point of sale -- a consumer encounters the

14  alleged infringing product -- in this case, in which a

15  consumer might encounter, for example, a Payless shoe in

16  a Sunday supplement or a flier or while window shopping,

17  and be drawn to that shoe initially, with the belief that

18  that shoe came from or is authorized by adidas, and thus

19  the shoe gets more attention than it would have gotten

20  had that belief not been present.

21  Q. For survey purposes, does initial interest confusion

22  require that the consumer purchases the product?

23  A. No, sir.  It requires that the consumer is initially

24  confused.

25  Q. Your survey was designed to measure post-sale

Exhibit 1 - Page 63 of 262

Ford - D

1  confusion or identify it.  Does your survey offer any

2  data or information on initial interest confusion?

3  A. Well, the survey was designed to measure post-sale

4  confusion or likelihood of post-sale confusion.  I

5  believe the data in the survey is applicable to post-sale

6  confusion, also.

7  Q. And is it applicable to initial interest confusion?

8  A. I'm sorry.  And it's applicable to initial interest

9  confusion.  I misspoke.

10  Q. What is point-of-sale confusion?

11  A. Point-of-sale confusion is confusion that happens,

12  you know, at the moment of sale.  And that's something

13  that was not tested here.

14  Q. If you were going to test point-of-sale confusion,

15  generally, how would you have done it?

16  A. Well, you probably would have gone and screened or

17  searched out for people that -- I guess would report that

18  they were likely to buy shoes at Payless.  You'd have

19  then shown them the Payless shoe, in a manner in which

20  they would see the Payless shoe at purchase or encounter

21  it.  You probably would tell them the price of the shoe,

22  and then you would ask them the same survey questions.

23  Q. Let's go back to post-sale confusion.  Basically, how

24  do you conduct a survey to test post-sale confusion?

25  A. Well, essentially what you'll do is you'll design a

Exhibit 1 - Page 64 of 262

Ford - D

1    of confusion with respect to shoes that have two or four

2    parallel stripes of equal width and equal spacing, angled

3    forward from the sole to the lace area, regardless of the

4    presence or the absence of a shell toe, a flat sole, and

5    parallel stripes.  Excuse me.

6           MR. BREWSTER:  Antonio, if you could pull up

7    Exhibit 587.

8    BY MR. BREWSTER:  (continuing)

9    Q. Specifically, Dr. Ford, could you identify these and

10   tell us what, if anything, you conclude about the adidas

11   three-stripe mark?

12   A. These were intended to be demonstrative of my opinion

13   with respect to the strength of the adidas three-stripe

14   mark.

15          I believe that the data in these surveys strongly

16   support a finding that that three-stripe mark is strong

17   enough to reach forward from three plus one to four

18   stripes, and that mark is clearly strong enough to reach

19   backward, three minus one, to two stripes, limiting again

20   that opinion to parallel stripes of equal spacing and

21   equal width, moving forward from the sole to the lace

22   area.

23   Q. Now, Dr. Ford, I want to take you to some of the

24   other Payless shoes, and here, if you could identify

25   initially an exhibit that we saw at the beginning of your

Exhibit 1 - Page 65 of 262

Ford - D

1    testimony, Exhibit 588, and tell us what this is and how

2    it relates to your opinion.

3    A. These are the 54 Payless shoes that are alleged to

4    infringe the Superstar trade dress.  My opinion, the

5    survey data -- there is empirical survey data to support

6    a finding of likelihood of confusion with respect to

7    these shoes, likelihood of post-sale confusion as well as

8    initial interest confusion.

9    Q. The next exhibit is 589.  Dr. Ford, can you identify

10   this multi-page exhibit and tell us what your opinion is

11   with respect to these shoes?

12   A. Right.  I think there are two pages of shoes

13   that -- two pages of shoes that have two or four parallel

14   stripes.

15        I believe that the surveys conducted in this case

16   would -- or in related cases would provide empirical

17   support or do provide empirical support for a finding of

18   likelihood of post-sale confusion as well as initial

19   interest confusion for these shoes.

20   Q. And Exhibit 589 here, which gets awfully small when

21   there are four screens, those are the Payless four-stripe

22   shoes on which you have expressed an opinion?

23   A. Yes, sir.

24   Q. Exhibit 590, could you identify those shoes and tell

25   us your opinion with respect to them, please?

Exhibit 1 - Page 66 of 262

Ford - D

1  A. Right.  These are two-striped Payless shoes which I

2  believe there is empirical evidence to support a finding

3  of likelihood of post-sale confusion as well as initial

4  interest confusion.

5  Q. Finally, Dr. Ford, of these charts here, Exhibit 591,

6  could you identify that for us and tell us what your

7  opinion is with respect to those?

8  A. Sure.

9       These are examples of shoes that I did not

10  include in my opinion.  I did not find empirical support

11  necessarily for likelihood of confusion for these shoes,

12  so not expressing an opinion, an empirical opinion with

13  respect to these shoes.

14       They're still alleged to infringe.  They're still

15  part of this case.  They're just not part of my testimony

16  with respect to prior surveys.

17  Q. And can you point out, what are the reasons that you

18  did not opine as to the particular shoes in this exhibit?

19  A. The shoes were just a little bit too far away from

20  what I tested to make me feel comfortable saying that

21  there was empirical evidence to support a finding in this

22  particular case on these shoes.

23       Antonio, can you bring up maybe the bottom

24  left-hand corner?  That one, yeah.

25       There's an example.  This is a shoe that I think

Exhibit 1 - Page 67 of 262

Ford - X

1    occurs is by fliers, you testified.

2    A. Or window shopping or otherwise.

3    Q. Now, did you ever take a store like the one on -- I

4    think it's Allard; I don't know the streets -- where you

5    took a photograph of a Payless store from five or seven

6    feet?  You could have done that and run that to see if

7    there was initial sale confusion, if there was a

8    four-stripe shoe in the window, couldn't you?

9    A. You could have done that.

10   Q. But you didn't?

11   A. No.  I still believe the survey data supports a

12   finding of initial interest confusion because of the way

13   it was conducted.

14   Q. Now, your survey does not measure actual confusion,

15   does it?

16   A. I don't think any survey measures actual confusion.

17   Q. And by actual confusion, I mean that the people that

18   you identified in your study didn't actually go into a

19   Payless store and buy a four-striped shoe thinking it was

20   made by adidas, did they?

21   A. No.

22   Q. And your survey -- you, yourself, say that your

23   survey does not establish that; is that correct?

24   A. It does not establish at-sale confusion.  It

25   establishes initial interest and post-sale confusion, or

Exhibit 1 - Page 68 of 262

Ford - X

1   Q. And did you ask anyone in your questions, after

2   question 6, whether they thought the shoes they saw in

3   the photograph were quality or not?

4   A. No.  They were only asked questions with respect to

5   the source or authorization or approval of the shoes.

6   Q. So your survey cannot provide the jury with any

7   evidence that people perceived the shoes they saw in the

8   photograph you gave them as a shoe of lesser quality, can

9   you?

10  A. Excuse me.  No.  The question was not addressed in

11  the survey.

12  Q. Did you ask them in your study, would they be more or

13  less likely to purchase the shoes shown in the photograph

14  since they have seen it?

15  A. No.  You obviously know that.  The questionnaire

16  speaks for itself.  Respondents were asked their state of

17  mind with respect to the source, authorization or

18  approval of the shoe they were shown.

19  Q. So you never asked them whether they were more or

20  less inclined to buy the shoe after they had seen the

21  photograph, did you?

22  A. No.

23  Q. Did adidas ever ask you to run a survey that would

24  identify whether anyone thought less of the three-striped

25  shoes by seeing the photograph that you showed them of

Exhibit 1 - Page 69 of 262

Ford - X

1   the four-striped shoes sold by Payless?

2   A. I was not asked to do that study.

3   Q. Do you know if they ever ran it?

4   A. I don't know.

5   Q. Did you ask in your study, after you asked them

6   questions 5 and 6, whether they would purchase adidas or

7   not in the future, having seen the photograph of the shoe

8   in the study?

9   A. No.  You know that I didn't.

10  Q. And no one asked you to run that, did they?

11  A. No.

12       I don't think that's a relevant question.  The

13  relevant question is whether or not the potential

14  purchaser is likely to be confused or deceived as to the

15  source of those goods.

16  Q. So you did not test whether people had a better or

17  lesser view of adidas after seeing the photograph in your

18  study, did you?

19  A. No.  I only tested for likelihood of confusion as to

20  the source of the shoes.

21  Q. Now, you showed them photographs, correct?

22  A. That's correct.

23       MR. HANSEN:  Your Honor, may I move over to where

24  the shoes are on display?

25       THE COURT:  You may.

Exhibit 1 - Page 70 of 262

1145

1   Q.  Okay.  Do you have an opinion with regard to this shoe?

2   A.  I think that you can see that this shoe bears four parallel

3   stripes.  And it may well be that this shoe, at a distance,

4   where you couldn't read Champion, I think that you would

5   conclude that it's going to create a likelihood of confusion.

6        What I don't have, what I testified that I didn't

7   have, is I didn't have direct empirical evidence on a shoe like

8   this.

9   Q.  All right.

10  A.  But it still bears -- it still bears the four parallel

11  stripes of equal width and equal spacing.  And all of this data

12  would suggest that it is likely this type of shoe would create

13  a likelihood of confusion.  But there's not enough empirical

14  data from what I've done, in exact studies that I've done, for

15  me to testify there's empirical support for that finding.

16  Q.  So my answer -- so the answer to my question is none of

17  your surveys support with empirical evidence a finding of

18  likelihood of confusion of this Payless shoe.  Is that correct?

19  A.  That's correct.  There's no direct empirical evidence on

20  this shoe.

21  Q.  Now, you -- you state that you follow scientific

22  experimental survey designs.

23        What you've done here today, for the first time in

24  your career, is to use data collected on one pair of shoes, put

25  out by an entirely different company, to serve as empirical

Exhibit 1 - Page 71 of 262

1146

1  evidence -- to use your terms -- of confusion of shoes you

2  never tested.  Is that correct?

3  A.  That's correct.  It's not the functional carrier of the

4  mark that is at issue.  It was the mark.  So those shoes didn't

5  have to be tested.

6  Q.  Now, adidas had the wherewithal to test any Payless shoe

7  they wanted to test, didn't they?

8  A.  I suppose within limits, they had the wherewithal to do a

9  lot of things.

10  Q.  And adidas only tested Payless shoes once, six years ago?

11  A.  That's correct.

12  Q.  Right?

13      And they asked you to use the data that you collected

14  on all of these other shoes and all of these other cases, to

15  bring it here today, to tell this jury that all of the shoes

16  you didn't test create a likelihood of confusion.  Correct?

17  A.  Adidas didn't ask me to do that.  That's something I did

18  entirely on my own, because I had the empirical data.  And I

19  believed that empirical data would very clearly -- very clearly

20  supported a finding of likelihood of post-sale confusion for

21  the shoes that I did testify to.

22  Q.  So we're clear Dr. Ford, that you're the one who

23  volunteered to do this?

24  A.  Absolutely.

25      MR. HANSEN:  No further questions.

Exhibit 1 - Page 72 of 262

1225

1    Q.  You didn't, in performing that final quality inspection,

2    look at the shoes on somebody else's feet, did you?

3    A.  No.

4         MR. ROCHE:  Can you pull up the next call out, just

5    for the opening.

6         (Pause, conferring.)

7    BY MR. ROCHE:

8    Q.  Mr. Teston, there is a statement that Mr. Brewster, adidas'

9    lawyer, made during the opening statement in this trial.  And

10   you can see what he said:

11        "...is the context that's important is going to be

12        what do other consumers see out in a post-sale

13        environment."

14        Do you understand that a post-sale environment means a

15   consumer seeing a shoe on somebody else's feet out in public?

16   A.  I'm not really familiar with the term -- the term

17   "post-sale."  I'm sorry.

18   Q.  Well, you didn't look -- perform your final quality

19   inspection in a context in which somebody in the public would

20   see these shoes, did you?  You had them right in your hand?

21   A.  I performed the -- the final inspection the way it would be

22   performed in our factories, in the final inspection rooms.

23   Q.  Not the way I would see a shoe out on the street, if

24   somebody else was wearing them?

25   A.  I -- I cannot say -- I mean, I cannot -- I don't know how

Exhibit 1 - Page 73 of 262

1239

1   wants to do that on redirect, I'm sure he will.

2        But to boil down, your answer to that question was, in

3   that specific shoe, it's a minor defect, and you would B grade

4   it.  Right?

5   A.  Yes.  My answer was it's a minor.

6   Q.  Which means it's good enough for adidas to sell that shoe

7   in the appropriate retail channels without harming the brand.

8   Right?

9   A.  Correct.  But as I said in the deposition, I would -- I

10  would indeed look at the rest of the shipment, because it's

11  indicating a -- a serious manufacturing malfunction, and we

12  would look at it further.

13  Q.  And like all of these pictures that we've talked about, you

14  don't know whether a consumer looking at a shoe on somebody

15  else's foot would even notice it, do you?

16  A.  No, I don't know.

17  Q.  And that's true of all of these pictures, isn't it?

18  A.  Correct.  Again, I'm not qualified to assess that.

19  Q.  Now, during your direct exam, when Mr. Henn was asking you

20  questions he asked you some questions about the materials

21  testing and the bonding question.

22        Do you recall that?

23  A.  Yes.

24  Q.  On the materials and bonding tests, you failed the shoes

25  because the Payless shoes have PVC in them.  Right?

Exhibit 1 - Page 74 of 262

Page 1273

1 research that they present, the soundness of the

2 conclusion, the soundness of the methodology.  So that's

3 the kind of assessments that we make.

4 Q. If you could just tell the jury just very briefly,

5 what were you requested to do in this case?

6 A. I was requested to assess five sets of issues.  The

7 first has to do with the strength of the adidas brand and

8 its related symbols, specifically the three-stripe mark.

9        The second set of issues I was asked to opine on

10 was:  How does this mark, this three-stripe mark,

11 influence the way consumers made decisions and are there

12 any benefits to adidas that arise out of that?

13       The third set of issues was the likelihood of

14 confusion that would arise from -- in consumers' minds

15 when they are exposed to the Payless shoes.

16       The fourth set of issues was:  Are there any

17 benefits that accrue to Payless from a consumer

18 psychology standpoint and marketing standpoint that arise

19 from the similarity, confusing the high -- potentially

20 confusing the high similarity between those shoes and

21 adidas shoes?

22       And the last set of issues was:  Are there any

23 damages that would arise if there were any evidence of

24 confusion between those shoes and adidas shoes?

25 Q. And in connection with forming your opinions on these

Exhibit 1 - Page 75 of 262

1        THE COURT:  I'll allow some cumulative evidence

2 by way of expert testimony.

3        Go ahead.

4        THE WITNESS:  I concluded two things, first of

5 all, that the adidas brand and the three-stripe mark were

6 well-known, both globally as well as in the U.S.; and the

7 second conclusion was that there was a strong mental

8 connection between the adidas -- the three-stripe mark

9 and the adidas brand.

10 BY MR. BREWSTER:  (continuing)

11 Q. We have heard some testimony on this, so I'm going to

12 take you through this quickly, also.

13        You reviewed and relied on the Interbrand brand

14 evaluation study to support this conclusion; is that

15 right?

16 A. That was part of the evidence, the evidence showing

17 the strong financial valuation of the adidas brand.

18 Q. And you also reviewed and relied upon the Icon

19 value-added research to support your conclusions

20 regarding the consumer recognition of the three-stripe

21 mark and its close association with adidas?

22 A. That's correct.  That was another part of the

23 evidence.  I recall in that study that 65 percent of

24 consumers when asked, you know, what they picture

25 whenever they think of adidas, mentioned that stripes --

Exhibit 1 - Page 76 of 262

1 with the three-stripe mark, which is adidas.  And that is

2 also reducing the risk that they make a bad decision.

3 Q. Your third topic were conclusions that you drew

4 regarding a likelihood of confusion caused by Payless'

5 two- and four-stripe shoes.  What conclusions have you

6 drawn regarding that?

7 A. I have drawn two main conclusions:  one, that there

8 is significant likelihood of confusion in a post-sale

9 context; and the second conclusion is that there is a

10 significant likelihood of confusion in an initial

11 interest context.

12 Q. And when you say in the post-sale context, what do

13 you mean by that?

14 A. I mean that the shoe, the product has been purchased

15 already and is being now used in the marketplace and is

16 being observed in the marketplace, and in the marketplace

17 another consumer observing this shoe being consumed in

18 the marketplace is mistakenly inferring that it is an

19 adidas shoe.

20 Q. And what are the situations in which that encounter

21 will occur?

22 A. Well, you can envision lots of such situations.

23 You're walking on the streets and, you know, at the

24 traffic light, you're stopping, and you sort of look at

25 the person ahead of you, and you notice that they're

Exhibit 1 - Page 77 of 262

Page 1300

1 wearing some shoes that have those stripes on the side

2 and infer that these are adidas shoes.

3        You're riding the subway in New York and you see

4 people sitting across from you wearing a shoe that has

5 stripes and then infer that these are adidas shoes.  You

6 are visiting your neighbors and they have a shoe rack

7 full of shoes there, and you see some shoes with stripes

8 on the side and believe that these are adidas shoes.

9        So you can envision lots of such situations in a

10 post-sale context that occur when the product is being

11 purchased and is consumed.

12 Q. Your second item you referred to was a likelihood of

13 confusion in the initial interest context.  What did you

14 mean by that context?

15 A. I mean -- one thing in particular is the fact that

16 a -- you know, when consumers make decisions, they go

17 through a series of stages.  So first of all, they need a

18 product.  They experience a need for a product, and then

19 they start searching for information.  And then when

20 they're searching for information, they decide, okay.

21 I'm going to zoom in on a subset of the options.  And

22 then they start comparing more carefully the options and

23 then eventually buy one of them.

24        So there is a series of stages which the

25 customer -- the consumer goes through:  first, experience

Exhibit 1 - Page 78 of 262

Page 1303

1 randomly in their mind, but in a cluster that we call a

2 memory network. Many consumers have memory networks in

3 their minds for different brands. So we put all the

4 information we know about adidas somewhere together, all

5 of the information that we know about McDonald's

6 somewhere together, all the information we know about

7 Toyota somewhere together. So we have those memory

8 networks of brands.

9        Now, when a stimulus, okay, something you see

10 outside -- it could be a product, an ad, a display,

11 whatever that is -- when a stimulus is encountered

12 outside, if there is a sufficient overlap between the

13 features of that stimulus -- that product display, that

14 product, that ad -- and your knowledge present in your

15 memory, your memory network for that brand, then that

16 brand will come to mind, literally come to mind, okay.

17        Now, whenever the brand comes to mind, then it

18 creates the likelihood that you will think that whatever

19 you are seeing is connected to that brand and comes from

20 that brand. It will be categorized, if you will, as

21 belonging to that brand. That is one of the major ways

22 that people make source attribution, source

23 identification, is by seeing the overlap between features

24 of a stimulus and what they know about the brand.

25        So in this case, if you're thinking about

Exhibit 1 - Page 79 of 262

1        But overall you can see very strong, I believe,

2 evidence of strong likely subjective similarity in the

3 mind of the consumers.

4 Q. Okay.  Dr. Pham, you may need to put it back

5 together, but what I want to have you get now is the

6 Plexiglas that had the two -- the Superstar and the

7 Payless shoe on it.  That's Exhibit 653.

8        MR. BREWSTER:  And then, Antonio, the other side

9 by side would be 556.

10 BY MR. BREWSTER:  (continuing)

11 Q. If you could --

12 A. Put it back?

13 Q. No, don't put it back.

14        Go ahead.  You've got the Payless shoe in your

15 hand there.

16 A. No.  I just want to organize --

17 Q. Okay.  If you could, with the Payless shoe, go ahead

18 and again, from a consumer psychology perspective, what's

19 the consumer reaction to that shoe?

20 A. You want me to do that with that shoe in particular,

21 in isolation?

22 Q. Yeah, or do it together.  That will shorten this up

23 here.

24 A. As I mentioned, there are lots of overlapping

25 features in terms of the three stripes -- or the stripes,

Exhibit 1 - Page 80 of 262

1 which I discussed, and so you will see a similarity in

2 angling, spacing, width of the stripes, the parallelism

3 of the stripes, et cetera.  Those all lead to what is

4 high perceived similarity.

5         One of the things that one you will notice in

6 addition, in terms of overlapping features, is the toe

7 area, which is, in adidas' language, is called a shell

8 toe, which you find on this shoe here and which you find

9 as well on the Payless Cross Trekker shoe.

10        And you can also look at them in a more detailed

11 fashion.  Normally this is made of a different rubber

12 material than the rest of the shoe, which is a common

13 characteristic of both these shoes.  In addition, the

14 lines here that are carved -- seem to be carved in the

15 top of the shoe, also have the same shape as the lines of

16 the adidas shoe.

17        I was pointing at the wrong one.  Sorry.

18        You will also notice that both shoes have a patch

19 area of the same color of the stripes, okay, which is

20 silver in this case.  If you look very carefully, the

21 shape is a bit different, but they are located in the

22 same place, and this is -- this is the adidas version

23 here.

24        There is something I notice, you know, when I

25 look at these shoes carefully, you will also notice that

Exhibit 1 - Page 81 of 262

1 there is a little -- in the front of the lace is this

2 little small plastic piece that has some decorative

3 element.  In this case of adidas, it shows the logo.  So

4 that would be an additional feature that overlaps.

5        So overall, in terms of subjective similarity of

6 these two pair of shoes, side by side, it's very high.

7 Q. The last pair of shoes you have on the Plexiglas is

8 Exhibit 658, and the other side-by-side slides that we

9 saw earlier in the case are Exhibit 557.

10       And if you could, again, from your perspective,

11 the same consumer psychology perspective, how does the

12 consumer react to that Payless shoe?

13 A. Well, again, they will notice the overlapping

14 features in terms of -- similarity of features in terms

15 of the stripes, which I won't belabor one more time.

16       You will notice in addition to the similarity of

17 the stripes and the position and the parallelism, the

18 width, the equal width and the equal spacing, that those

19 stripes are of the same colors on the two shoes, which is

20 an additional feature that they have in common, the fact

21 that the heel area is the same color as the stripes and

22 in the same location.

23       There is, in addition -- I don't know if you can

24 sort of see from where you are, but there is some texture

25 in those shoes that -- it's based out of stitching.  And

Exhibit 1 - Page 82 of 262

Page 1314

1 there is stitching along -- that curves like this along

2 the side of the shoe, both the adidas shoe as well as for

3 the Payless shoe.

4          And, finally, you'll see that on the side there

5 is a specific type of shape here around the front area of

6 the shoe that in this case bear -- I'm sorry.  You see, I

7 was pointing at the Payless shoe.  I meant to point out

8 the adidas one.

9          But you will see that there is a -- some kind of

10 a curvature here in the front area, and that says

11 Goodyear in the case of adidas.  And, in fact, some of

12 the models I've seen on adidas, I believe that this area

13 here is black in some of the models.

14 Q. As it would be in Exhibit 557?

15 A. Okay.  So that's black, and that you see side by

16 side, next to the Payless equivalent, and the Payless

17 version has the black area.  That increases, again, the

18 subjective similarity between the two shoes.

19 Q. You've mentioned the subjective similarity, and you

20 started talking about the model where the -- the pluses

21 and the minuses.

22 A. Yes.

23 Q. Here, are there some minuses, also, that would

24 help --

25 A. Yes.  As you pointed out, in this case, if I were to

Exhibit 1 - Page 83 of 262

1 look at these two shoes, one of the minuses is the fact

2 that this shoe here has a white sole and this one has a

3 black sole. But that's not a minus in the pictured

4 exhibit, because both of them have black soles.

5        And I know that whenever it has a black sole, the

6 material looks like a tire. And that's also the case for

7 the Payless shoe. So these two shoes, the Tuscany, as

8 well as the Payless equivalent side by side, both have

9 the tire-like sole that is black.

10        But these two of them side by side, one of the

11 features that would count against similarity, that would

12 be on the minus side, if you will, is the fact that this

13 area here is white and this one is dark; the fact that it

14 has, if you read carefully, the Champion name here on the

15 side that is there, and the fact that it has also a logo

16 here that I understand is a Champion logo here, whereas

17 here is the Goodyear logo.

18 Q. From a consumer psychology perspective, in that

19 particular shoe, how do you -- what's your opinion with

20 respect to how consumers will view the similarities

21 versus the distinctions that you've identified?

22 A. I think that overall the subjective impression that

23 people will have is that -- that consumers will have is

24 that, okay, these are very similar shoes, and they are

25 almost identical shoes.

Exhibit 1 - Page 84 of 262

1 had been asked to draw some conclusions about the

2 benefits to Payless of selling these two- and four-stripe

3 shoes.  What are your conclusions in that regard?

4 A. I believe there will be about three main types of

5 benefits to Payless that arise out of these type of

6 confusion.

7         One is that it will help attract consumers'

8 attention to their products.  As I mentioned earlier,

9 familiarity of a mark helps attract attention to the

10 products bearing those marks, the same mark.  And so to

11 the extent that these shoes with four or two stripes are

12 confused with adidas shoes, it will -- which are

13 familiar, the adidas three-stripe mark, it will help

14 attract consumers' attention to the Payless shoes.  It's

15 increasing the chance that it will be considered for

16 further inspection, considered eventually for purchase.

17 So that's a big advantage from the Payless standpoint.

18         Related to that, advantage is not just attention,

19 you know, while you're walking on the street and noticing

20 the shoes in the window.  It also could be attention when

21 you're looking at a newspaper and you find an

22 advertisement insert that has those shoes that you

23 believe are adidas shoes.  Then you start noticing them.

24 Okay.  Maybe I should go and plan a trip at the Payless

25 store.  So that's increasing attention to the products of

Exhibit 1 - Page 85 of 262

1 that when people mentally see two objects -- in this

2 case, it's the experimenter and the assistant who has a

3 similar haircut -- even if the basis of similarity is

4 superficial, okay, they know this is different

5 individuals, they will impute qualities of one

6 object -- in this case, the experimenter -- onto the

7 other object, the assistant, who has similar

8 characteristics.

9         Now, imagine what it does, the same psychology,

10 to a shoe that looks very much like adidas, okay.

11 That's -- if either people believe it's an adidas, in

12 which case they attribute the qualities of the adidas

13 brand, and even if they don't believe it's an adidas, the

14 fact that they look so similar subjectively will likely

15 have a transfer of the quality of the adidas brand onto

16 the Payless shoes.

17 BY MR. BREWSTER:   (continuing)

18 Q. Dr. Pham, in your example, that piece of research,

19 when the subject was asked afterwards, after they made

20 their selection of which of the two people to go to,

21 about the influences, what did they say?

22 A.  Okay.  That's a very important aspect of that study.

23 The subjects, after they hand out their questionnaire to

24 either assistant, they're asked, "Why did you choose to

25 give the questionnaire to this one assistant as opposed

Exhibit 1 - Page 86 of 262

1 to the other one?"  And none of them -- none of the ones

2 who were influenced by the insult of the experimenter

3 mentioned that.  They absolutely denied it.  They said,

4 "I don't know.  I don't know.  This one was free" or

5 whatever.

6        So what it means is that this kind of influence

7 can happen even subconsciously, when consumers are not

8 aware of it.

9 Q. Your last and fifth topic was looking at the

10 conclusions regarding any detriment to adidas.  What are

11 your conclusions regarding any detriment to adidas?

12 A. I think there will be a number of types of damages,

13 and I think it's helpful to organize them according to

14 to -- to what happens when there is post-sale confusion

15 and then what happens when there is initial interest

16 confusion.

17 Q. Okay.  Let me divide it, then, chop this up.

18 A. Okay.  Thank you.

19 Q. What are your conclusions regarding the likelihood of

20 post-sale confusion harm to adidas?

21 A. Well, there will be different types of negative

22 consequences to the adidas brand that arise from

23 post-sale confusion.

24        First of all, if there are consumers who will

25 observe the Payless shoes being consumed in the

Exhibit 1 - Page 87 of 262

1 marketplace and think, mistakenly, that these are adidas

2 shoes, then they will have an enhanced perceived

3 pervasiveness of those shoes and a loss of uniqueness.

4 So whatever distinctiveness is in those shoes will tend

5 to be eroded because, okay, there's lots of those shoes

6 there and so there's a loss of uniqueness.

7        The second consequence is that if the Payless

8 shoes happen not to be of the same quality and withstand

9 the use and wear of time not as well as the adidas shoes,

10 these quality characteristics, you know, may taint the

11 perceptions of consumers who will observe these qualities

12 and attribute them to be adidas shoes.

13        So if I see a Payless shoe and I don't know it, I

14 think it's an adidas shoe, and it has a yellowish sole

15 area, I might mistakenly believe that this is -- you

16 know, that those adidas shoes are not well made, for

17 example.  So that would tarnish the perception of the

18 adidas brands in terms of its quality in consumers'

19 minds.

20 Q. You mentioned the prevalence and loss of uniqueness.

21 What impact does that have in terms of any

22 self-expressive benefits for the brand?

23 A. If I understand correctly, my reading of the -- my

24 research in this case is that those kind of shoes are

25 often used for identity, so people wear shoes partly to

Exhibit 1 - Page 88 of 262

1 signal who they are.  And if -- and one of the ways they

2 can signal who they are is by, you know, having marks on

3 the shoes that signals the kind of shoes they are.

4        And if this mark is diluted in its ability to

5 identify specific, you know, brands, that decreases

6 consumers' ability to express themselves through that

7 benefit, through that function.

8 Q. You mentioned post sale and you mentioned initial

9 interest.  What are your conclusions regarding the

10 initial interest confusion harm to the adidas brand?

11 A. So one of the -- the setting of -- of damage that

12 is -- that is potential and likely over time is that, you

13 know, if a consumer is walking in front of a Payless

14 store and mistakenly believes that they have seen an

15 adidas shoe at the window of that store, or if a consumer

16 reads a newspaper, comes across a newspaper insert for

17 Payless and mistakenly encodes that incident as meaning

18 that, okay, adidas shoes are available at Payless, then

19 the characteristics of the Payless brand, okay, may

20 transfer over to the characteristics of the adidas brand

21 in their minds, okay.  And that may dilute the image of

22 the adidas brand in their mind and therefore tarnish it

23 subjectively, okay.

24        One thing that's very well established in the

25 marketing literature is that consumers infer in part the

Exhibit 1 - Page 89 of 262

1 these brand valuation studies look at the aggregate --

2 the aggregate level of how the brand is doing overall in

3 the marketplace from a financial standpoint, and what the

4 study is really trying to do is to try to project

5 profitability into the future and then ascribe a

6 percentage of that to the brand.

7          Now, the profitability will be driven by lots of

8 factors, okay, not just Payless' actions, but adidas' own

9 actions.  And I understand that they've spent, over the

10 last six or seven years, over a billion dollars marketing

11 their brand.  So that will also drive the brand

12 valuation.

13          So whatever is happening from the Payless

14 activities, on a consumer level, you know, it's going to

15 be washed out -- and it's hard to discern whenever you're

16 measuring it at such a high aggregate level -- and washed

17 out potentially if adidas is very aggressive in its

18 marketing, in marketing its brand, to offset some of

19 that.

20          MR. BREWSTER:  We pass the witness, Your Honor.

21          THE COURT:  All right.  Cross-examination.

22          MR. MARTIN:  Thank you, Your Honor.

23

24

25

Exhibit 1 - Page 90 of 262

1                    CROSS-EXAMINATION

2 BY MR. MARTIN:

3 Q. Good morning, Dr. Pham.  Michael Martin on behalf the

4 Payless in this case.

5 A. Good morning, Mr. Martin.

6 Q. Now, you did a comparison, a side-by-side comparison

7 of a number of the shoes during your direct testimony.

8 A. I did.

9 Q. Now, those shoes would never appear side by side,

10 would they, in a shop window?

11 A. They would not.

12 Q. They would never appear side by side, would they, in

13 any type of advertising?

14 A. Advertising is harder to tell, because advertisers

15 are free to place ads more or less where they want.  So

16 they could be appearing, for example, in a newspaper.

17 Q. They wouldn't be appearing side by side in a Sunday

18 circular?

19 A. In a single circular, they would not.  They would

20 not.

21 Q. And the shoes wouldn't appear side by side in a

22 retail context?

23 A. Not that I know of, no.

24 Q. Adidas shoes are sold in retail outlets and adidas

25 stores.  Payless shoes are sold in Payless stores?

Exhibit 1 - Page 91 of 262

Page 1334

1 verbalize, you never gave them the chance in this case,

2 did you, because you never asked them?

3 A. I did not go out there to do a specific study to get

4 at what's happening in the mind of consumers of the

5 Payless stores.

6 Q. Now, Mr. Brewster indicated that this case was

7 filed -- during your direct testimony, that this case was

8 filed in 2001.  And you were hired as the consumer

9 psychologist for adidas in January 2007?

10 A. I believe that's true, yes.

11 Q. And you were the second consumer psychologist, or was

12 it the third that adidas hired in this case?

13 A. I believe there was one consumer psychologist who had

14 been retained earlier than me.

15 Q. And you initially got involved in this case through

16 your relationship with Vivaldi, right,

17 Dr. Joachimsthaler's company?

18 A. Not exactly.  I didn't have a relationship with

19 Vivaldi.  It's simply that I had a former student in one

20 of my seminars who had done some work for Vivaldi and who

21 mentioned my name to them at some point, yes.

22 Q. And that's how you got involved in this case, was

23 through Vivaldi?

24 A. Indirectly through Vivaldi.

25 Q. And you were hired by Mr. Swann, correct?

Exhibit 1 - Page 92 of 262

1 A. That's correct.

2 Q. Now, are you aware of any instance where somebody was

3 walking down the street in a pair of Payless shoes and

4 that those shoes were somehow mistaken for adidas shoes?

5 A. The only awareness would be some of the people that

6 are, you know, close to me, my family.  So that would not

7 count.  So I cannot point you to one person in

8 particular.

9        And part of the reason is because if people are

10 confused, they will not know, right?  That's -- so they

11 cannot tell you that "I was confused," because they

12 believe this is an adidas shoe.  So that's part of the

13 reason why, in a post-sales context, you don't get many

14 people coming forward, saying "I was confused," because

15 they don't even know it.

16 Q. You're not aware of a single instance, are you, in a

17 post-sale context, where somebody mistook a Payless shoe

18 for an adidas shoe?

19 A. The -- in an actual marketplace context, I cannot

20 point you to a specific instance.  In the Ford studies,

21 there were quite a few instances.

22 Q. Okay.  Well, let's assume for purposes of my question

23 that that actually did happen in the real world, that

24 somebody was walking down the street wearing a pair of

25 Payless shoes.  Somebody sees them and says, "Oh, that

Exhibit 1 - Page 93 of 262

Page 1340

1 person must be wearing adidas shoes."

2        Wouldn't adidas be enhanced by that, by what you

3 termed previously during your testimony as the mere

4 exposure effect?

5 A. The mere exposure effect is mostly study based on

6 repeat exposure to the same stimulus, the same stimulus,

7 not a variant of it.

8        So we know that repeated exposure to the same

9 thing over and over again, everything else equal,

10 increases liking for that one stimulus.  I -- I don't

11 know of the research that it would extend for repeated

12 exposure to a variation of that stimulus, and that's why

13 I cannot opine on what would be the effect with respect

14 to that.

15 Q. So that would work both ways, wouldn't it?  You

16 couldn't opine on the effect of something, a variant, two

17 or four stripes, as opposed to three stripes, right?

18 A. I'm sorry.  Could you repeat your question?

19 Q. Yeah.  It would work both ways, wouldn't it?

20 A. In terms of what?

21 Q. Adidas wouldn't benefit by a variant.  Neither would

22 Payless, right?

23 A. Um --

24 Q. You can't opine on a variant between two and four

25 stripes and three stripes?

Exhibit 1 - Page 94 of 262

1 A. No.  I just made a -- my answer to your previous

2 question was more specific than that.  It was about

3 answering the question, can we generalize the mere

4 exposure effect findings to one in which there is a

5 variation of the stimulus?  And I am not aware of

6 research that would test that, that can allow me to make

7 an opinion about that.

8 Q. And you're also not aware of any instance in an

9 initial interest context where somebody has mistaken a

10 Payless shoe for an adidas shoe and been drawn to a

11 Payless store as a result, are you?

12 A. I cannot give you the name of someone in particular.

13 The science underlying these predictions, conclusions, is

14 very well established, lots of literature, including some

15 my own research.

16 Q. Now, you, yourself, you didn't do any type of focus

17 group sessions in this case?

18 A. I did not.

19 Q. You didn't do any types of surveys?

20 A. I did not do a survey of the kind that Dr. Ford did,

21 indeed.

22 Q. Now, let's get to Dr. Ford's surveys.  In terms of

23 conducting a survey of initial interest confusion, would

24 you agree with me that it's important that you replicate

25 as closely as possible that initial interest environment?

Exhibit 1 - Page 95 of 262

1 A. If the objective of the survey is to assess the

2 degree of -- of initial interest confusion, I would

3 indeed construct a survey that replicated the essence of

4 initial interest situation.

5 Q. And that would be, for example, showing somebody the

6 advertisements, right?

7 A. That would be one example, yeah.  That -- the survey

8 will be directed -- would be -- in order to make that

9 inference, the ideal survey to make that inference would

10 be different.  That doesn't mean that one cannot draw

11 inferences from a survey testing a slightly different

12 question and looking at the essence of the survey and the

13 methodology and what it is showing in essence would not

14 be applicable, yes.

15 Q. Perhaps my question wasn't clear, and I want to be

16 clear.  I'm not asking what inferences could be drawn.

17 A. Okay.

18 Q. I'm asking about the best way to do this.  And the

19 best way to do an initial interest survey, if you want to

20 measure confusion, is to replicate that initial interest

21 environment as closely as you can, isn't it?

22 A. Replicate the essence of that initial interest.  And

23 by essence, it's hard to -- it's not a trivial question,

24 because the essence of initial interest should generalize

25 to initial interest that comes from newspaper ad

Exhibit 1 - Page 96 of 262

Page 1343

1 exposures, as well as walking in front of a store

2 exposure.  So there are not trivial methodological

3 matters one would have to resolve.

4 Q. Well, let's look at the first one you talked about,

5 the advertisement, the newspaper advertisement exposure.

6        MR. MARTIN:  And if I could have Exhibit 3445.

7 BY MR. MARTIN:  (continuing)

8 Q. Now, these are the types of advertisements that you'd

9 see in the Sunday newspaper, the circulars, the newspaper

10 advertisements that you referred to earlier, right?

11 A. That's correct.

12 Q. Have you seen this before today?

13 A. I just was given a copy yesterday evening.

14 Q. Once you found out that was an exhibit you were going

15 to use?

16 A. Yes.  Mr. Brewster told me this was an exhibit that

17 was about to be shown.

18 Q. Now, with this advertisement, you've got Payless

19 ShoeSource clearly indicated as the source of the

20 advertisement, right?

21 A. As the source of that ad, yes.  It's not as obvious

22 that it is also clearly showing the source of the shoes,

23 all right.

24        So this is showing that those shoes are on sale

25 at Payless ShoeSource.  It does not say clearly that each

Exhibit 1 - Page 97 of 262

1 shoe here is a Payless shoe.  A consumer may infer that

2 these are branded shoes with four stripes or three

3 stripes or whatever, that are available at Payless.

4 Q. Okay.  But the four stripes, that's pretty prominent,

5 isn't it?

6 A. It is -- it is there if one pays close attention to

7 it.

8 Q. Even a cursory review would indicate to you, wouldn't

9 it, that this refers refers to four-stripe shoes as

10 compared to three stripes?

11 A. In a consumer -- in this courtroom, one of the things

12 we have discussed is things that are familiar attract

13 your attention.  So this is actually what is at work

14 here.  We have been discussing four stripes so much that

15 we're paying close attention to four stripes, and we're

16 more likely to notice four stripes here because of being

17 in this courtroom.

18        I'm not sure that I can make a -- a competent

19 opinion that consumers will all notice that there are

20 four stripes and that there will not be a number of them

21 who will mistakenly, if they do a cursory review of this

22 ad, encode this as having three stripes.

23 Q. Is it your testimony to this jury, Dr. Pham, that

24 somebody looking at this advertisement would mistake the

25 shoes here for three stripes?

Exhibit 1 - Page 98 of 262

1 A. Someone not looking carefully at these

2 advertisements, which is what we discussed could happen

3 in the initial interest context.  You know, you just

4 received your newspaper.  You open it.  You're drinking

5 your cup of coffee.  You don't necessarily look at this

6 ad and then count the stripes on the shoes that you see

7 in this ad.  If you just happen to see it, that snapshot,

8 you know, impression that you have of these ads may not

9 necessarily clearly identify to you that there are four

10 stripes there on those shoes as opposed to three.

11 Q. As least as far as advertisements are concerned,

12 Dr. Pham, would you agree with me that this actual

13 advertisement for Payless shoes more closely replicates

14 the initial interest environment than the picture that

15 was used in Dr. Ford's surveys?

16 A. It's -- it's hard to make a -- an opinion.  This

17 would be an example of initial interest confusion

18 that -- that could be used in an experimental condition.

19 One could design a stimulus that could be a photo of a

20 shoe on display in a window of a Payless store.  So it's

21 really hard to make a judgment here.

22          Part of the reason is that if you get people to

23 pay close enough attention to this full ad, if they pay

24 close enough attention, you know, then -- you know, if

25 they pay close attention, then there is only one brand

Exhibit 1 - Page 99 of 262

1 mentioned here.  If you push them, they would say, "Okay.

2 I would guess or assume that it's Payless."

3         It's not clear, however, that this would be

4 representative of the kind of impressions people get from

5 an ad like this if they are not paying as close

6 attention.

7         THE COURT:  All right.  Mr. Martin, is this a

8 good breaking point?

9         MR. MARTIN:  Yes.

10         THE COURT:  Okay.  We'll break for lunch, then.

11 We'll come back at 1:30.  That's 1:30 today.

12         Have a good lunch, and remember what I've told

13 you before:  Don't come to any conclusions.

14         Thank you.

15         (The jury leaves the courtroom.)

16         THE COURT:  Okay.  Mr. Henn, I want to take up

17 Exhibit 141 when we meet -- Do you have it now?

18         MR. BREWSTER:  We'll hand it up, Your Honor

19 (handing).

20         MR. HENN:  This is a color copy of the ad.  This

21 is the one that was actually used in the deposition with

22 Mr. Haugh.  He was shown this in color.

23         THE COURT:  As I recall -- let's see if I can

24 find it here.

25         Now, is this the one you were going to offer as

Exhibit 1 - Page 100 of 262

1        MR. HENN:  We weren't making authenticity-type

2 objections, and the like.

3        THE COURT:  Okay.  All right.  We'll be in recess.

4        We'll let you know when we're ready to start.

5        (Recess taken.)

6        (Jurors enter.)

7        THE COURT:  All right.  Good afternoon.

8        I should mention if any juror at any time feels they

9 need a break, just raise your hand and let me know.

10        All right.  We're ready to go.  You may cross-examine.

11        MR. MARTIN:  Thank you, your Honor.

12                CROSS-EXAMINATION (continuing)

13 BY MR. MARTIN:

14 Q.  Dr. Pham, when we left off for the lunch break, I believe

15 we were on Exhibit 3445.

16 A.  Correct.

17 Q.  A question I have, Dr. Pham, is it your testimony that a

18 consumer, looking at this advertisement, would be confused that

19 the four-stripe shoes depicted here are actually three-stripe

20 adidas shoes?

21 A.  My testimony is that if a consumer is not paying close

22 attention upon being exposed to this ad, there is a probability

23 that they may encode that exposure as being in relation to

24 three-stripes.

25 Q.  Would they be confused, or not, in seeing this ad?

Exhibit 1 - Page 101 of 262

1 A.  That would be an instance of what we had called initial

2 interest confusion.  So they -- they -- they would think that,

3 okay, I saw three -- three-stripe shoes, that the three-stripe

4 mark is on adidas shoes, and they may notice that it's at

5 Payless.

6 Q.  Okay.  So they would be confused?

7 A.  They would be, in this instance as described.  Are those

8 ones who mistakenly encode that impression as referring to

9 three-stripes, they would be categorized as being confused of

10 the initial interest kind.

11 Q.  Can you tell me whether they would likely be confused or

12 wouldn't be confused in looking at this ad?

13 A.  I just said that there is a likelihood that a number of

14 them will be confused of the initial interest kind.

15 Q.  Now, I believe, though, before the break you had indicated

16 that if you're going to do a survey to measure initial interest

17 confusion, it's best to replicate those conditions as -- those

18 initial interest conditions, that environment, as closely as

19 possible?

20 A.  It would be best to -- to elicit conditions that extract

21 the essence of an initial interest setting.

22 Q.  And to do that, you would want to replicate -- all things

23 being equal, you would want to replicate that situation, that

24 initial interest situation, to make sure that your survey is

25 accurate, wouldn't you?

Exhibit 1 - Page 102 of 262

Page 1366

1 A.  The -- when you do a survey on experiment, you also always

2 try to abstract the essence of what you are trying to test.

3 And trying to leave out of whatever stimuli that you're using,

4 any source of noise.  And so that's why you have to be very

5 careful.

6        For example, if you have pricing information on the

7 ads, they may or may not be something that -- you know, that

8 would influence whatever impression people get.  And so it's

9 hard to make a -- a firm opinion on what is best stimulus to

10 use.

11        But in general, yes, you would like to have a stimulus

12 that could be interpreted as being representative of the

13 initial interest of -- context.

14 Q.  And you would agree with me, would you not, that a photo of

15 a Payless shoe, as it appears in the store window, would be

16 most representative of that type of situation?

17 A.  That would be representative of that type of situation.

18 And a photograph or an example of an ad of this kind would also

19 be representative of that kind of situation.

20 Q.  Also representative?

21 A.  Again, I -- I have to be very careful of what did you use

22 it more -- or most, because I have to -- to see compared to

23 what are the other options.

24 Q.  Okay.  Well, let's say if the other option is the

25 photograph that Dr. Ford used in his survey, if that's the

Exhibit 1 - Page 103 of 262

Page 1367

1 other option, you would agree with me -- would you not -- that

2 an actual photograph of a store front would be more

3 representative than Dr. Ford's photograph of that initial

4 interest situation?

5 A.  That would be more representative, indeed.

6 Q.  Now, until you got involved in this case, you weren't even

7 aware of the term "initial interest confusion," were you?

8 A.  I was -- I'm trying to refresh my memory about what I knew

9 beforehand, so it's hard to -- the notion that people can miss

10 encode information at any stage of the decision-making process

11 is one notion that is relatively well known in consumer

12 psychology.  That it has a legal term called "initial interest

13 confusion."  I'm not sure when I learned exactly about that

14 term.

15 Q.  Well, you learned about that term, didn't you, in the

16 context of this case?

17 A.  I'm not sure exactly.

18 Q.  It's actually -- it was actually Mr. Swann who informed you

19 about that terminology, wasn't it?

20 A.  I had -- I know that Mr. Swann had mentioned that term to

21 me.  I did not know if I had heard that term being used in a

22 legal sense in another setting before that.

23 Q.  Okay.  Well, why don't you take a look at page 68 of your

24 deposition, line 6 to 8, and see if that refreshes your

25 recollection.

Exhibit 1 - Page 104 of 262

Page 1373

1 A.  That was not, I believe, a question that was asked.  And --

2 because that's a question that pertains to dilution, as opposed

3 to confusion.

4 Q.  And they were never asked whether or not they had perceived

5 the adidas shoes to be more or less exclusive as part of that

6 survey, were they?

7 A.  Not in that survey.  I understand that survey was done to

8 assess confusion in the post-sales context only.

9 Q.  And Dr. Ford conducted 11 surveys?

10       Do you recall that testimony from yesterday?

11 A.  I do.

12 Q.  4,216 interviews?

13 A.  Yeah.  That was -- that's the number that I remember he

14 interviewed, yes.

15 Q.  And over a five-year period?

16 A.  I don't recollect.  It must have been around five years,

17 yes.

18 Q.  And none of those questions were ever asked, were they?

19 A.  I believe they were not asked in any of those studies,

20 which were meant to assess likelihood of confusion in

21 post-sales context as opposed to dilution.

22 Q.  Were they not asked because Payless [sic] didn't want to

23 know the answer to those questions?

24 A.  I cannot tell you right away why they were not asked.

25 Q.  So we don't have any survey or testing evidence that -- to

Exhibit 1 - Page 105 of 262

Page 1374

1 what you have termed this brand dilution as taking place?

2 A.  The -- the -- there's quite a bit of evidence that comes

3 from the whole literature, from consumer psychology on the

4 phenomenon of dilutions.  That's empirically very well

5 established.

6        For example, there's research showing that when people

7 are exposed to a mark that is similar to another mark that they

8 know in their minds, they -- this reduces the accessibility of

9 that well-known mark from their memory.

10        So that's -- you know, this was an empirical study

11 that is out there.  And there's lots of such empirical studies

12 that demonstrate dilutions of various kinds in different

13 contexts.

14        But I have not done any specific study testing these

15 predictions, which were bell demonstrated in previous research.

16 Q.  Okay.  So you didn't do -- there's been no type -- I think

17 that was a long answer to a fairly short question, and that was

18 that we have -- you haven't done any types of testing or

19 surveys in this case to determine brand dilution.  Right?

20 A.  I have not done an experimental study testing dilution

21 specifically.

22 Q.  Now, Dr. Pham, are you aware that, at least according to

23 adidas, from -- during the period that's at issue in this case,

24 from 2000 to 2006, there have been three -- over 300 million

25 dollars worth of Payless two- and four-stripe shoes sold?

Exhibit 1 - Page 106 of 262

1 A.  I was not aware of that specific number.

2 Q.  Does that sound about right to you?

3 A.  I -- you know, I did hear that there were, you know,

4 millions and millions dollars worth of shoes that had been

5 sold.  I just didn't know whether -- whether it was 300

6 millions.

7 Q.  And there were a number of other two- and four-stripe shoes

8 manufactured by others that were sold during this same period?

9 A.  I understand that there were others, yes.

10 Q.  Others being besides Payless?

11 A.  Yes, yes.  Other than Payless.

12 Q.  Well, let's talk about Payless.

13        So if you have -- let's assume, for purposes of my

14 question, that the figure is 300 million dollars.  And let's

15 assume that the average sale price for a shoe is 20 dollars You

16 divide 300 million by 20, you've got -- what?  15 million

17 sales?

18 A.  Correct.

19 Q.  And you're going to have some repeat sales.  Right?  Repeat

20 customers?

21 A.  Yes.  If you sell them 15 million pairs of shoe, I'm assume

22 some of the people who bought those 15 million pairs would buy

23 them again.

24 Q.  Three to five -- did the average customer maybe buys three

25 to five pairs of shoes during that period?

Exhibit 1 - Page 107 of 262

Page 1376

1 A.  It's hard to tell whether they would buy the same pair of

2 shoe or not.  So I cannot --

3 Q.  Let's just talk about three to five pairs of two- to

4 four-stripe shoes during that period.

5          Does that seem reasonable to you?

6          And if it's not reasonable, tell me what you think is.

7 A.  I do not know whether a -- the same customer would buy

8 three or four times a pair of two-, four-stripe shoes in a row.

9 That, I cannot tell you.

10          I can -- there's a certain probability that a customer

11 buys the same shoes or similar kinds of shoes.  That

12 probability we know is never exactly one.  So it's always less

13 than one.  So I cannot tell you the exact numbers.  It depends

14 on the brand loyalty.  And there are some brands for which

15 there's greater repeat purchase than other brands.

16 Q.  Okay.  Let's just deal, then, with the 15 million sales

17 that took place during that period that we can't agree upon the

18 repeat customers.

19          For all 15 million of those sales, you can't specify

20 for me a single instance where somebody came back and said,

21 gee, I bought a pair of Payless shoes -- you know, two- or

22 four-stripe Payless shoes, thinking they were adidas shoes?

23 A.  I cannot.  But I believe that's a separate issue.  This

24 issue that you're talking about is what is known as sales

25 confusion.

Exhibit 1 - Page 108 of 262

Page 1377

1          So when the confusion is in the -- the actual

2 purchase.  Whereas, my testimony has been about confusion in

3 the post-sales context, as well as in the initial interest

4 context.

5 Q.  Well, let's talk about that then.  Let's go to that.

6          You're not aware of any instance of transfer of brand

7 association from Payless to adidas shoes during that period,

8 are you?

9 A.  I have not done the -- an empirical study that can point to

10 one customer in particular, when a customer -- when a transfer

11 has been demonstrated, I cannot opine based on the extensive

12 research that is consistent with that -- that opinion.

13 Q.  And we all -- I think we understand, at this point, about

14 the extensive research.  But I'm asking a specific instance.

15 And you can't point to one, can you?

16 A.  I cannot point to one person in particular.

17 Q.  Let's look at what we can point to.

18          The one thing we do know is that at least according --

19 well, you recognize Interbrand -- the Interbrand method as

20 being the best method of valuing brands?

21 A.  I don't know if it is the best method.  It's hard to make

22 an absolute judgment like that.  But I -- I know that this is a

23 well-respected methodology for assessing the value of brands

24 from a financial standpoint.

25 Q.  And as of 2006, Interbrand valued the adidas band at 4.29

Exhibit 1 - Page 109 of 262

Page 1378

1 billion dollars?

2 A.  I believe in 2006, it was that number.  And it was higher

3 in 2007, yeah.

4 Q.  And it went up 11 percent in 2007?

5 A.  Correct.

6 Q.  And adidas was what in 2006?  I believe, it was the 69th

7 most valuable brand in the world?

8 A.  I believe it was 71st in 2006 and 69th in 2007.

9 Q.  And from 2000 to 2006, the value of the brand had increased

10 from 3.79 million to 4.29 million -- or billion.  Billion, with

11 a B.

12 A.  I don't remember the date up, all the way back.  I would

13 trust your -- your statement of it as defining.

14 Q.  So we have -- if I understand your testimony correctly, we

15 have no specific evidence in this case of any instance of brand

16 dilution?

17 A.  By specific evidence, if you mean a specific individual for

18 which we have measured dilution, no.  There's no specific

19 individual for which we have measured dilution.

20 Q.  And we have no testing or survey evidence of brand dilution

21 in this case?

22 A.  There has not been any specific studies that would be of --

23 or experimental kind that has been done to test dilution.

24 Q.  So what we're left with, then, is your research studies and

25 your theories.  Right?

Exhibit 1 - Page 110 of 262

Page 1379

1 A.  What we're left with is an extensive body of findings from

2 a variety of -- of literature; consumer psychology, cognitive

3 psychology, and other findings from the -- the marketing

4 literature that converge into predicting significant dilution

5 in the marketplace that occurs as a result of exposure to shoes

6 that lead to confusion with the adidas mark.

7 Q.  When you say predictive, would you agree with me that --

8 that the best predictor of what's going to happen in the future

9 is what's happened in the past?

10 A.  Not necessarily so.

11 Q.  Anyway, of these research -- as I understand it, based upon

12 your testimony today, you're asking that this jury award

13 damages in this case based upon your theories and research?

14 A.  I'm not asking them anything.  I'm just explaining --

15 explaining what the -- the -- the research shows and what my

16 understanding of the case suggests is the likely confusion that

17 would accrue from exposure to these -- these shoes; the likely

18 damages that happen -- that are likely to happen from a

19 consumer psychology standpoint and the strength of the mark.

20 All of the issues that I was asked to opine on.

21 Q.  And those theories and -- those theories and research would

22 indicate that people can be confused subconsciously, without

23 even knowing it?

24 A.  That people can be confused and not realize it.  In fact by

25 definition, if one is confused that they're seeing an adidas

Exhibit 1 - Page 111 of 262

Page 1380

1 shoe even though that this is a Payless shoe, they would not

2 know it.  If they knew it, then they would not be confused or

3 that confusion would have been corrected.

4 Q.  And is it your understanding that adidas is seeking to

5 recover damages against my client, Payless, based upon that

6 type of subconscious confusion?

7 A.  I -- I can only -- I understand that I'm only one witness

8 out of a larger case.  And my understanding is that this is --

9 that adidas is -- is seeking a ruling or damages based on the

10 extensive body of facts and evidence and experts, witnesses,

11 judgments that are consistent with likelihood of confusion and

12 likelihood of dilution.

13 Q.  If you were to award damages in a case, would you want

14 something more?

15 A.  I am not a -- a -- an expert on the issues of financial

16 damages and legal damages, so I would not be able to answer the

17 question.

18        MR. MARTIN:  Thank you, your Honor.  I have nothing

19 further.

20        THE COURT:  Redirect.

21                  REDIRECT EXAMINATION

22 BY MR. BREWSTER:

23 Q.  Dr. Pham, just a few questions.

24        The initial questions that you got on

25 cross-examination were about those -- don't touch them --

Exhibit 1 - Page 112 of 262

Page 1396

1 Q.  And what was that conclusion?

2 A.  Well, it's -- it's a two-part answer.

3        The first part is there is a royalty rate of about 7.8

4 percent on retail sales of Payless shoes that feature the

5 adidas brand assets.

6        And a second component is a product sourcing fee that

7 is charged against Payless's first cost in the manufacture of

8 the shoes.  And that's -- that's at 8.25 percent of their first

9 cost.

10        And it's important to note that the royalty rate of

11 7.8 percent also includes that advertising and marketing

12 investment requirement that I mentioned earlier, and also a

13 sales commission fee.

14 Q.  Okay.  Let's -- let's dig into that a little bit, and see

15 how you came to that conclusion.

16        How did you arrive at -- at the royalty rate you've

17 described?

18 A.  Well, I essentially reviewed the adidas and Payless

19 agreements and determined what the terms were that are

20 applicable to this situation, to get a feel for what types of

21 terms may result in a hypothetical negotiation between adidas

22 and Payless.

23 Q.  Based on your review of the license agreements and other

24 information that you reviewed, what was adidas's approach to

25 licensing in the late '90s, early 2000s?

Exhibit 1 - Page 113 of 262

Page 1416

1       And if adidas was to license into the footwear

2 category, they're going to be as restrictive, or more so, than

3 they were in any of another agreements that they have entered

4 into.

5 Q.  You mentioned that the average -- or, excuse me, the adidas

6 licenses involved a bundle of intellectual property.  It wasn't

7 just the three-stripe mark.  It wasn't just the Superstar trade

8 dress.

9       Did you make any downward adjustment to the 7.8 number

10 to account for the difference between those agreements and the

11 hypothetical license in this case?

12 A.  I didn't believe any adjustment would be necessary.

13 Because we were using an average of the royalty rates and other

14 factors found in the adidas agreements, it's already below what

15 would have been expected for their -- their core product

16 category, I believe.

17 Q.  All right.  Now, let's look at the bottom half of this, the

18 product sourcing fee section.

19       Can you tell us what the product sourcing fees there

20 would be?

21 A.  The product sourcing fee is something adidas requires when

22 the licensee is interested in marketing something that they

23 already have facilities and sourcing relationships --

24 manufacturing facilities and sourcing relationships in place.

25       MR. SHAEFFER:  Your Honor, I'm going to object on the

Exhibit 1 - Page 114 of 262

1 compensate adidas for lost profits, are you?

2 A.  That's correct.  It's not a lost profits analysis.

3 Q.  Do you understand that adidas -- I think we went over this

4 quickly.

5       Adidas has several trademarks.  Correct?

6 A.  Yes, they do.

7 Q.  And you've said the trademarks at issue in this matter are

8 the three-stripe mark?

9 A.  The three-stripe mark.

10 Q.  My client never used the three-stripe mark, though, did it?

11 A.  I haven't seen any evidence of that, no.

12 Q.  Okay.  And my client didn't use the adidas name?

13 A.  Not that I'm aware of.

14 Q.  And didn't use the trefoil?  Did it?

15 A.  I'm sorry.  Was that a question?

16 Q.  Yes.  Did they use the trefoil?

17 A.  Not that I've seen.

18 Q.  And a significant portion of your business is the valuation

19 of trademark rights like those held by adidas.  Correct?

20 A.  Yes.  Very significant.

21 Q.  And in this case you're not offering any opinion at all

22 about any impact or loss of value of adidas's brand, are you?

23 A.  Well, to the extent that they've missed out on royalty

24 revenue they should have been paid, yes.  But not specific to

25 the value of the brand overall.

Exhibit 1 - Page 115 of 262

1 Q.  You're not offering any opinion on the value of the adidas

2 trademarks, are you?

3 A.  No.

4 Q.  And you're not offering any opinion that those trademarks

5 are now worth less because of anything my client did?

6 A.  That's correct.  We haven't -- we haven't determined

7 anything like that.

8 Q.  And you would agree with adidas, wouldn't you, that --

9 strike that.

10       You're familiar with the concept of goodwill?

11 A.  Yes, I am.

12 Q.  And you would agree with adidas, wouldn't you, that

13 goodwill, with respect to adidas -- or damage to adidas'

14 goodwill would be measured by damage to its brand.  Correct?

15 A.  Could you repeat that?

16 Q.  And you would agree with adidas, wouldn't you, that damage

17 to goodwill -- from adidas' perspective -- means a damage to

18 adidas's brand?

19 A.  That would be part of it, yes.

20 Q.  And no one from adidas told you, did they, that their brand

21 is worth less now because of anything my client did?

22 A.  No.  No one ever said that to me from adidas.

23 Q.  And you've heard and the jury's heard repeatedly -- so I'm

24 not going to do it again -- that between 2000 and 2007,

25 adidas's brand value, the value of its trademarks has increased

Exhibit 1 - Page 116 of 262

1 dramatically?

2 A.  Yes.  And that was instrumental in determining the various

3 relative negotiating position between adidas and Payless that

4 we used in our reasonable royalty analysis.

5 Q.  So if the jury was going to be considering any injury to

6 goodwill by looking at the value of the adidas's brand, the

7 only evidence they had before them is that the brand has

8 increased in value?

9 A.  Well, it has increased in value in -- in a complete sense,

10 but that doesn't mean that it couldn't have increased in value

11 more than that if the infringement activity had not taken

12 place.

13 Q.  But you haven't done any research, investigation, or

14 valuation effort to determine if that's a fact, have you?

15 A.  That's correct.

16 Q.  And so you're not telling the jury somehow that this 41

17 million dollars that your -- you believe is appropriate

18 compensation is compensation -- is the amount by which adidas'

19 brand has been damaged, are you?

20 A.  It's not a direct correlation to that, that's correct.

21 Q.  And if you wanted to look at a measure of damages to

22 adidas's brand, one thing you could look at is a corrective

23 advertising award.  Correct?

24 A.  That is one thing you could look at, yes.

25 Q.  And you asked Mr. Henn whether or not you should do a

Exhibit 1 - Page 117 of 262

Page 1439

1 Q.  You agree that when you're talking about a license, you're

2 talking about a profit split.  Correct?

3 A.  Not in all cases.

4 Q.  Well, let's take a look at your deposition, page 185, 16 to

5 23.

6           "Question:  I take it you agree that some profit

7           split is appropriate in a hypothetical license

8           negotiation, such as you conducted in your March

9           12th, 2000, expert report?"

10          "Yes.  In fact that's the whole point of a

11          reasonable royalty analysis.  That's correct."

12          And you would agree what Payless would be willing to

13 pay adidas is relevant to your hypothetical analysis, isn't it?

14 A.  It is a factor that needs to be addressed.  But, again, I

15 think adidas was in a much stronger negotiating position.

16 Q.  So you're agreeing with me that what Payless would be

17 willing to pay is relevant to the hypothetical negotiation that

18 you're asking this jury to make?

19 A.  I also think that adidas would have had some type of

20 minimum pricing restrictions.

21 Q.  Try one more time.

22          You would agree, wouldn't you, that what Payless was

23 willing to pay for a license is relevant to this jury's

24 hypothetical negotiation?

25 A.  It's minimally relevant.

Exhibit 1 - Page 118 of 262

Page 1440

1 Q.  And you would agree that if Payless's profit margin on the

2 accused shoes that it sold was less than 10 percent, Payless

3 never would have agreed to pay adidas a license fee equal to 10

4 percent?

5 A.  Well, therein lies the answer or the solution to the

6 problem.

7        If adidas is going to require a minimum price, that's

8 going to increase -- or likely increase the profit margin

9 associated with the product.

10 Q.  Would Payless agree to enter a license agreement with

11 adidas that was more than its profit margin on the shoes?

12 A.  Again, before the negotiation is concluded, there's no way

13 of knowing what the profit margin is on the shoes.  So that's a

14 risk that the licensee takes.

15 Q.  A licensee is not going to agree to a royalty rate that is

16 10 percent of net sales when its profit margin is only 10

17 percent.  Correct?

18 A.  And I would say that a licensor is not going to agree to an

19 agreement that substantially undervalues their assets.

20 Q.  So if -- try again, because I don't think you gave me an

21 answer.

22        If Payless's profit margin on its shoes is only 10

23 percent, Payless would not enter -- has no incentive to enter a

24 license with adidas for 10 percent?

25 A.  Their incentive is reduced.  I agree with that.

Exhibit 1 - Page 119 of 262

Page 1441

1 Q.  They have no incentive?

2 A.  They may look at it as a loss leader to bring additional

3 customers into the store.  There are a number of other

4 different promotional aspects.

5 Q.  I'll show you what's impeachment Exhibit 375.

6          MR. SHAEFFER:  Can I approach, your Honor?

7          THE COURT:  You may.

8          MR. HENN:  (Handed document.)

9          THE WITNESS:  (Handed document.)

10         Thank you.

11 BY MR. SHAEFFER:

12 Q.  Can you identify this document I pulled off of your

13 website?

14 A.  This is an article that I wrote.  I guess it was back in

15 2004.

16 Q.  Okay.  And it's on your website?

17 A.  Yes.

18 Q.  So if anyone's looking to retain you as an expert in a

19 case, you put this article forward as an authoritative piece

20 that you've written?

21 A.  Yes.  This has to do with patent licensing.

22 Q.  And you wouldn't put this document on your website if you

23 didn't believe its contents were true?

24 A.  That's correct.

25 Q.  So let's go to page 3 of this document.

Exhibit 1 - Page 120 of 262

Page 1442

1 A.  Okay.

2 Q.  Do you see the quote "broadly speaking"?

3 A.  Yes.

4 Q.  Now, you kind of derided one of Payless's experts,

5 Mr. Epperson, for using the 25 percent rule.  But you reference

6 the 25 percent rule in your own article, don't you?

7 A.  Yes, I do.  I think my derision was more to his

8 misapplication of the rule.

9 Q.  Well, you also know that our counterpart to you in this

10 case isn't Mr. Epperson.  It's Dr. Haas?

11 A.  He's also an expert report -- or he has an expert report

12 that I reviewed as well, yes.

13 Q.  And he's the one who's providing an alternative royalty

14 calculation.  Correct?

15 A.  Okay.

16 Q.  Mr. Epperson is not?

17 A.  Mr. Epperson had royalty calculations in his report.

18 Q.  Well, the jury will remember that, and we'll hear

19 Mr. Epperson when he comes here.

20        And you talk about the 25 percent rule here.

21        And you say, "This rule is based on the fact that a

22        licensee will be unwilling to pay an amount that is

23        inconsistent with the realities of the market in

24        which it operates.  For example, a licensee is not

25        going to agree to a royalty rate that is 10 percent

Exhibit 1 - Page 121 of 262

1           of net sales when the profit margin is only 10

2           percent.  There is no incentive to compete in a

3           marketplace when all of the rewards are going

4           somewhere else."

5           You agree with that statement, don't you.

6  A.  Yes.  And I would also point to the first two words of the

7  paragraph, "broadly speaking."  That means in a general sense,

8  that is absolutely true.

9  Q.  Well, royalty rate that results in the licensee losing

10 money on every product isn't reasonable, is it?

11 A.  Well, again, you're -- you're bringing some of the elements

12 of my analysis in and ignoring other elements, such as the

13 requirement for a minimum pricing.

14 Q.  I listened closely to Mr. -- Mr. Henn's examination of you.

15 And I've looked at all of your documents, I've read your

16 reports, I've read your depositions.  I've looked at all of

17 this stuff.  There's nothing about this minimum pricing issue

18 anywhere.

19          Mr. Henn didn't talk about it, did he?

20 A.  I don't remember Mr. Henn talking about it.  I have

21 mentioned it.  I don't remember if it was during your

22 examination or Mr. Henn's examination.  But I distinctly

23 remember mentioning minimum pricing.

24 Q.  So when you're talking about minimum pricing, now, you're

25 talking about that adidas would have required Payless to raise

Exhibit 1 - Page 122 of 262

1 the price of its shoes?

2 A.  The shoes that feature their brand assets, yes.

3 Q.  Okay.  And in this hypothetical negotiation, let's say

4 adidas says you're going to have to raise the price of all of

5 these shoes to 30 dollars.  Okay?  Are you with me so far?

6 A.  Sure.

7 Q.  And Payless sold 30 million shoes in this case.  Do you

8 know that?

9 A.  That sounds reasonable, yes.

10 Q.  So wouldn't that increase the revenue number?

11 A.  It would increase the revenue number.

12 Q.  Well, have you explained to the jury how to take that into

13 consideration when they're doing this calculation?

14 A.  What you're taking into -- into consideration for the

15 calculation is the actual results and then applying the

16 reasonable royalty to that.

17 Q.  But you just told me that in these hypothetical

18 negotiations there would have been a minimum price.  Would

19 there have been a minimum price, or wouldn't there have been?

20 A.  I think for the negotiation to be concluded successfully,

21 there probably would have been a requirement for a minimum

22 price.

23 Q.  And if there was I minimum price, the revenues would have

24 been higher?

25 A.  I don't know that.

Exhibit 1 - Page 123 of 262

Page 1445

1 Q.  Well, you also know if you raise prices you tend to sell

2 less shoes.  Right?

3 A.  Thereby the revenue figure may not change.

4 Q.  So how's the jury -- this jury, here, supposed to figure

5 this out in a nonspeculative manner?

6         You've got an opinion here that says there has to be a

7 minimum price.  If the minimum price is higher than the price,

8 your revenues are going to go up.  But with a higher minimum

9 price, you're going to sell less.

10        What number are they supposed to start with?

11 A.  Again, they're supposed to look at the sales activity

12 associated with the infringing shoes, and then apply a

13 reasonable royalty based on existing license agreements.

14 Q.  But you just told me that the price that these shoes were

15 sold for is the wrong price.

16 A.  From adidas's perspective, absolutely.

17 Q.  So this hypothetical negotiation wouldn't have resulted in

18 a license agreement.

19 A.  Well, unfortunately, Payless didn't stop to negotiate with

20 adidas.

21         (Sealed testimony adjourned.)

22

23

24

25

Exhibit 1 - Page 124 of 262

Drews - X - SEALED

1      DAVID DREWS

2    called as a witness in behalf of the Plaintiff, having

3    been previously duly sworn, is examined and testifies as

4    follows:

5

6                    CROSS-EXAMINATION

7    BY MR. SHAEFFER:

8    Q. Good morning, Mr. Drews.

9    A. Good morning.

10   Q. How are you today?

11   A. I'm fine.

12   Q. When we broke yesterday, we were talking about your

13   hypothetical negotiation between adidas and Payless.  We

14   were talking about minimum pricing.  We were talking

15   about royalties and splitting of profits.  I just have

16   one more question in this area.  Then we can move on.

17         In your thought process of putting all of this

18   together, isn't it true that --

19         MR. SHAEFFER:  Oh, set up Drews 1, so the jury

20   can get acclimated here.

21   BY MR. SHAEFFER:  (continuing)

22   Q. This is my version of what your opinion is here; is

23   that correct?

24   A. Yes.

25   Q. And as part of your thought process in doing all of

Exhibit 1 - Page 125 of 262

Drews - X - SEALED

1    this, you came up with your royalty rate.  You assumed

2    that the profit split between adidas and Payless would be

3    about 50 percent, didn't you, 50-50?  Adidas would get 50

4    percent of the profits from the sale of these shoes and

5    Payless would get 50 percent of the profits?

6    A. I don't know that that was an assumption that I made.

7    I think that that would be a reasonable outcome.

8    Q. So I'm trying to get an understanding of what you

9    mean by reasonable outcome, that at an eight percent, you

10   believe that that would result when the minimum pricing

11   is set, the shoes' pricings are all set, the split of

12   profits between adidas and Payless would be about 50-50?

13   A. Again, I don't think that was a part of my

14   consideration or my analysis.  I wasn't trying to come up

15   with a 50-50 split.  But if that's the way that it shakes

16   out, I think that would be reasonable.  I think that

17   adidas is bringing forth a significant contribution to a

18   licensing effort here.

19   Q. Do you remember when we talked yesterday in your

20   analysis and I showed you that article from your Web

21   site, and you were talking about in this hypothetical

22   negotiation, the licensee is never going to sign a

23   license agreement when they give up all their profits,

24   right?

25   A. Very seldom does that happen.

Exhibit 1 - Page 126 of 262

Drews - X - SEALED

1    A. Yes, it is.

2    Q. Now, the agreements you considered were these -- I

3    think it's about 12.

4         Let's put up Exhibit 1003, which again I know is

5    kind of hard to read, but you selected out of the license

6    agreements you looked at with adidas about 12 agreements?

7    A. Yes, the most relevant ones.

8    Q. And these were the agreements that the lawyers

9    provided to you?

10   A. Yes.  Most of the documentation came from the

11   attorneys.

12   Q. And at the time you wrote your expert report in

13   this -- in this case, did you talk to anyone at adidas to

14   ask them -- ask adidas whether or not they had any other

15   relevant royalty agreements?

16   A. I personally did not.  I believe someone in our

17   office, prior to my involvement in this project, may

18   have, but I don't know for certain.

19   Q. So you don't know whether anyone in your office spoke

20   to adidas prior to your involvement?

21   A. I don't know.  The collection of the license

22   agreements had all taken place before I became involved.

23   I simply analyzed them.

24   Q. And I think my understanding is you excluded certain

25   of adidas' licenses.  You excluded the license between

Exhibit 1 - Page 127 of 262

Drews - X - SEALED

1    adidas USA and adidas Germany?

2    A. I think that was included.

3    Q. But is that included in your royalty calculation?

4    A. Yes, I believe it is.

5    Q. Okay.  But you excluded the license agreements that

6    were parts of settlements of lawsuits?

7    A. Yes, I did.

8    Q. And you excluded license agreements that related to

9    figurines and video games?

10   A. Yes.

11   Q. But what you wanted to include was all the license

12   agreements involving clothing?

13   A. Products, products that consumers actually wear or

14   utilize, watches, things of that nature.

15   Q. You would agree, wouldn't you, that a T-shirt is

16   apparel?

17   A. Yes.

18   Q. Look at 3540.  This is a June 2003 license agreement

19   with Team Edition apparel.  Do you know why you didn't

20   include that license?

21   A. Give me one minute to look through, please.

22   Q. Uh-huh.

23   A. I don't recall having seen this license agreement

24   prior to producing my report.

25   Q. Your report, though, was done in 2007, correct?

Exhibit 1 - Page 128 of 262

Drews - X - SEALED

1   A. Yes.

2   Q. So this license agreement was in adidas' possession

3   in 2007 -- in 2007?

4   A. I would assume, yes.

5   Q. And this wasn't provided to you, to the best of your

6   recollection?

7   A. That's correct.

8   Q. And it's not included in your calculation?

9   A. It does not -- it is not included in the calculation,

10  that's right.

11  Q. And can you -- we can look at paragraph 2 of this

12  agreement.  You can confirm that this agreement is for

13  T-shirts, Tracy McGrady T-shirts --

14  A. Tracy McGrady T-shirts, that's correct.

15  Q. -- that use the adidas mark?

16  A. Yes.

17  Q. And you understand that Tracy McGrady is one of the

18  athletes who features prominently in adidas ads?

19  A. Yes.

20  Q. You see also this is a non-exclusive license?

21  A. That's correct.

22  Q. And can you explain to the jury real briefly the

23  difference between an exclusive and non-exclusive

24  license?

25  A. Well, it usually has to do with a product category or

Exhibit 1 - Page 129 of 262

Drews - X - SEALED

1   a geography.  An exclusive license means that no other

2   licensees will be allowed to use those rights in either

3   that territory or on that product category.

4        A non-exclusive license means that other

5   licensees may be signed up to have similar rights in

6   similar product categories or geographies.

7   Q. Now, is a licensee going to pay as much for a

8   non-exclusive license as they would for an exclusive

9   license?

10  A. Typically a licensee will pay a little bit more for

11  an exclusive license.

12  Q. And in your hypothetical negotiations between adidas

13  and Payless, you were assuming a non-exclusive license?

14  A. It would have to be a non-exclusive license, yes.

15  Q. And if we take a look at paragraph 3, which is the

16  royalty rate for these T-shirts, you can see that this

17  royalty rate is four percent of wholesale sales?

18  A. Yes.  It says four percent of net sales, so I would

19  assume that that's the licensee's sales, which would be

20  the wholesale level.

21  Q. If you read a little further, it says "wholesale."

22  A. Okay.  Yes.

23  Q. So if we took that up to your retail analysis, that

24  would have been two percent?

25  A. That's correct.

Exhibit 1 - Page 130 of 262

Drews - X - SEALED

1  Q. And if you would have included this in your analysis,

2  that would have reduced the overall royalty rate you

3  would have considered appropriate in this case?

4  A. Slightly.  It's within the royalty rates that were

5  within that exhibit, 1003.  The range, if I remember

6  correctly, was two to 18 percent.

7  Q. Yes.  But when you did your analysis, you always took

8  the midpoint of those ranges, right?

9  A. Not the midpoint.  The average.

10  Q. The average.  Okay.  The average of those.

11      But in no instance and in none of these did you

12  take the -- was the average number in any of your royalty

13  agreements two percent?

14  A. No.

15  Q. So this, then, would reduce the appropriate royalty

16  rate that you presented in this case?

17  A. It would have a slight impact.  I would say probably

18  less than a quarter percent.

19  Q. And can you think of any reason you would exclude

20  this -- the jury should exclude this contract from their

21  analysis?

22  A. No, not as I sit here right now.

23  Q. Let me show you another one, 3589.  This is an

24  agreement between adidas and Adams USA.  It's another

25  agreement that doesn't appear in your analysis, correct?

Exhibit 1 - Page 131 of 262

Drews - X - SEALED

1    A. I don't believe this is in that 1003, that's correct.

2    Q. And if you go under licensed product, this agreement

3    is for -- it's 1.5.  This agreement is for baseball and

4    football gloves, correct?

5    A. Baseball and football gloves, yes.

6    Q. So that would fit within the realm of what you were

7    including in your analysis as being relevant?

8    A. That's correct.

9    Q. And if you go to 2.1, Adams is given an exclusive

10   license, aren't they?

11   A. I'm sorry.  2.1?

12   Q. 2.1.

13   A. Exclusive license within the territory, yes.

14   Q. And if you look at 1.7, they were given rights to use

15   a whole variety of marks, designs, and patents.  They got

16   the whole basketful of intellectual property rights to

17   use with these gloves?

18   A. With the notable exception of the Superstar trade

19   dress.

20   Q. Well, you couldn't put a -- you couldn't put the

21   trade dress on a glove, could you?

22   A. No.  But my point is that different licensees will be

23   interested in different bundles.  The Payless bundle is

24   different than the bundle of assets that would be

25   utilized by a baseball and a football glove licensee.

Exhibit 1 - Page 132 of 262

Drews - X - SEALED

1   Q. But when I look at 1.7, I don't see this saying they

2   can't use the Superstar trade dress.  So if they could

3   figure out a way to do it, they could have put it on

4   there, right?

5   A. I would say it's not specifically enumerated.

6   Q. But it's not -- is anything excluded?  Trademarks,

7   patents, utility models, copyrights, other intellectual

8   property rights, graphic designs and other devices?

9   A. It would seem to include all of the various

10  intellectual property assets, yes.

11  Q. That would hold true also for those Tracy McGrady

12  T-shirts.  If they could find a way to put that trade

13  dress on a T-shirt, they'd have those rights as well?

14  A. That's correct.

15  Q. Okay.  Now, let's look at the license agreement in

16  this license agreement, 5.1.

17  A. 5.1?

18  Q. Yeah.

19  A. Okay.

20  Q. And that's the license fee here, right, or the

21  royalty rate?

22  A. These are the royalties, yes.

23  Q. And it goes from zero to five percent?

24  A. Yes, it does.

25  Q. And had you included this agreement, that would also

Exhibit 1 - Page 133 of 262

Drews - X - SEALED

1   tend to force down the royalty calculation in this case,

2   right?

3   A. That's correct.

4   Q. And this is on a wholesale basis again?

5   A. I believe so, yes.

6   Q. So we're actually -- if they sold -- it's only when

7   they sell -- have sales of more than $4 million that

8   they're going to be paying five percent, right?

9   A. That's correct.

10          I also note that this agreement dates from 1997.

11  And, again, that was prior to the evolution of the

12  licensing program at adidas to become much more

13  restrictive and controlling.

14  Q. And that was the licensing program that you didn't

15  know about when you wrote your report, right, in 2007,

16  because you hadn't spoken to anyone from adidas at that

17  point in time?

18  A. No.  I was able to discern that from my analysis of

19  the contracts.

20  Q. Oh, okay.  So just by reading contracts, you're able

21  to discern what the licensor is thinking?

22  A. I'm able to see that there is an evolution in the

23  language contained in the agreements to be much more

24  restrictive and much more controlling of what the

25  licensee's actions are, yes.

Exhibit 1 - Page 134 of 262

Drews - X - SEALED

1   second.

2          THE WITNESS:  It's 1003.  I'm sorry.

3   BY MR. SHAEFFER:  (continuing)

4   Q. 1003.  Sorry.  1003.

5   A. I just want the record to be accurate.

6   Q. I'm a little dyslexic.  So any time you can help me,

7   that's great.

8          You list a few contracts on here as being -- as

9   being non-exclusive.  Do you see that?

10  A. Yes.

11  Q. Now, I want to see if I understand what you're doing

12  here.  And we talked about earlier that being exclusive

13  is more valuable than being non-exclusive, right?

14  A. For the licensee, yes.

15  Q. And almost all of these licenses are exclusive except

16  for, I think, three?

17  A. I think that's right.

18  Q. Let's take a look at 3581, which is one of the Agron

19  agreements that you say is non-exclusive, right?

20  A. That's correct, yes.

21  Q. Let's look at paragraph 2.1, page 7.

22  A. Okay.

23  Q. And I'll agree with you it says non-exclusive as to

24  know-how, but you see it says it's exclusive as to the

25  licensed products?

Exhibit 1 - Page 135 of 262

Drews - X - SEALED

1   A. Yes, it does.

2   Q. So it's an error to call that one non-exclusive?

3   A. Well, there are provisions for both.  But in terms of

4   use of the brand assets, it is an exclusive agreement,

5   yes.

6   Q. Well, that's what we're talking about here.  Was

7   adidas going to provide Payless any know-how?

8   A. In terms of the product sourcing and manufacturing,

9   yes.

10  Q. But, I mean, that would have been on a non-exclusive

11  basis, right?

12  A. Yes.

13  Q. But was adidas going to give us exclusive rights on

14  use?

15  A. No.

16  Q. So for purposes of your analysis here, this Agron

17  agreement should have been exclusive?

18  A. That's correct.

19  Q. Now let's look at the Power of Two agreement, 3603,

20  another one of the agreements that you said was

21  non-exclusive, right?

22  A. Yes.

23  Q. 2.1 is the exact same provision that was in the Agron

24  agreement, isn't it, page 5?

25  A. Yes, it is.

Exhibit 1 - Page 136 of 262

Drews - X - SEALED

1  Q. So, again, you made another error.  This one should

2  have been exclusive and non-exclusive?

3  A. That's correct.

4  Q. Let's go to the third one, see if it has the same

5  provision, the Berlin agreement.

6  A. The Betlin agreement.

7  Q. Betlin agreement.  Sorry about that.

8        And that is 3606, page 5.

9  A. Okay.

10       MR. SCHAEFFER:  Let's pull it out again, so the

11  jury knows, 2.1.

12       THE WITNESS:  And it does have the same language

13  as the other two.

14  BY MR. SHAEFFER:  (continuing)

15  Q. So it's also exclusive?

16  A. For the use of the brand assets, yes.

17  Q. So every single one of the contracts that you

18  compared Payless to was exclusive?

19  A. Yes.

20  Q. So there is an error in your chart, then?

21  A. That's correct.

22  Q. But I bet you're going to tell me that wouldn't

23  change your analysis.

24  A. It would have a minimal impact.

25  Q. Would you agree with me that the right to use three

Exhibit 1 - Page 137 of 262

1563

1  Correct?

2  A.  That is correct.

3  Q.  What percentage of Payless's overall sales, during that

4  same relevant time period, does the 393 million dollars

5  reflect?

6  A.  It's about 1.7 percent, over the entire period.

7  Q.  And how do you know that the 393 million dollars reflects

8  only 1.7 percent of Payless's overall sales?

9  A.  Yes.  By doing some pretty simple math, we do know what the

10  total revenue was for Payless over that relevant period of time

11  for domestic sales.  It's about 23 billion dollars.  And we

12  obviously know what the sales were for the alleged infringing

13  footwear, which is about 393 million dollars.  And so by

14  dividing 23 billion into 393 million, you'll come up with about

15  1.7 percent.

16  Q.  And can you explain to the jury what you believed were the

17  key issues in your analysis of Payless's profits?

18  A.  Yes.  Really -- really two key things that -- that -- that

19  were issues that we needed to address as we were doing our

20  work.

21      And the first was to determine of Payless's expenses,

22  which expenses are variable expenses and which expenses are

23  fixed expenses.  So that was the first thing that we addressed.

24      The second was to determine of the expenses in

25  Payless, what expenses actually contributed to or provided

Exhibit 1 - Page 138 of 262

1571

1   alleged infringing shoes?

2   A.   In my opinion, the only expenses that should be deductible

3   are those expenses that are of a variable nature.  And in my

4   analysis, those expenses are limited to what's called

5   merchandise cost of sales.

6   Q.   And that term you just used was merchandise cost of sales?

7   A.   Correct.

8   Q.   And what does -- and I put back up here Exhibit 995, which

9   was your summary -- profit summaries.

10          And is that term, "merchandise cost of sales"

11  reflected on here?

12  A.   Yes, it is.  There, at the very bottom of this schedule, I

13  define what merchandise cost of sales -- at least in a very

14  overview, simple way.  And that is, first cost, store cost,

15  damage and shrink, freight adjustments.  There is another

16  profit adjustment that Payless uses called a PSSI, slash, PSI.

17  I'm not sure what the nomenclature stands for.  And other

18  purchase order adjustments.

19          Within the first costs, you've got things that really

20  make up what's called a landed cost.  So you've got the actual

21  cost to buy the footwear.  And then the, you know, duty and

22  freight and brokerage commissions to bring that footwear here

23  into the United States, if manufactured overseas.

24          So this captures, you know, all of the costs

25  associated with, you know, the actual piece of footwear that

Exhibit 1 - Page 139 of 262

1572

1   was being sold, in this analysis.

2   Q.  Okay.  And -- and the other items there?  Store costs,

3   damage and shrinkage, freight adjustment, et cetera?

4   A.  Yes.  We believe and assume that all of those are variable

5   costs that are going to -- that are going to move with changes

6   in revenue.

7        You know, since -- since there are 393 million dollars

8   of value of shoes that have been sold in this case, we're

9   assuming that, in this case, the -- the costs are going to go

10  up, commensurate for all of these items that are listed in the

11  merchandise cost of sales.

12  Q.  Now, like you, did Mr. Epperson, in conducting his profit

13  analysis, deduct only those expenses that actually contributed

14  to or provided actual assistance in the production,

15  distribution, or sale of the alleged infringing shoes?

16  A.  He did not.  The terminology that Mr. Epperson uses

17  throughout his report is the term "related to," shows up under

18  the other cost categories that he analyzes -- or all of the

19  cost categories that he analyzes.

20       So he's using a description or definition of which --

21  which costs are deductible based on whether these costs are

22  related to the sales, as opposed to actually contributing to.

23       So effectively, what Mr. Epperson does is deduct from

24  revenues virtually all of the costs of Payless in operating

25  their business.  Variable costs and fixed costs alike.

Exhibit 1 - Page 140 of 262

1573

1  Q.  And let's turn to your more detailed analysis in this case.

2       Have you prepared a schedule to help explain to the

3  jury your analysis?

4  A.  Yes, I have.

5       MR. FELDMAN:  Okay.  And, Antonio, if you could pull

6  up Exhibit 996.

7  BY MR. FELDMAN:

8  Q.  And can you identify this document and explain to the jury

9  what it reflects.

10 A.  Yes.  This is our defendant's profit analysis.  You can see

11 that -- or you may not be able to see that in the upper

12 left-hand corner.

13      The -- the left column of this schedule has exactly

14 the same descriptors -- descriptors of revenue, all the way

15 down to the various expense items that we saw on the schedule a

16 couple of minutes ago.

17      So this is laid out in the same format as the

18 profit-and-loss statements of Payless, as provided to us.

19      Across the top, you'll also see the same years that --

20 that we spoke about a few minutes ago, from 1999 through 2007.

21      What's a little different here, what's added is this

22 column that's there on the left-hand -- or, yeah, excuse me.

23 Left-hand side, which is the first boxed column.  Which has Ys

24 and Ns in it.  Which stands for expenses that we have either

25 deducted or not deducted, as a part of this profits analysis.

Exhibit 1 - Page 141 of 262

1574

1    And you can see in this analysis -- and this is what I

2    mentioned just a couple of minutes ago.  Under our profits

3    analysis, the only expenses that -- that I believe are --

4    are -- are deductible in this case are the merchandise cost of

5    sales, which is the very first line item that you see here

6    right after the sales revenue for the accused lots.

7    Q.  And what were the total merchandise cost of sales over

8    the -- the entire relevant period, fiscal year 1999 through

9    fiscal year 2007?

10   A.  Yes.  If Antonio could blow up that upper right-hand

11   corner.  Yes, there.

12       Again, we have the sales number we've talked about

13   before, which is the 393 million dollars.  And so the -- the

14   total merchandise cost of sales over the entire period are

15   184,656,520 dollars.  And that represents approximately 47

16   percent of the sales that were generated over that period of

17   time.

18   Q.  And then when you deduct the approximately 184 million from

19   the approximately 393 million, you are left with?

20   A.  Down in the bottom right-hand corner, you're left with our

21   profits opinion in this case, which is 208,790,506 dollars,

22   which is about 53 percent of the sales that were made in this

23   case.

24   Q.  And -- so you and Mr. Epperson are at least in agreement on

25   the fact that the merchandise cost of sales should be deducted.

Exhibit 1 - Page 142 of 262

1575

1   Correct?

2   A.  Correct.

3   Q.  Now, you mentioned earlier that you've done work in other

4   trademark infringement cases involving adidas.  Correct?

5   A.  Yes.  Two other cases that are currently -- currently

6   going.

7   Q.  Now, is there anything from your work in those cases that

8   helps inform your opinions in this case?

9   A.  Each of the three cases are different.  But what's, I

10  think, particularly of interest is in the case that we have

11  that Wal-Mart is opposite, there is an expert that's been

12  engaged in that case.  And a man named Mr. Scott Phillips,

13  who's a CPA, whose opined about the lost -- or about the

14  profits of Wal-Mart in that case.  And he is of the same

15  opinion that I am, that the only costs that are deductible from

16  the income statement should be cost of sales.

17  Q.  So in this case, based on the analysis that you've

18  performed, and we've already seen, your -- your profits opinion

19  is -- is it the number we've just been looking at?  The 208

20  million --

21  A.  Yes, it's the 208 million dollar number at the bottom of

22  that schedule, in the right-hand corner.

23  Q.  And in your opinion, if adidas is awarded a full recovery

24  of profits in -- in that amount, would it constitute a double

25  recovery for adidas to also recover a reasonable royalty

Exhibit 1 - Page 143 of 262

1578

1   infringement?

2   A.   Yes.

3   Q.   Now, in this case did you do any other profit calculations?

4   A.   Yes, we did.

5   Q.   And why did you do those other calculations?

6   A.   Well, as I mentioned a few minutes ago, Mr. Epperson

7   essentially deducted all items of expense throughout the entire

8   income statement, or profit-and-loss statement; from the

9   merchandise cost of sales, all the way down to interest

10  expense, for instance.

11       So in order to -- and we are in disagreement about

12  that, clearly.  Because the expenses that we are deducting are

13  just the merchandise cost of sales.

14       But knowing that there's going to be facts and

15  witnesses presented in this case and there are some clear

16  divisions in that profit-and-loss statement, it was my opinion

17  that it would be good to set out a profits calculation using a

18  couple of different alternatives to measure profits, by

19  deducting additional expenses, again, for illustrative

20  purposes.  And so we have prepared two different alternative

21  calculations that essentially deduct additional expenses that

22  we don't believe should be deducted but yet Mr. Epperson has

23  deducted.

24  Q.   And have you called those other profit calculations

25  alternative A and alternative B?

Exhibit 1 - Page 144 of 262

1579

1   A.  Yes, I have.

2   Q.  Let's take a look at your alternative A profits analysis.

3        MR. FELDMAN:  And, Antonio, if you could pull up --

4   thank you.  That's Exhibit 997.

5   BY MR. FELDMAN:

6   Q.  And can you identify this document and tell the jury what

7   it reflects.

8   A.  Yes.  You'll see up in the upper left-hand corner, this is

9   defendant's profit analysis, alternative A.  You'll see that

10  those boxes and descriptions there, in the top half of that

11  schedule, are exactly the same as discussed before but the

12  profit numbers have changed.

13       So, for instance, for all alleged infringing lots, the

14  profits that are determined in this case, under alternative A,

15  are now 137,003,578 dollars, which represents about 34.8

16  percent of revenues over that period of time.

17       And the profits that relate to the Superstar lots only

18  are 47,531,757 dollars.

19       And you'll see what happens here, by looking at the

20  bottom half of this schedule, is that we in fact reduced the

21  revenue figure by additional expenses from the profit-and-loss

22  statement of Payless.

23  Q.  And like you did with your primary analysis, have you

24  prepared a schedule to further illustrate the -- this -- this

25  profits analysis, alternative A?

Exhibit 1 - Page 145 of 262

1    A.  Yes, we have.

2         MR. FELDMAN:  And, Antonio, if you could pull up 998.

3    BY MR. FELDMAN:

4    Q.  Now, is this the schedule that you prepared?

5    A.  Yes, it is.  This is the schedule that looks exactly the

6    same as our profits analysis that we discussed a few minutes

7    ago, but this is now alternative A.

8         And you can see that the -- if you would be able to

9    see, I guess.  Everything about this schedule -- which I'm

10   sorry it's so small.

11        But the only change that's been made is that now there

12   are a number of additional Ys, instead of Ns, in that first

13   section of that P and L.  So this is the first natural break I

14   was talking about a minute ago, because Payless accounts for

15   their total cost of sales in two different ways.

16        One is what they're calling their merchandise cost of

17   sales, and they arrive at what's called a merchandise margin

18   after they've deducted those.  And then they have what are

19   called other cost of sales.  And it's these other cost of sales

20   that, in this -- in this alternative, we are deducting.

21   Q.  Well, in fact is it -- is it the case that you're deducting

22   all of the other cost of sales with the exception of

23   depreciation?

24   A.  That is true.

25   Q.  Now -- and the cost categories that are listed under the

Exhibit 1 - Page 146 of 262

1587

1   11,015,725 dollars.

2          The bottom half of that schedule, you can see that the

3   list has grown.  We're now including items of selling general

4   and administrative expense, that was not included under

5   alternative A.

6   Q.  And like you did with your primary analysis and your

7   alternative A analysis, have you prepared a schedule to further

8   illustrate your analysis for alternative B?

9   A.  Yes, we have.

10         MR. FELDMAN:  And, Antonio, if you could bring up

11  Exhibit 1000.

12  BY MR. FELDMAN:

13  Q.  Is this the schedule you prepared?

14  A.  Yes.  Looks a lot like the other couple of schedules that

15  we've looked at now.

16  Q.  Just some additional Ys?

17  A.  Correct.  Some additional Ys.

18         And maybe we can focus, for just a moment, over on

19  that far left-hand, about halfway down there.

20         You can see that -- you know, again, let's kind of

21  recap.  At the top we have the sales of all of the product.  We

22  have the first line item deducted being the merchandise cost of

23  sales.  We then have that next category, which we've just

24  spoken about, which is the other cost of sales.

25         So you then get to this next level of disclosure on

Exhibit 1 - Page 147 of 262

1588

1    the profit-and-loss statement, and that's called selling,

2    general, and administrative expense.  Includes these six line

3    items.  You have payroll, payroll tax, advertising costs, other

4    operating expense, store development reclass -- that's that

5    100,000 dollars that I told you was moved from down here, up

6    above.  And then you have something called nonoperating

7    expense, slash, income.  To get to a total selling general,

8    administrative expense in that category.

9    Q.  So are the costs categories listed under this heading

10   selling general and administrative expense, are those expenses

11   that Mr. Epperson conducted in carrying out his analysis?

12   A.  Yes, he did, except for two adjustments that I should

13   mention.

14        One is that Mr. Epperson made the decision not to

15   deduct legal expense, which would be within this category of

16   expense.  We have in fact deducted it.  So our profits number

17   would be lower than his by that amount.

18        And then, secondly, there is a portion of what he

19   considers selling expenses that relate mostly to payroll,

20   that's in this category, that he also did not deduct.  But

21   otherwise, all of the categories, yes.

22   Q.  And in your opinion, should any of these cost categories

23   under selling general, administrative expense be deducted in

24   terms of a profit analysis in this case?

25   A.  No.

Exhibit 1 - Page 148 of 262

1603

1   A.  Is that the EBIT number?

2   Q.  That is the EBIT number.

3        MR. FELDMAN:  Your Honor, I don't believe that is.

4   That -- I think that that's the earnings before income taxes

5   number below the EBIT number.

6        THE WITNESS:  I think the EBIT number is two lines up

7   from there.

8        MR. FELDMAN:  It is.  If you would like, I can -- I'm

9   holding it.  I can read it to you, Mr. Sickler.

10       With counsel's permission?

11       MR. SHAEFFER:  That's fine.

12       MR. FELDMAN:  And I also -- I think that we're talking

13  about billion, not million.

14       MR. SHAEFFER:  Billion.  Yes, exactly.

15       MR. FELDMAN:  So 1,152,941,530.

16       THE WITNESS:  Divided by --

17  BY MR. SHAEFFER:

18  Q.  The total revenues, which is --

19  A.  Twenty two, nine, seventy, four, nine, seven, seven, two,

20  three.

21       But my calculator doesn't go that far.  I'm going to

22  have to do a little rounding here.

23       Okay.  Let me look at this again here.

24       So I'm going to take 1152 divided by twenty two, nine,

25  seventy.  Equals -- just multiply by 1.7 percent.  Hang on

Exhibit 1 - Page 149 of 262

1604

1    here.

2        Go 1152 times .017 equals -- if I've got it right

3    here, about 19.6 million.

4    Q.  About 19.6 million dollars.

5        If we just applied your total revenue -- your total

6    revenue percentage to the -- of 1.7 percent to the normal

7    measure of profits for a corporation, the number would be about

8    1.9 million dollars?  19 million dollars?

9    A.  Yeah, the -- I would say, yes, with one proviso there.

10    That you characterize that as -- a normal measure of profit is

11    a -- is a commonly used measure of profit, and it would result

12    in 19 million dollars, in that case.

13    Q.  Common -- common measure of profits.

14        Do you know whether the sales of any of these accused

15    shoes here, independent of your analysis -- but just from a

16    traditional, general accepted accounting mechanism, do you know

17    whether or not Payless earned more money on the sale of the

18    accused shoes in this case than the other shoes it sold?  Did

19    they charge a higher price for them?  Did they get them

20    cheaper?

21    A.  I haven't seen any evidence about that in this case.

22    Haven't been provided any information about that.

23    Q.  So you don't have any reason to believe that there was any

24    greater profits associated with the accused shoes in this case

25    versus any other shoes sold at Payless?

Exhibit 1 - Page 150 of 262

1605

1   A.  Not that I've seen personally, no.

2   Q.  And I wonder if you could do one more helpful thing for me,

3   here, since you've got your calculator out.

4        Can you tell me the profit margin that -- that Payless

5   is getting here between -- you know, compare the total revenues

6   verses the EBITDA?

7   A.  Yes.  If we just highlight that same EBIT section that we

8   were in before, you can see that -- I was going to go back to

9   EBIT, which is -- for the total period, it's 1 billion 152

10  million dollars.

11       There, in the far right column, where there's the

12  percentages, you can see that that's 5 percent.  So that's

13  already been calculated on that schedule.

14  Q.  So they're earning about 5 percent of -- out of its

15  revenues, about 5 percent of the revenues turns into actual

16  profits?

17  A.  Yes.  For the overall company, that's true.

18  Q.  So if there was a 10 percent royalty put on top of those

19  revenues, Payless would be losing a lot of money, wouldn't it?

20  A.  (Pause.)  Well, I don't know how to characterize "a lot."

21       But, yes, if you were paying a royalty that was in

22  excess of what you're making there on the EBIT line, then doing

23  the math, you would be losing money.

24  Q.  If -- your profit margin is 5 percent, your royalty is 10

25  percent, that means you're now losing 5 percent?

Exhibit 1 - Page 151 of 262

1606

1   A.  Exactly.

2   Q.  Okay.  And do you know on average every year how many --

3   how many pairs of shoes Payless sells?

4   A.  Could we go back to -- I don't, off the top of my head.

5   But if we go to the Epperson document, I could do the

6   calculation for you.

7   Q.  Let me make it easier for you.

8        I actually have behind you our set of documents.  But

9   I'm just going to pull out the information from the 2006

10  Payless annual report.

11       MR. SHAEFFER:  If you could call that document up,

12  which is Exhibit 559.

13  BY MR. SHAEFFER:

14  Q.  And I'm looking at page 15.

15       And right under "general," pull that out.

16       And I think it says 177 million pairs of shoes were

17  sold in 2006.

18  A.  Yes, that's true, for their overall operations, including

19  the Caribbean and Central America and South America.

20  Q.  And if you look at -- if we go to page 10 of Exhibit 559,

21  what were -- I don't know if this is readable.

22       What were Payless's profits selling 177 million shoes

23  in 2006?

24  A.  You'll have to define for me which profits measure you

25  would like me to use.

Exhibit 1 - Page 152 of 262

1607

1   Q.  Well, let's take a very conservative one.  If we just look

2   at operating profits, they made 166 million dollars of

3   operating profits in 2006.  Right?

4   A.  Correct.

5   Q.  So under your analysis, you're asking this jury to award

6   more money than they -- than their profits were in 2006?

7   A.  Correct.  But, again, my profits analysis spans nine

8   periods versus the one period here.

9   Q.  You have no reason to believe there's anything inaccurate

10  about the -- about Payless's financial statements that we're

11  seeing here, do you?

12  A.  I hope not.  Otherwise, the auditors aren't going to be

13  very happy.

14  Q.  Well, let's step back a little bit.

15          What are -- just very, very briefly, what are

16  generally accepted accounting principles?

17  A.  Those are accounting principles that all public companies

18  must follow for Securities and Exchange Commission purposes.

19  And also most larger businesses around the country will follow

20  what's called GAAP -- sometimes referred to G A A P -- which is

21  generally accepted accounting principles.

22  Q.  And you have no reason to believe that Payless doesn't

23  follow general accepted accounting principles or normal

24  accounting practices?

25  A.  Yeah, I have no reason to believe that they don't.

Exhibit 1 - Page 153 of 262

1611

1    THE COURT:  All right.  Go ahead and ask a question.

2    If you're reading from his deposition, you quote the

3    page and the deposition number and ask him if he made that

4    statement.

5    BY MR. SHAEFFER:

6    Q.  Okay.  Then why don't we just take a look at your

7    deposition; which is right behind you, as well.  Page 111.

8    Lines 10 to 23.

9    A.  What page, again?

10   Q.  111.

11   A.  All right.  I have that in front of me.

12   Q.  Okay.

13       Question:  Have you ever, in your 20 years of

14       experience as a CPA or as a damage expert, ever

15       told a client that their selling expenses didn't

16       actually assist in or contribute to the sale of the

17       products in question?

18   No -- Answer:  No.

19       Question:  But that's what you're saying here,

20       isn't it?

21       Answer:  We are talking about a very specific

22       narrow section of law that deals with trademark

23       damages.  And, to me, it's not -- that's not a good

24       corollary with what you would do from business

25       perspective in just advising your clients,

Exhibit 1 - Page 154 of 262

1612

1    generally, about what expenses do and don't do.

2    Is that what you testified to?

3  A.  Yes, that's true.  Yep.

4  Q.  And now I understand your testimony here is based on some

5  cases that were provided to you by Mr. Feldman and his firm.

6  A.  Yes.  We did review some cases in doing the work that we

7  did initially in this case.

8  Q.  And you're not a lawyer.  Correct?

9  A.  That's correct.

10  Q.  And you didn't do your own legal research to make sure that

11  Mr. Feldman gave you the correct cases, did you?

12  A.  No, I did not.

13  Q.  And do you know for certain whether he gave you all of the

14  cases that were relevant to your analysis?  That would be

15  relevant to your analysis?

16  A.  I do not know.

17  Q.  But the two cases you principally rely upon are a case

18  called Frank Music and Kmart International.  Correct?

19    MR. FELDMAN:  Objection, your Honor.

20    THE COURT:  No.  I'm going to allow him to testify as

21  to his state of mind.

22  BY MR. SHAEFFER:

23  Q.  Those are the principal cases you relied upon?

24  A.  Yes.  Those are the two cases, I believe, that we quote in

25  our report.

Exhibit 1 - Page 155 of 262

1613

1    Q.  And I looked at those cases, and I was struck by something.

2         Neither one of those cases is a trademark case, is it?

3    A.  I think you're correct, yes.

4    Q.  They're both copyright cases?

5    A.  That's true.

6    Q.  And that's a different area of law?

7    A.  Yes.

8    Q.  And your analysis here about contributing to or actually

9    assisting comes out of these copyright cases?

10   A.  That is true.

11   Q.  Did you ever look if there was any trademark cases on this

12   issue?

13   A.  No, I did not.

14   Q.  So you're not familiar with a case called Lindy Pen?

15   A.  No, I'm not.

16   Q.  And you're not familiar -- do you know who the Ninth

17   Circuit is?

18   A.  Yes.  The Ninth Circuit is the one that we're in.

19   Q.  And that -- in your report, you talk that that is the

20   authoritative court for -- the law of that court is the

21   authoritative court for this court.  Correct?

22   A.  I don't know if I testified to that, but that is the court

23   that we're in.  That's the jurisdiction here, is the Ninth

24   Circuit.

25   Q.  And you don't know whether or not in that trademark case

Exhibit 1 - Page 156 of 262

1618

1  Q.  And in fact all -- wouldn't it be fair to say that all

2  27,000 of Payless's employees contribute in some way to my

3  ability to buy a shoe at the store in Portland?

4  A.  Yes.  Some more directly than others.  But, yeah, if you --

5  you need to have some function, otherwise there's probably no

6  reason for them to hire you.

7  Q.  Now, one trouble I'm having with your analysis -- I guess,

8  from a technical perspective, it's kind of the incremental

9  cost-type analysis?

10  A.  Generally, yes.

11  Q.  Now, you're just -- you're assuming here that if Payless

12  didn't sell these accused shoes, they wouldn't have sold 30

13  million pairs of shoes.  You would just deduct 30 million pairs

14  of shoes out of their sales over this period.  Correct?

15  A.  Yeah, that's not what we're doing.

16  Q.  Well --

17  A.  We're not assuming they wouldn't sell the shoes.  They sold

18  the shoes.  And we're just calculating the profits that flow

19  from the sale of the shoes.

20  Q.  But you're saying the profit that flowed from the sale of

21  those shoes, and you're not deducting costs that wouldn't have

22  changed.  Correct?

23  A.  Correct.

24  Q.  But you're not adding to that revenues that Payless would

25  have achieved if it sold different shoes?

Exhibit 1 - Page 157 of 262

1626

1     I've be very brief.

2                    CROSS-EXAMINATION (continuing)

3    BY MR. SHAEFFER:

4    Q.  Mr. Sickler, you were here for Mr. Drews' testimony.

5    Correct?

6    A.  Yes, I was.

7    Q.  And he testified to a damage theory based on a reasonable

8    royalty?  A calculation based on a reasonable royalty?

9    A.  Yes, he did.

10   Q.  And your calculation is based on a lost profit?

11   A.  My --

12   Q.  Based on profit disgorgement?

13   A.  Defendant's profit disgorgement.  Correct.

14   Q.  And Mr. Feldman, in -- during the course of his testimony,

15   asked you whether or not if the jury awarded both, that would

16   be -- I think he used the term "double recovery"?

17   A.  Yes.  I believe that was the term he used.

18   Q.  What does "double recovery" mean?

19   A.  Well, in a simplified way, it's the -- it's the recovery of

20   the same income stream twice.

21              MR. SHAEFFER:  Thank you.  Nothing further.

22              THE COURT:  All right.  Redirect.

23              MR. FELDMAN:  Yes, your Honor.  A few questions.

24              THE COURT:  Go ahead.

25                         REDIRECT EXAMINATION

Exhibit 1 - Page 158 of 262

1628

1  and financial expert with 25 years experience, how would you

2  calculate the profits on the specific shoes at issue?

3  A.  In terms of the specific shoes at issue in this case, the

4  1.7 percent of sales, it's my opinion that only variable costs

5  should be taken into account, not fixed costs in anyway.

6  Q.  And the -- you were just asked about a double recovery.

7        Under what circumstances would an award of a

8  reasonable royalty and a profits award constitute a double

9  recovery in this case, in your opinion?

10 A.  Well, the only way I think there's a double recovery in

11 this case is if -- if -- is if adidas is awarded the entire 209

12 million dollars that I've testified to in this case.

13       If they are awarded something different -- you know, a

14 different amount of profits that we've calculated under our two

15 scenarios, or something that's different than that, then there

16 is an opportunity for the profits to be awarded and for a

17 reasonable royalty to be awarded.

18 Q.  And finally, you were asked a series of questions about

19 warehouses being necessary, trucks being necessary, buyers

20 being necessary, and salespeople being necessary.

21       Do you remember that?

22 A.  Yes, I did.

23 Q.  And why do you think that those expenses should not be

24 deducted from revenue at arriving at Payless's profits in this

25 case?

Exhibit 1 - Page 159 of 262

1637

1   familiarity with the marketplace, and in her capacity as inside

2   counsel, having knowledge of the enforcement files.  Do you

3   recall that?

4   A.  Yes, I do.

5   Q.  Do you agree with the testimony that she gave that day with

6   respect to whether the companies she was asked about were in

7   fact selling or offering for sale the shoes with two or four

8   stripes?

9   A.  I do not agree.

10       MR. RUDY:  Can we bring up the big board.

11  BY MR. RUDY:

12  Q.  Mr. Pfannenstiel, this is a -- a copy of what Mr. Henn had

13  on a foam board that day.

14       And I'm going to take you through this fairly briefly

15  and come back to it in more detail a little bit later.

16       There are a number of -- what's -- can you identify

17  this, please.

18  A.  Okay.  This is an exhibit that we compiled using both store

19  catalogs, marketing materials, and actual retail samples for

20  two-, three-, and four-stripe shoes, going back as far as 1931.

21       MR. RUDY:  Your Honor, I have the foam board, which

22  may be more perceptible to the jury.  May I --

23       THE COURT:  (Nods head.)  You may.

24       MR. RUDY:  I'm just going to kind of lean this at an

25  angle here.

Exhibit 1 - Page 160 of 262

1638

1  BY MR. RUDY:

2  Q.  And, Mr. Pfannenstiel, feel free to make reference to

3  either the foam board or the copy that's up on the screen.

4       And my question to you is do you have an opinion about

5  whether the third-party use of two and four stripes on footwear

6  was in fact with respect to shoes that were actually offered

7  for sale?

8  A.  Considering some of the shoes were found at retail, those

9  most definitely.  The other shoes were available in catalogs,

10  Sears, J.C. Penney.  You know, marketing materials.

11       And based on my 20 years of experience in retail, you

12  do not go to the market and promote product without having it

13  available for consumers.  It's a good way to disappoint

14  consumers.  It's also a good way of running afoul of the law of

15  bait and switch.

16  Q.  Now, what law is that?  And this is not the law of the --

17  controlling trademark law?

18  A.  No.

19  Q.  I'm -- Mr. Pfannenstiel, would you tell us what it would

20  mean for a company to advertise at all, in the marketplace,

21  shoes for sale when in fact they did not actually have those

22  shoes available for purchase?

23  A.  In the past, when -- when Payless and other retailers --

24  I've worked for Macy's and a couple of other retailers.  You

25  make every effort, when you put an item in a circular or a

Exhibit 1 - Page 161 of 262

1639

1    catalog, to have that.

2          Some companies do make goods when it's not available.

3    But, in general, you make every effort to do it.

4          And in some cases you'll get involved with district

5    attorneys that will come back if you did not have the item for

6    sale.  And they will -- you know, consumer complaints will come

7    in, and people will have to, you know, rectify the issue.  But

8    in every case that I've worked in a retailer, we've made every

9    effort to have the product.

10   Q.  And that's a customary practice in the retail trade?

11   A.  Customary practice.

12   Q.  Now, Mr. Pfannenstiel, would you explain, in -- in terms of

13   what's shown here, the bottom one-third section that runs from

14   left to right.  What -- what is depicted there?

15   A.  Those are the four-stripe shoes that were found in the

16   marketplace, dating back to 1949, when adidas was formally

17   founded.

18   Q.  Now, there are a lot of shoes shown there, and a number of

19   different companies.

20         How is it that you have come to know that each of

21   those shoes shown there has been offered for sale or sold in

22   the marketplace?

23   A.  In the case of Sears, we went back to historic catalogs and

24   looked at the offerings.  J.C. Penney, as well.

25         Kmart would have been through their fliers.

Exhibit 1 - Page 162 of 262

1640

1    In more resent times, it would have been through

2  actual product that we acquired in the stores.

3  Q.  And if you would do the same for the top layer.  Explain

4  what that is, please.

5  A.  The top is the same, going back all the way to Keds and

6  their two-stripe shoe in 1931, which is in an advertisement.

7  The majority of these came from either -- you know, archives at

8  Stride Rite.  You know, they came from Sears catalogs, J.C.

9  Penney catalogs, Pro-Keds catalogs.  And then two of the more

10  recent time periods, they were either acquired on line, they

11  were acquired in retail stores.  And some of the examples were

12  actually from Zappos Online, or other retailers.

13  Q.  Now, the top layer there concerns two stripes.  Correct?

14  A.  That's correct.

15  Q.  And so the shoes shown there are shown because they have in

16  common two stripes on their sides.  Right?

17  A.  That is correct.

18  Q.  Would -- would you -- is it also the case that the bottom

19  layer concerns shoes -- third-party use shoes with four

20  stripes?

21  A.  That's correct.

22  Q.  That's the common?

23  A.  That's the common, on both the top and the bottom.

24  Q.  Very good.

25      MR. RUDY:  Amy, would you bring up 3396.

Exhibit 1 - Page 163 of 262

1641

1  BY MR. RUDY:

2  Q.  Mr. Pfannenstiel, would you identify this exhibit, please.

3  3396.

4  A.  This is a Sports Illustrated --

5         MR. RUDY:  Page 4.

6         THE WITNESS:  From 19 -- from March 30th, 1970.

7         And this is a Converse ad with a two-stripe shoe

8  depicted.  It also has a rubber cap toe.

9  BY MR. RUDY:

10  Q.  And is this an example of the advertising you were talking

11  about a moment ago?

12  A.  Yes.  This is the absolute examples of the historic

13  advertising that we looked at.

14         MR. RUDY:  Amy, 3400.  Exhibit 3400, please, page 1.

15  BY MR. RUDY:

16  Q.  Can you identify page 1 of Exhibit 3400?

17  A.  This is a screen shot from a Zappos search.  It shows a

18  Donald Pliner two-stripe shoe.

19         And I can't see for sure.  And I think it also has a

20  cap toe.  You still can't see.  So --

21  Q.  Let's go to page 2, please.

22         What -- what's shown on page 2 of Exhibit 3400?

23  A.  It is also another Donald Pliner shoe with a rippled

24  bottom.  More on the line of a cross-country running shoe.

25  Q.  And what's the source of this document?

Exhibit 1 - Page 164 of 262

1642

1    MR. RUDY:  Go back to page 1, please.

2    THE WITNESS:  This is a close-up of a Zappos screen

3  shot.

4  BY MR. RUDY:

5  Q.  And this is a screen shot of the -- that is downloaded from

6  the Internet?

7  A.  Yes.

8    MR. RUDY:  Go to 3404, please.  Page 4.

9  BY MR. RUDY:

10  Q.  Can you identify what's shown on page 4 of Exhibit 3404,

11  please.

12  A.  This is a Famous Footwear ad, a circular that was inserted

13  in a Sunday paper.  The page before was, again, City Star, with

14  a Steve Madden four-stripe shoe.

15  Q.  And I probably jumped the gun.  I didn't give you a chance.

16    What is the date of this advertisement,

17  Mr. Pfannenstiel?

18    You may have to go to page one.

19  A.  Have to go back a page.  I can't --

20  Q.  Page 1.

21  A.  This is from 1978, August 27th.

22  Q.  Very good.

23    Turn to page 9, please.

24    Can you describe -- or identify what you see on page

25  9?

Exhibit 1 - Page 165 of 262

1643

1    A.  This is also a Steve Madden shoe.  I think this is also

2    from a -- if you look at it, this is also from a Famous

3    Footwear ad.

4    Q.  And the Madden shoe you're talking about is the one with

5    the four-stripes on the side.  Is that correct?

6    A.  Yes, it is.

7    Q.  Page 10, please.

8         Can you identify what's shown on page 10?

9    A.  This is also a Steve Madden shoe.

10        There's -- well, actually, this is an lei shoe.  These

11   are from a Famous Footwear ad from 2002.

12   Q.  Very good.

13        And page 12.

14        Describe what is shown on page 12, please.

15   A.  This is a -- at -- from Famous Footwear as well, with

16   Skechers.  Two different versions of a two-stripe shoe.

17   Q.  And what's the date of this ad?

18        Oh, it's the same date.  You already identified it.  I

19   beg your pardon.

20        If you would turn to 3411, please.

21        Can you identify this?

22   A.  This is a J.C. Penney ad.

23   Q.  What's shown there?

24   A.  We have both two- and four-stripe shoes.  One with a --

25   that same kind of track bottom.  The other one with a cap toe.

Exhibit 1 - Page 166 of 262

1644

1       And this is from the September 7th, 1976 -- or

2   September 1st, 1976.

3   Q.  Now, go to page 30, please.  Identify what's shown there,

4   if you would.  The footwear that's shown there.

5   A.  This is also a two-stripe shoe with a cap toe, from J.C.

6   Penney.

7   Q.  And that was page -- page 22, next.

8       Identify the striped footwear that's shown on this ad.

9   A.  We have two- and four-stripe football cleats.

10      And then, as well, is a striped jogging shoe and a

11  lightweight track shoe.  And this is from a J.C. Penney

12  catalog.  And I think this is either from 1976 or '72.

13  Q.  Well, let's try to pinpoint that date.

14      MR. RUDY:  Can you go back to the cover page, please.

15  Page 1.

16      And the date ought to be on the top header, there.

17  BY MR. RUDY:

18  Q.  Can you see that, Mr. --

19  A.  That's from 1976.  That's from the print ad.  The

20  catalog -- let me see if I can find it in the --

21  Q.  Oh, I'm sorry.  Turn to 3411 in your books.

22  A.  (Pause, referring.)  What page was that?

23  Q.  We were on page 22.

24  A.  I apologize.  It's almost -- or 200-some pages in this.

25  It's 1972.

Exhibit 1 - Page 167 of 262

1645

1   Q.   Thank you.

2        Why don't you keep that out, and just turn along with

3   us, and bring up page 28.

4   A.   Also some -- same catalog.

5   Q.   Same catalog?

6   A.   Yes.

7   Q.   And similar shoes with stripes?

8   A.   Similar shoes.

9        We have two -- or four-stripe cleats.

10  Q.   Very good.

11       Page 35, next.

12       Describe the footwear shown at the top of this page,

13  if you would, please.

14  A.   Okay.  This is from the 1979 J.C. Penney catalog.

15       It shows a four-stripe shoe with serrated edges and a

16  four-stripe shoe with a cap toe.  And then a canvas with

17  three-stripes.

18  Q.   And the cap toe you're talking about --

19       MR. RUDY:  Amy, would you -- and I've been calling you

20  Liz.  I'm sorry.  Amy, if you would bring up that shoe there.

21  BY MR. RUDY:

22  Q.   Is the cap toe you're talking about the toe on the shoe

23  that Amy called out?

24  A.   Yes, I am.

25  Q.   And describe that if you would, please.

Exhibit 1 - Page 168 of 262

1646

1  A.  It's a rubber overlay on the front of the shoe that -- I

2  can't tell if this one is actually a really stitched shoe or is

3  an injected molded shoe bottom.  But it is to protect the front

4  of the shoe.  It's a cap toe.

5  Q.  And who is the manufacturer or the retailer that offers

6  this?

7  A.  This is J.C. Penney, and they are -- the brands that they

8  have on these shoes are Conference sports shoes.

9  Q.  Very good.

10           Page 42 please.

11           The shoe on the lower right there, would you identify

12  that, please.

13  A.  This is also a two-stripe shoe available in that same J.C.

14  Penney catalog.  It has a cap toe, as well.

15  Q.  Very good.

16           MR. RUDY:  Turn to Exhibit 3412, Amy, page 1.

17  BY MR. RUDY:

18  Q.  Mr. Pfannenstiel, would you identify this document, please.

19  A.  This is a -- an Amazon.com page that we printed.

20           It was printed on the -- on 4-10 of '07.  So it was a

21  shoe that was available last year.  And it is a K-Swiss shoe

22  with four stripes.

23  Q.  And you said that shoe was available for purchase via this

24  mechanism?

25  A.  Yes, it was.

Exhibit 1 - Page 169 of 262

1647

1   Q.  Next exhibit.  3423, please.

2        Describe this exhibit, if you would.

3   A.  Exhibit 3423?

4   Q.  3423.

5   A.  Yes.  Okay.

6        This is a Zappos ad -- or Zappos printout.  This is

7   from, I believe, also '07.

8        This is a Palladium shoe with a more cross-country

9   bottom and two-stripes.

10  Q.  Help us understand who or what Zappos is.

11  A.  Zappos is the largest footwear retailer on the Internet.

12  Q.  Next, Exhibit 3432, please.

13  A.  I'll have to switch books.  Just a second.

14  Q.  And once you have it open, go ahead and identify it, if you

15  would.

16  A.  This is a Sears ad.

17  Q.  What's the date of the ad?

18  A.  It is 1978, as best I can read this.

19  Q.  Thank you.

20        MR. RUDY:  Turn to page 5, please.

21  BY MR. RUDY:

22  Q.  Can you describe what's shown -- striped footwear shown on

23  page 5 of this exhibit?

24  A.  This is a Sears ad.  It's from their 85th anniversary, from

25  the Kansas City paper.  It is an ad for a four-stripe athletic

Exhibit 1 - Page 170 of 262

1648

1    shoe with a cap toe, as well.

2    Q.  Our next, page 16.

3          Describe the striped footwear shown on page 16, pleas.

4    A.  This is from a 1971 Sears catalog.

5          Which page?  I'm sorry.

6    Q.  16.

7    A.  16.

8          There is a two-stripe court shoe at the top, as well

9    as two-stripe sports shoes, cleat -- it's an all-purpose cleat

10   for both soccer and football and baseball.

11   Q.  Do you see any other stripe -- describe the shoe right

12   beneath that.

13   A.  Oh.  And, also, there's another NBA-approved basketball

14   shoe in the kind of lower left-hand with four-stripes and a

15   flat sole.

16   Q.  Now, this is a Sears catalog.  Is that right?

17   A.  This is a Sears catalog.

18   Q.  And these are not adidas shoes, are they?

19   A.  No, they are not.

20   Q.  Okay.  Turn to page 18, please.

21          Describe the striped footwear shown on page 18.

22   A.  Again, from the same Sears catalog, we have a cleated shoe

23   with four -- well, actually, five stripes.

24   Q.  Very good.

25          That was page 18.  Turn to page 20.

Exhibit 1 - Page 171 of 262

1649

1    A.  This is from the 1972 Sears catalog, and it shows a

2    four-stripe athletic shoe.

3    Q.  Can you tell, from your exhibit, what -- what the toe

4    treatment is on that shoe?

5    A.  No, I cannot.

6    Q.  All right.  Page 26.

7         MR. RUDY:  Call out the shoe at the bottom left, Amy.

8    BY MR. RUDY:

9    Q.  First, we're still in the same catalog, are we not?

10   A.  I believe so, yes.

11   Q.  All right.  What's shown here, in this picture, that --

12   that we've blown up from that -- that page on that exhibit?

13   A.  It's listed as a Burchholz -- Burchholz tennis shoe.  It

14   shows two different versions, both with three perfed stripes

15   going down the midsole -- or mid -- mid-foot.

16   Q.  Next, 38.  Describe the striped footwear shown on this

17   page, please.

18   A.  This is from the 1976 sears catalog.  It shows several

19   two-stripe shoes.  Some with a -- kind of a cap toe and a flat

20   bottom.  One with a kind of serrated-edged bottom.  We have it

21   in multiple colors in children's and --

22   Q.  Very good.

23        Page 40.  Describe what you see there of the striped

24   footwear, in a summary way, that's shown on page --

25   A.  This is from the same catalog.  It is a catalog page for a

Exhibit 1 - Page 172 of 262

1650

1  four-stripe shoe with a -- kind of a cross-country running

2  bottom.

3  Q.  And is there a name for that bottom?

4  A.  I mean, it's -- you know, I think that's what its purpose

5  in the industry, is as a cross-country.  You know, it's kind of

6  a -- a sawtooth bottom that's been used on lots of different

7  footwear.

8  Q.  And the toe treatment on the shoes shown there, I don't

9  know if there's a name for that -- that particular design.

10        Do you see what I'm talking about?

11  A.  Yeah.  You know, some people have called them mud guards.

12  I am not sure what their real technical term is.  You know, I'm

13  not a footwear designer.

14  Q.  Pull up, Amy, the toe treatment on the lowest -- lowest

15  shoe.

16        Now, the -- the -- what you just referred to as the

17  mud guard, am I correct that you were referring to the gray toe

18  treatment on the top of that shoe?

19  A.  Yes.

20  Q.  All right.  Page 41, please.

21  A.  Same catalog.  And we have, you know, four -- three

22  four-stripe shoes at the top, suede, with a similar bottom.

23  Q.  And am I correct, that -- that the one on the top, in the

24  front of the group of three, is blue suede?

25  A.  Yes.

Exhibit 1 - Page 173 of 262

1651

1    Q.  Okay.  Page 45, please.

2    A.  This is from a 1973 catalog.  It also shows a four-stripe

3    athletic shoe.  This one is a Converse shoe with a rubber cap

4    toe, as well.

5    Q.  Page 48.

6    A.  This is from the same catalog.  I think it is.

7         So we have a Little League-approved cleated shoe.  We

8    have two of those.  And then we also have a four-stripe shoe

9    below it, as well as two other track shoes below the

10   two-stripes.  Then we have the Ted Williams shoe with

11   two-stripes.  And then an NBA-approved shoe with four-stripes.

12   Q.  Could you tell from the call out that Amy just brought up

13   on the screen, how that -- how that toe is constructed on that

14   shoe?  If the picture is not good enough --

15   A.  No, I actually cannot.

16   Q.  All right.  That was -- next, 55, please.

17        Describe the striped footwear you see here on page 55.

18   A.  Again, we have a -- (pause) this is actually from a 1971

19   Sears catalog.

20        It is a no -- again, a Little League-approved baseball

21   cleat, with two-stripes.

22   Q.  Okay.  Page 56, please.

23   A.  Same catalog, also showing an NBA-approved four-stripe

24   shoe.

25   Q.  Can you tell whether that's a rubber toe cap on that shoe,

Exhibit 1 - Page 174 of 262

1652

1   Mr. Pfannenstiel?

2   A.  No, I cannot.

3   Q.  All right.  Page 61.

4           Describe the four-stripe shoe shown on the -- on the

5   page at the lower right, if you would, please.

6   A.  Okay.  This is in -- (pause, referring.)  Same -- this is a

7   1972 Sears catalog, with a four-stripe shoe with kind of a

8   shell bottom.

9   Q.  What do you mean by a shell bottom?

10  A.  The bottom wraps around the shoe.  It's not -- it doesn't

11  set on top of the shoe.  It's not like the joggers we looked at

12  earlier, which actually the sole is below the bottom of the

13  foot.  This actually wraps around the side of the foot.

14  Q.  Page 77, please.

15          Describe the shoes shown -- the three on the bottom

16  panel on this, if you would call them out.

17  A.  Okay.  Okay.  So we have three four-stripe shoes with -- it

18  appears to be -- that sawtooth bottom.  And they're vylon -- or

19  nylon and suede.

20  Q.  Thank you.  Page 79.

21          Describe the striped footwear in this -- on this page,

22  in this exhibit.

23  A.  We have two shoes.  There's -- both by Converse.  One with

24  a four-stripes and a toe guard.

25          On the other one, I don't believe it has a toe guard

Exhibit 1 - Page 175 of 262

1653

1    or cap toe at the top of the page.  But both by -- by Converse.

2    Made by Converse.

3    Q.  Mr. Pfannenstiel, I'm going to stop on this exhibit.

4           But in -- in Exhibit 3432, there are 242 pages.  And

5    have we talked, here, about all of the striped shoes shown in

6    that exhibit?

7    A.  No, we have not.

8    Q.  Is it fair to say these are representative samples?

9    A.  Yeah.  These are representative samples; just like the

10   board that you have in front of you with the two, three, and

11   four stripes are representative samples of the materials we've

12   pulled.

13   Q.  And the materials we're talking about, are the exhibits I

14   just read into the record?

15   A.  Yes, they are.

16   Q.  And yet there are other exhibits that we'll move into

17   evidence later today, which were supplied to counsel, which

18   have other examples of striped shoes.  Is that correct?

19   A.  Yes, that's correct.

20   Q.  And among that whole body of exhibits, is there support for

21   your conclusion that the shoes shown on the board --

22          MR. RUDY:  Bring the -- the big board up again.

23   BY MR. RUDY:

24   Q.  -- have in fact been offered for sale?

25   A.  Yes, I believe.

Exhibit 1 - Page 176 of 262

1654

1    Q.  And have in fact been sold by these companies?

2    A.  Yes.  As a matter of fact, I -- I grew up in the '70s.  And

3    not specifically these shoes, but the shoes we have on the

4    board, I actually owned a pair of the Sears shoes with the

5    three-stripes on them, back in the '70s.  And, actually, a pair

6    of roller skates that had four-stripes on them.

7    Q.  Now, the shoes shown in the bottom, representing

8    four-stripe shoes, does that represent all the four-stripe --

9    examples of four-stripe shoes shown in the exhibits?

10   A.  No, it does not.  It is a representative sample as it is

11   with the four -- or two-, three-, four-stripe shoes, as well.

12   Q.  Same question on the top panel there.  With respect to

13   two-stripe shoes.

14   A.  Yes.  It is also a representative sample.  It is not all of

15   the shoes that we have found.

16   Q.  All right.  I'm going to shift gears, now, to the subject

17   of Stride Rite.

18            Who is Stride Rite?

19   A.  Stride Rite Corporation is now a subsidiary of Collective

20   Brands, which is also a -- is Payless.

21            We have -- in Stride Rite there is Saucony, is one of

22   the brands under Stride Rite.  Sperry Top-Sider, obviously

23   Stride Rite.  Robeez, which is kind of an infants' line.

24   Trying to think of what else.  That's the majority.

25            Keds and Pro-Keds is also under the Stride Rite

Exhibit 1 - Page 177 of 262

1673

1    MS. BECK:  I'm sorry.  That's not it.

2    MR. RUDY:  We were willing to go there with you.

3    MS. BECK:  I'm sorry.

4    MR. RUDY:  Pause it for a moment.

5    Your Honor, this person is speaking in a video.  May I

6  have the Court's permission to broadcast --

7    THE COURT:  Turn on the audio?  Yes, you may.

8    MR. RUDY:  Yes.

9    MS. BECK:  I'm going to start her again.

10    (Pause.  Video playing.)

11  BY MR. RUDY:

12  Q.  This weekend, 10 dollars a pair.  That's not a new ad, is

13  it?

14  A.  No.

15  Q.  Do you have a recall of when that ad --

16  A.  That would have been the mid-'80s.

17    In those days, we were running the ads for several

18  years, and we would change out the product at the end of the

19  ad.

20    MR. RUDY:  Bring up 3701, please.

21  BY MR. RUDY:

22  Q.  Can you identify this?

23  A.  This is screen shots from the historical TV spots.

24  Q.  Let's flip through one or two of these.

25    Now, if you would identify this.

Exhibit 1 - Page 178 of 262

1674

1    A.  This is one of the examples from the 1970s.  It's one of

2    the first athletic focused ads we did.  And it actually talks

3    about the quality of the footwear, at that time.

4    Q.  Let's flip ahead to the '80s.

5              This is not going to be easy to do.

6              Mr. Pfannenstiel, let me shortcut this.

7              This document has in it representative samples of TV

8    ads through the period of time from that time when they first

9    started advertising on TV, all the way to current?

10   A.  Yes, it does.

11   Q.  And the one we just saw is the representative sample of

12   what you would see in this exhibit?

13   A.  Yes, it is.

14   Q.  And, of course, we're talking about a lawsuit over stripes.

15             The media compilation collected here in 3701 has many

16   examples of striped shoes just by happenstance.  Isn't that

17   correct?

18   A.  Yes, it does.

19   Q.  Payless has been doing striped shoes for a long, long time.

20   Is that a fair statement?

21   A.  Before I came with the company.  Yes, it did.

22   Q.  And by striped shoes, I'm talking about two stripes,

23   parallel, equal width, equally spaced?

24   A.  Yes.

25   Q.  No trademark in between the stripes?

Exhibit 1 - Page 179 of 262

1675

```
 1   A.  No.

 2   Q.  Same question as to four-stripes.

 3        Payless has been making four stripes for a long time?

 4   A.  Since the mid-'70s, yes.

 5   Q.  And I'm talking about four parallel stripes?

 6   A.  Yes.

 7   Q.  On the side of the shoe, running from the lacing area, down

 8   to the outsole?

 9   A.  Yes.

10   Q.  Leaning forward in -- in angularity, if you will?

11   A.  Yes.

12        MR. RUDY:  You can stop there, Amy.

13   BY MR. RUDY:

14   Q.  And turn to Exhibit 3692, please.

15        Can you identify this, Mr. Pfannenstiel?

16   A.  Yeah.  This is a free-standing insert or Sunday circular

17   from 19 -- I'm trying to read the number op the bottom of this

18   one.

19        THE WITNESS:  Can you blow that up a little bit,

20   please?

21        From 1996, September.

22   BY MR. RUDY:

23   Q.  This is an example of what Payless would put in newspapers

24   that are delivered on Sunday morning?

25   A.  Newspapers and in your mailbox.
```

Exhibit 1 - Page 180 of 262

1676

 1          MR. RUDY:  Let's flip through this, Amy.  And I think
 2   it has examples of striped shoes.
 3          Back one up, to page 4.
 4          The shoe on the lower left, would you call that out.
 5   BY MR. RUDY:
 6   Q.  So here are shoes with three stripes, sold in this time
 7   frame.  Is that correct?
 8   A.  Right.
 9          MR. RUDY:  Move to the next one.  Keep going.
10          Back up one page -- right there.
11   BY MR. RUDY:
12   Q.  The shoe in the upper left, describe that for the jury, if
13   you would, please.
14   A.  It's an athletic cross-training court shoe with four
15   parallel stripes.
16          MR. RUDY:  Thank you.  You can take this down.
17          Your Honor, this might be a good breaking time.
18          THE COURT:  All right.  We'll go ahead and recess,
19   then, for the weekend.
20          We will not be in court Monday.  I would like to start
21   at 8:30 on Tuesday of next week.
22          Is that a problem for anyone?
23          If not, we'll be here.  In fact, we may start at 8:30
24   most mornings, if we can do it.
25          So we'll see you, then, on Tuesday at 8:30.

Exhibit 1 - Page 181 of 262

Page 1709

1          THE COURT:  Sure.

2

3                     BRUCE PFANNENSTIEL

4 called as a witness in behalf of the Defendant, having

5 been previously duly sworn, is examined and testifies as

6 follows:

7

8                     DIRECT EXAMINATION

9 BY MR. RUDY:

10 Q. Good morning, Mr. Pfannenstiel.

11 A. Good morning.

12 Q. When we left off on Friday, we had been

13 discussing use made by other retailers of various shoe

14 features, like stripes, over a period of time.

15 A. That's correct.

16 Q. The question I have and what I'd like to talk about

17 for the next few minutes are questions directed to

18 whether Payless itself has used two and four straight

19 parallel stripes on shoes in the past.  Is that --

20 A. Yes.

21 Q. -- in fact, the case?

22 A. Yes.

23 Q. For what period of time, roughly, has Payless been

24 making use of two and four parallel stripes?

25 A. I think since the late sixties, we've had two to four

Exhibit 1 - Page 182 of 262

Page 1710

1 stripes.

2        THE COURT REPORTER:  Could I ask you to move

3 closer to the microphone, please.

4 BY MR. RUDY:  (continuing)

5 Q. Now, you mentioned on Friday that Payless had put

6 together a 50th anniversary presentation, and it

7 contained certain archival information; is that correct?

8 A. That is correct.

9 Q. And we saw one of those historic television

10 advertisements, correct?

11 A. That's correct.

12        MR. RUDY:  Amy, would you bring up Exhibit 3693?

13 BY MR. RUDY:  (continuing)

14 Q. When this comes up, I'll ask you to identify it, if

15 you would.

16        Mr. Pfannenstiel, what do you see up there,

17 Exhibit 3693?

18 A. This is a catalog for Payless ShoeSource in the early

19 seventies, '72 through '75.

20        MR. RUDY:  Amy, could you turn to -- I believe

21 this is page 8.

22        I tell you what.  Let's go back to page 1.

23 BY MR. RUDY:  (continuing)

24 Q. Would you describe the striped shoe shown there on

25 the screen, Mr. Pfannenstiel?

Exhibit 1 - Page 183 of 262

Page 1711

1 A. I've got a four-striped suede -- it appears to be

2 blue, with a cross country saw-toothed bottom.

3 Q. Describe the toe -- the stylistic feature on the toe,

4 if you would, please.

5 A. You know, as I said earlier or last week, I wasn't

6 sure if they called it a mud guard, but it has that kind

7 of athletic toe characteristic that was common at that

8 time.

9 Q. Thank you.

10     MR. RUDY:  The next page, Amy.

11 BY MR. RUDY:  (continuing)

12 Q. Briefly describe the striped shoes shown on this

13 page.

14 A. We've got a multitude of striped shoes on the page.

15 We've got a two-striped flat bottom -- it looks like a

16 court shoe, as well as a four-striped cap-toe canvas

17 shoe.

18 Q. Thank you.

19     MR. RUDY:  Next page, Amy.

20 BY MR. RUDY:  (continuing)

21 Q. Describe those, if you would.

22 A. So it looks like it's -- well, the shoe from the

23 front page is also featured on the inside.  It's that

24 same suede blue with the cross country saw-toothed

25 bottom.  We also have another kind of court shoe with a

Exhibit 1 - Page 184 of 262

Page 1712

1 four-stripe.

2 Q. Thank you.

3        MR. RUDY:  Amy, bring up Exhibit 3694, please.

4 BY MR. RUDY:  (continuing)

5 Q. Identify this exhibit, if you would,

6 Mr. Pfannenstiel.

7 A. This is an in-store visual guide for the store

8 associates.

9        MR. RUDY:  The next page.

10 BY MR. RUDY:  (continuing)

11 Q. Okay.  Could you describe what's shown in these

12 pictures?

13 A. It looks like at this point we've got the data

14 center, as it stood, and then a merchandising room with

15 product.

16 Q. And the time frame for this?

17 A. This would have been, I think, 1975.

18 Q. And self-service shoe selection was, at that point,

19 still in use --

20 A. Yes.

21 Q. -- at Payless?

22        And it's in use today?

23 A. Yes.  We were kind of the innovators in the

24 self-service arena.

25 Q. That began in 1956 --

Exhibit 1 - Page 185 of 262

Page 1713

1 A. Yes.

2 Q. -- when the company was founded?

3 A. Yes.

4 Q. And continues to be used today --

5 A. That is correct.

6 Q. -- through all the Payless stores?

7 A. That is correct.

8         MR. RUDY:  Next page, please.

9 BY MR. RUDY:  (continuing)

10 Q. Describe what's shown in the lower left.

11 A. We have the kind of traditional racking that we've

12 used kind of since the beginning.  It used to be wood

13 shelves.  Now it's metal.  And in this case, the product

14 was racked by style.  We now kind of rack by size,

15 so -- we also -- you can see there are some four-striped

16 shoes on the lower left as well.

17 Q. And the Payless trademark appears on the outside of

18 this store; is that correct?

19 A. Yes, and on the boxes.  In this case, these boxes

20 would have been marked Pro Wings.

21 Q. And it was in use then --

22 A. Yes.

23 Q. -- the Payless trademark?  And it's been in use ever

24 since; is that correct?

25 A. That is correct.

Exhibit 1 - Page 186 of 262

Page 1714

1 Q. And it's on the outside of the store --

2 A. It's on the outside of the store.

3 Q. -- today?

4 A. Yes.

5 Q. And it was on the outside of the store then --

6 A. Yes.

7 Q. -- and at all times in between?

8 A. Right.

9          MR. RUDY:  Amy, go to 3696.

10 BY MR. RUDY:  (continuing)

11 Q. What is shown there?

12 A. This is also a promotional planner from around the

13 same time period.

14 Q. Briefly describe the shoe shown there.

15 A. It looks like we have a four-stripe -- it looks like

16 a nylon and suede athletic shoe with kind of a waffle

17 bottom, and it has the Pro Wings logo on the back heel

18 and on the eye row.

19 Q. Thank you.

20          Next is 3697.  Again, is this more material that

21 was part of this 50th anniversary?

22 A. Yes.

23 Q. Okay.  What's shown there?

24 A. This is a back-to-school Footnotes, which is our kind

25 of internal newsletter, lets people know what's going on.

Exhibit 1 - Page 187 of 262

Page 1715

1 This is a back-to-school Footnotes that has -- you can

2 see the Pro Wings boxes on the front and Coasters, and

3 Highlights is one of the other brands we carry.

4 Q. Now I'd like to take you through some specific uses

5 made by Payless of two and four stripes on footwear.

6          MR. RUDY:  Would you bring up Exhibit 3653, page

7 5, please.

8 BY MR. RUDY:  (continuing)

9 Q. I think we've seen this before once or twice.  Go

10 ahead and explain what's shown here.

11 A. It's a newspaper ad for -- it's from the Kansas City

12 Star, and it's for athletic shoes.  We have a

13 three-stripe athletic with a cap toe.  I think this is

14 from 1974.  There was a page -- a date on this before,

15 but it's not in front of me.

16          MR. RUDY:  Turn to 3701, Amy, page 4, please.

17 BY MR. RUDY:  (continuing)

18 Q. 3701 is a document that you described on Friday.  Do

19 you remember that?

20 A. Yes.

21 Q. What is shown here on page 4?

22 A. This is a new arrivals TV ad from the 1970s.  As I

23 told you before, we kind of ran ads for a number of

24 years, because of costs.  But it was in the early

25 seventies.

Exhibit 1 - Page 188 of 262

1       We show a -- two four-striped shoes and a

2 three-striped shoe with -- it looks like the same kind of

3 cross country bottom on the upper ones.  It's got the EVA

4 midsole, and the same on the bottom, but it's just a

5 darker color.

6 Q. And the mud cap appears here?

7 A. Yes, it does.

8 Q. All right.  Page 6, please, again, describe what is

9 shown there on page 6.

10 A. Also an ad from the seventies that has a four-striped

11 shoe, it looks like with the same kind of cross country

12 saw-toothed bottom.

13 Q. Describe the heel treatment on the -- I guess it's

14 the person's left leg in the back.

15 A. It looks like we have a contrasting heel mustache.

16 And then I can't tell for sure, but it looks like the

17 sole wraps up across the back of the heel as well.

18 Q. All right.  The last one, second-to-the-last one in

19 this exhibit, page 2 of 3701, describe the shoe shown in

20 the upper left there.

21 A. It's a very similar shoe that we looked at earlier.

22 It is a four-striped athletic shoe.  It has what looks

23 like a saw-toothed bottom that wraps up to the front of

24 the toe, same kind of toe characteristic as we talked

25 about earlier.  It has the kind of contrasting padded

Exhibit 1 - Page 189 of 262

Page 1717

1 collar, and it also has perfs going between the four

2 stripes.

3 Q. Okay.

4        MR. RUDY:  3690, page 2, please.  Call that out.

5        I may have the wrong exhibit.  I wrote the wrong

6 exhibit number down, Amy.  3653, page 3.

7 BY MR. RUDY:  (continuing)

8 Q. There's a Wings athletics there.  Do you see that?

9 A. Yes.  It's Pro Wings.  It's one of our brands at that

10 time.

11 Q. Describe that.

12 A. This is 1977 Pro Wings ad, and it has also the shoe

13 we talked about earlier with four stripes, with the -- it

14 looks like the kind of cross country bottom, and you cann

15 also see the Pro Wings logo called out on the side of the

16 shoe.

17        MR. RUDY:  Go back to page 2, Amy.

18        THE WITNESS:  That's from 1977.

19        MR. RUDY:  3653, page 2.

20 BY MR. RUDY:  (continuing)

21 Q. Can you describe the footwear, the four-striped

22 footwear shown there?

23 A. Yet again we have the same kind of shoe that we

24 looked at earlier.  It's got four -- the one in the upper

25 right hand has got a Pro Wings label at the eye row.  It

Exhibit 1 - Page 190 of 262

Page 1718

1 is a four-striped shoe contrasting against the -- I don't

2 know whether it's canvas, but -- and the saw-toothed

3 bottom with the toe guard as well.  And then there are

4 additionally another -- there's three perfed looking or a

5 stitched shoe next to it with -- it looks more like a

6 flat bottom.

7 Q. All right.  And is it a fair statement that Payless,

8 through the seventies, at various times made use of two

9 and four stripes like those shown on footwear?

10 A. Yes.  And so did other retailers at the same time.

11 Q. And I said made use of.

12 A. Yes.

13 Q. By that I mean they offered for sale and sold two-

14 and four-striped shoes --

15 A. Yes.

16 Q. -- to the public?

17         All right.  Let's move ahead to the eighties.

18         MR. RUDY:  3695, page 2, please.  Go back to page

19 1.

20         Let's go to 3693, page 8.

21 BY MR. RUDY:  (continuing)

22 Q. And we've talked about this exhibit before.

23 A. Yes, we have.

24 Q. And this is a late 1970s time frame; is that correct?

25 A. Yes.

Exhibit 1 - Page 191 of 262

Page 1719

1 Q. And there are four-striped shoes again shown there --

2 A. Yes.

3 Q. -- right?

4         MR. RUDY:  Let's move to 3701, page 10.

5 BY MR. RUDY:  (continuing)

6 Q. And this is the 1983 time frame, and I'd ask you to

7 describe the shoe on the right there.

8 A. So on the far right, it looks like we have a -- I

9 can't tell if it's -- it looks like a double velcro

10 athletic shoe with -- so we have three stripes, two white

11 and then it looks like a red stripe, with an EVA -- I

12 can't tell if it's a waffle or a serrated edge bottom.

13         MR. RUDY:  Okay.  3658, page 44, Amy, if you

14 would call out the long display there.

15 BY MR. RUDY:  (continuing)

16 Q. Do you see the four-striped shoe on the right

17 there --

18 A. Yes

19 Q. -- Mr. Pfannenstiel?

20         Describe that, if you would.

21 A. It looks like we have a four-striped court shoe,

22 white.  It's under the Pro Wings brand.  This is right

23 when we switched to a white store format, so it's giving

24 the associates two display guidelines.

25 Q. And shoes like that were sold by Payless during the

Exhibit 1 - Page 192 of 262

Page 1720

1 1980s, on and off --

2 A. On and off.

3 Q. -- correct?

4 A. That is correct.

5 Q. Let's move ahead to the nineties.

6       MR. RUDY:  If you would bring up 3701, page 20.

7 BY MR. RUDY:  (continuing)

8 Q. This is indicated, from the presentation materials,

9 early 1991; is that correct?

10 A. That's correct.

11 Q. What do you see there as a striped shoe?

12 A. We have a two-striped girl's shoe.  It's kind of

13 a -- I think this is more of a flat -- probably at that

14 time it was more of an aerobics bottom, and with two

15 stripes going down the side.

16 Q. Okay.  Let's move ahead to 1994.

17       MR. RUDY:  3701, page 29.

18 BY MR. RUDY:  (continuing)

19 Q. Describe what is shown there, Mr. Pfannenstiel.

20 A. So we have two four-striped shoes with kind of that

21 shell bottom we talked about earlier; and, also, it

22 appears to be a cap toe.

23 Q. Now, reference has been made throughout the trial of

24 this 1994 agreement between Payless and adidas.  Do you

25 remember that?

Exhibit 1 - Page 193 of 262

1 A. That's correct.

2 Q. The cap toe was not the subject of that agreement at

3 all?

4 A. No, it was not.

5 Q. That agreement just referenced the shoes at issue

6 then and restrictions as to the use of three stripes and

7 two and four stripes; is that correct?

8 A. That is correct.

9 Q. But not anything about a rubberized toe cap?

10 A. No, it does not.

11 Q. Go to page 30 of this same exhibit.  Is that another

12 picture of the same type of shoe that was shown

13 previously?

14 A. Yes, it is.  And also, this one you can see the

15 perfing between -- I guess you'd call it the second and

16 third stripe, and with the contrasting heel counter as

17 well.

18 Q. All right.  Let's move ahead to 1996.

19        MR. RUDY:  3692, page 2, please.  And bring up

20 the lower left there, Amy, the two-striped shoe there.

21 BY MR. RUDY:  (continuing)

22 Q. Would you describe for the jury what you see there.

23 A. So we have a two-striped shoe.  This is more of

24 a -- you know, updated kind of court bottom.  I don't

25 know if they would have classified some of this as cross

Exhibit 1 - Page 194 of 262

Page 1722

1 trainers, but it has the heel pull and then a contrasting

2 toe that kind of wraps up against the toe.

3          MR. RUDY:  Bring up 3687, please.

4 BY MR. RUDY:  (continuing)

5 Q. Can you identify this exhibit, Mr. Pfannenstiel?

6 A. Yeah.  This is the Payless timeline of two- and

7 four-stripe usage.

8 Q. Some of the shoes that have been up on the screen and

9 which have been the subject of your testimony are shown

10 on this --

11 A. Yes.

12 Q. -- is that correct?

13 A. This is, as we talked about, when you showed the

14 large foam core board, that was really an extraction of

15 all the different materials we had pulled together.  So

16 this is examples of those materials.

17          MR. RUDY:  Amy, let's quickly move through the

18 five pages that made up this timeline.  Just keep

19 scrolling through.

20 BY MR. RUDY:  (continuing)

21 Q. Obviously, we didn't describe every shoe on this

22 timeline; is that correct?

23 A. No, we did not.

24 Q. There are others --

25 A. There are many others.

Exhibit 1 - Page 195 of 262

Page 1723

1 Q. -- that appear on this timeline?

2 A. Yes.

3 Q. Now, the use by Payless of these stripes during the

4 seventies and eighties, was that part of a trend?

5 A. Yes, it was.

6 Q. And did that trend go away and come back, as it were,

7 later?

8 A. Yeah.  It reasserts -- if you looked at the board

9 that we provided about the third use, you can see that

10 there are kind of waves.  There was a wave in the

11 seventies and there was another wave in the eighties.

12       And you can tell by the number of years, like

13 especially in the Sears one, you can see that there were

14 consecutive years of usage.  And then there was a gap,

15 and then it came back again.  So the trends are in 10-,

16 15-year waves on some of these trends.

17       MR. RUDY:  Amy, let's bring up the big board.

18       Your Honor, may I set up the foam board, please?

19       THE COURT:  You may.

20 BY MR. RUDY:  (continuing)

21 Q. So up on the screen now is the electronic version of

22 the foam board.  That's the board you were talking about?

23 A. Yeah.

24 Q. And the trends that you referred to a moment ago are

25 graphically illustrated here?

Exhibit 1 - Page 196 of 262

Page 1727

1 recurred about when?  What time frame?

2 A. Well, we have -- the most recent one would have been

3 in the kind of early 2000s.

4 Q. And did Payless, as it were, ride that wave?

5 A. Yes, it did, along with other retailers.

6 Q. Well, let's look at some other retailers.

7      MR. RUDY:  Would you bring up 3460, page 2,

8 please.

9 BY MR. RUDY:  (continuing)

10 Q. What do you see shown here?

11 A. It looks like an excerpt from Nordstrom, with a

12 two-striped, kind of a more -- you know, call it a

13 driving or bicycle-type bottom.  I don't know.  I'd have

14 to scan back.  It's a Diesel shoe.

15      MR. RUDY:  Amy, can you back this out?

16 BY MR. RUDY:  (continuing)

17 Q. Can you tell what time frame this corresponds to?

18 A. It looks like this was from 2004, Nordstrom.

19      MR. RUDY:  Bring up 3412, please.

20 BY MR. RUDY:  (continuing)

21 Q. I think you testified about this on Friday.  Describe

22 again what this is.

23 A. This looks like K-Swiss four-striped shoe.  It looks

24 like it's an infant's shoe, available on Amazon.com.  It

25 looks like a 2007, if the date is right at the bottom.

Exhibit 1 - Page 197 of 262

Page 1728

1      MR. RUDY:  Your Honor, may I pass these to the

2 witness?

3      THE COURT:  Yes, you may.

4 BY MR. RUDY:  (continuing)

5 Q. I'm going to hand you Exhibits 3745 and 3749 and ask

6 you to take a look at those and explain what they are, if

7 you would (handing).

8 A. We have two different K-Swiss shoes.  One, the more

9 traditional, in terms of K-Swiss, was the stripes ending

10 in a D ring.  Usually there are five.  This one has four.

11 It has more kind of a court updated bottom.

12      This one (indicating) is a K-Swiss shoe with four

13 stripes, with kind of their inlaid -- and I think these

14 are the ones, if I'm correct, you can change the color of

15 the stripes actually, so there are little slider bars.

16 And it has more of a waffle bottom, with an EVA midsole.

17 Q. And are those currently available to purchase?

18 A. One of them was 2007, so they were released in 2007,

19 available for purchase.

20 Q. And as of the date of this --

21 A. It was 4-10, I think it looks like, 2007.

22 Q. This shoe was available for sale as of that date?

23 A. Yes.

24      MR. RUDY:  Let's move on, Amy, to 3421, a Nike

25 shoe, a four-striped Nike shoe.

Exhibit 1 - Page 198 of 262

Page 1729

1        I don't think we have the right one here.  Oh, I

2 said 12.  21, 3421, page 12.

3 BY MR. RUDY:  (continuing)

4 Q. Describe what you see there, if you would.

5 A. This is -- it looks like a women's Nike Shox shoe

6 with four contrasting stripes.

7 Q. It could be five, couldn't it, depending on how you

8 look at it?

9 A. Yeah, if you go either other.  But yes, if you look

10 at the white, it's four.  If you look at the pink, it's

11 five.

12 Q. And the time frame for this?

13 A. This looks like it was -- it was printed on

14 October 7th of 2005.

15 Q. So this is part of that retro --

16 A. It's part of that retro look, correct.

17        MR. RUDY:  Page 27, please, another Nike shoe out

18 of the same exhibit.  First pull up the date, if you

19 could, Amy.

20 BY MR. RUDY:  (continuing)

21 Q. Could you identify the date, Mr. Pfannenstiel?

22 A. This is -- I think it's 2006, Nike.

23 Q. All right.

24 A. And it's a Nike Shox Turb Oh.  I think this is a

25 men's, in men's sizes, with the same -- this one has a,

Exhibit 1 - Page 199 of 262

Page 1730

1 you know -- you can look at it as either a five stripe or

2 a six stripe, depending on if you look at the contrast or

3 the white stripes.

4        MR. RUDY:  All right.  Let's go to 3441, page 2.

5 And bring up the first page so he can identify the source

6 of this.

7        THE WITNESS:  It's a Wal-Mart -- it's a Wal-Mart

8 circular for back to school.

9 BY MR. RUDY:  (continuing)

10 Q. What time frame?

11 A. Actually, I have to look at the back page, I think.

12 Oh, it's up at the top.  July 1st, 2005 -- 31st.

13        MR. RUDY:  Let's go to page 2.

14 BY MR. RUDY:  (continuing)

15 Q. Do you see striped shoes shown there?

16 A. Yes.  So we have the shoes listed for $9.87.  It has

17 four stripes.

18        MR. RUDY:  Page 3.

19 BY MR. RUDY:  (continuing)

20 Q. Describe the --

21 A. Yes.  Actually, two different ones here, or actually

22 three.  I take that back.

23        You've got the top two-striped -- it looks like a

24 boys' and kids' athletic shoe.  It looks like it has

25 perfing as well.

Exhibit 1 - Page 200 of 262

Page 1731

1       Then in kind of the middle of the page, you've

2 got another four-striped shoe that is a ladies shoe that

3 has four contrasting stripes, as well as a kind of more

4 updated court bottom.

5       Then I think at the bottom, there is also another

6 striped shoe, this one made with basically stitching.  So

7 that one looks like it's more of a five-stripe shoe.

8       MR. RUDY:  3411, Amy, page 148.

9 BY MR. RUDY:  (continuing)

10 Q. Describe the Fila shoe shown there, Mr. Pfannenstiel.

11 A. So it looks like we have a Fila shoe with -- you

12 either can say it's four or six stripes, contrasting

13 stripes, from a J.C. Penney catalog.

14 Q. What year is this?

15 A. Well, that one said '71, but I don't think this one

16 is a '71 catalog, just from the styling.

17       That's '76.  But I'm pretty sure, just from

18 looking at the graphic treatments and the shoes, it's

19 more -- either it's in the 2000s or late nineties.

20       MR. RUDY:  Go to page 168.  This should be a Nike

21 shoe shown there.

22       No.  It doesn't show it very well.

23       Let's go to 3433, page 19.

24 BY MR. RUDY:  (continuing)

25 Q. So we're bringing up a Skechers catalog.

Exhibit 1 - Page 201 of 262

Page 1732

1 A. It's a 2001 Skechers fall catalog.

2          MR. RUDY:  And go to page 19.  Okay.  Page 42.

3 BY MR. RUDY:  (continuing)

4 Q. Do you see striped footwear on this?

5 A. You've got -- at the top, you've got four different

6 striped shoes, and I think there is one at the bottom.

7 There's four different versions of a two-striped.  Then

8 at the bottom, there is a two-striped perfed shoe with

9 more of a lug sole bottom.

10          MR. RUDY:  Go to 3407, please.

11 BY MR. RUDY:  (continuing)

12 Q. Identify this, if you would.

13 A. It's a Saks Fifth Avenue Web site.  It's for a Gucci

14 Oxford with, you know -- we have three stripes, two black

15 and one red, with the, you know, contrasting heel.

16 Q. Is this a heel tab, the contrasting heel?

17 A. Yes.

18          MR. RUDY:  All right.  Thank you, Amy.

19          THE WITNESS:  That's 2005.

20 BY MR. RUDY:  (continuing)

21 Q. Now, that was not all inclusive of shoes --

22 A. No.

23 Q. -- available on the market --

24 A. No.

25 Q. -- as part of this retro?

Exhibit 1 - Page 202 of 262

Page 1733

1        Go ahead.

2 A. No, that was not.

3 Q. Many others were sold by other companies?

4 A. Yes.

5 Q. Is that a fair statement?

6        Now, Mr. Pfannenstiel, over the course of the

7 trial, you've heard a lot of testimony about the accused

8 shoes, correct?

9 A. That is correct.

10 Q. The accused Payless shoes, 268 lots, correct?

11 A. Correct.

12 Q. And you're familiar with those lots?

13 A. Yes, I am.

14 Q. And of those 268 lots, a first group was accused of

15 infringing the adidas Superstar trade dress, correct?

16 A. That's correct.

17 Q. I'm going to refer to those during the course of this

18 examination as group -- category C, Payless category C

19 shoes.

20        And there's about 51 lots in that category; is

21 that --

22 A. Yes, that is right.

23 Q. Plus or minus?

24 A. Plus or minus.

25        THE COURT REPORTER:  One at a time, please.  Let

Exhibit 1 - Page 203 of 262

Page 1734

1 him finish his question.

2 BY MR. RUDY:  (continuing)

3 Q. My question was:  About 51 lots, plus or minus?

4 A. That is correct.

5 Q. And there is a second category of shoes which -- and

6 I'm talking about Payless shoes -- which are accused of

7 infringing the three-stripe mark and also being similar

8 to the adidas Originals and Performance shoes, correct?

9 A. Infringing or confusing the three-stripe mark

10 and -- and the adidas Originals, yes.

11 Q. All right.  And just for clarification, these

12 plaintiff's exhibits here illustrate what I've called the

13 Payless group C shoes.  This is an example of the adidas

14 Superstar, Plaintiff's Exhibit 50, I think, correct?

15 A. Correct.

16 Q. And one of the lots accused of infringing -- I

17 misspoke; that's Exhibit 100 -- is this Payless,

18 Plaintiff's Exhibit 936, correct?

19 A. Correct.

20 Q. And there are about 51 lots in this category?

21 A. Yes.

22 Q. And the Payless category B shoes I was referencing

23 are, by way of example, this Payless shoe, 769, which is

24 claimed to be similar to the adidas Campus shoe,

25 Exhibit 261, correct?

Exhibit 1 - Page 204 of 262

Page 1735

1 A. Correct.

2 Q. And there was the Country Ripple adidas and so on?

3 A. Yes.

4 Q. And so the shoes accused of infringing the

5 three-stripe mark and also being similar to these shoes

6 we'll call Payless category B shoes.

7        And there are slightly over 100 lots in that

8 category; is that correct?

9 A. That is correct.

10 Q. All right.  So of the 268 lots, that leaves about 113

11 lots, if I did my math?

12 A. Yes.

13 Q. I'm going to call those Payless category A lots.  Are

14 you familiar with those?

15 A. Yes, I am.

16        MR. RUDY:  Amy, can we bring up some samples of

17 the category A lots.

18 BY MR. RUDY:  (continuing)

19 Q. We didn't hear a lot about these shoes during the

20 plaintiff's case, so I want to talk about it during our

21 case, about this category of shoes.

22        What do you see here, Exhibit 2987?

23 A. We've got the Payless lot 486 with four white

24 contrasting stripes and kind of a court bottom.

25 Q. Now, I'm not going to go through all 113, but I'd

Exhibit 1 - Page 205 of 262

Page 1736

1 like to step through about three or four, and then we'll

2 just show the rest to the jury very quickly.

3 A. All right.

4        MR. RUDY:  Bring up the next, please.

5 BY MR. RUDY:  (continuing)

6 Q. Describe this shoe, if you would.

7 A. So we have a children's double velcro with four

8 stripes, both with stitching and perfing, and more of the

9 same kind of court bottom.

10 Q. And next?

11 A. You have a two-stripe, you know, what you would call

12 more of a cross trainer, athletic, with two stripes and

13 kind of a nylon vylon upper.

14        MR. RUDY:  All right.  Amy, let's just move

15 through the rest of these very quickly, just to give a

16 view of the kind of shoes.

17 BY MR. RUDY:  (continuing)

18 Q. If you would, as these are coming up, just basically

19 describe them.  They all have two or four --

20 A. They all have two or four stripes, either with

21 contrasting or stitched or perfs.

22 Q. Do any of them have a shell toe?

23 A. No.

24 Q. Do any of them have a flat bottom that is claimed to

25 be part of the Superstar trade dress?

Exhibit 1 - Page 206 of 262

1 A. No, they do not.

2 Q. Do any of them have the heel tab that's claimed to be

3 part of the Superstar trade dress?

4 A. No, I do not believe so.

5 Q. There may be some heel treatments?

6 A. There's heel treatments.  There's contrasting, but

7 not with the uprised, you know, kind of --

8        MR. RUDY:  Back up to that one, Amy.

9 BY MR. RUDY:  (continuing)

10 Q. It looks like we may have included a shell toe in

11 this.  Well, I thought I saw a shell toe.

12 A. There's one right there.

13 Q. That one is not intended to be in this group.  So for

14 the record, we're removing 3085 from Payless category A.

15 A. Right.

16        MR. RUDY:  Keep going.

17 BY MR. RUDY:  (continuing)

18 Q. Now, you heard the testimony last week from adidas'

19 witnesses, right?

20 A. Yes.

21 Q. And we didn't hear that any of these shoes were

22 similar to the Superstar trade dress, correct?

23 A. I don't believe so.

24 Q. We didn't hear that any of these shoes were similar

25 to the Performance or Originals shoes, did we?

Exhibit 1 - Page 207 of 262

Page 1738

1 A. I don't believe so.

2 Q. Other than possibly that one shell toe?

3 A. Yeah.

4 Q. So the reason these shoes are accused is because they

5 have two and four stripes.  Is that a fair --

6 A. That's fair.

7 Q. As far as you know?

8 A. As far as I know.

9          MR. RUDY:  All right.  Amy, you can end that.

10 BY MR. RUDY:  (continuing)

11 Q. What I'd like to do now is turn the discussion to a

12 comparison between these Payless category A shoes and

13 some of the features we saw in the other slides.

14          MR. RUDY:  And, Your Honor, these are

15 demonstratives.  Copies have been supplied to counsel.

16          THE COURT:  All right.  They're not marked with

17 an exhibit number, then?

18          MR. RUDY:  No.  But if that's what you desire --

19          THE COURT:  No, no, I'm not suggesting that.  We

20 don't want to get them confused with the exhibits that go

21 to the jury.  These are demonstrative exhibits, then?

22          MR. RUDY:  Correct.

23          THE COURT:  All right.  Go ahead.

24          MR. RUDY:  Amy, if you'd bring up A.

25

Exhibit 1 - Page 208 of 262

Page 1739

1 BY MR. RUDY:  (continuing)

2 Q. Describe what's shown in this demonstrative, which is

3 a side-by-side of Exhibit 2987 on the left and 3412 on

4 the right.

5 A. So we have the Payless lot number on the left, and we

6 have the K-Swiss lot number on the right.  Both have four

7 white contrasting stripes.  Both have that updated kind

8 of court bottom.

9        MR. RUDY:  Go to the next one, Amy.

10 BY MR. RUDY:  (continuing)

11 Q. Describe what you see here, which is, again, a

12 side-by-side comparison of the lot at issue, 3006, and

13 shoes on the right, which were part of this narrative

14 about prior art -- or third-party uses of stripes,

15 correct?

16 A. That's correct.

17        Can we zoom in?  It's hard for even me to see on

18 the screen each individual one.

19 Q. On the right?

20 A. Yeah.  Because I think it has the date as well.

21        So we have a 1996 Nike on the left hand of the

22 screen.  Then we have a 2000 Nike, both with four

23 stripes.  Then below we have Skechers from 2001, with

24 four stripes or five stripes on the left hand, and then

25 we have a Tommy Hilfiger four-striped shoe from 2007.

Exhibit 1 - Page 209 of 262

Page 1740

1        MR. RUDY:  Go to the next one.

2 BY MR. RUDY:  (continuing)

3 Q. What do you see on the right or on the left first?

4 A. On the left we have two of the accused Payless lots

5 with two stripes.

6        Then on the right we have a Converse shoe with a

7 rubber toe guard from 1972; a J.C. Penney with a rubber

8 toe guard from 1976; a Stride Rite shoe with the same

9 characteristics, two stripes and toe guard, from 1978;

10 and a Pro-Keds with two stripes from 1996; and, again, a

11 Stride Rite shoe -- it's so blurred I can't tell you what

12 the date is on the Stride Rite.  Then we have a Skechers

13 two-stripe shoe from 2002.

14        MR. RUDY:  Amy, thank you.  Let's go to the next

15 demonstrative.

16 BY MR. RUDY:  (continuing)

17 Q. Describe what is shown on the left and again on the

18 right.

19 A. So we have the Payless accused lot with stitching and

20 perfing creating the stripes.  And then we have from Nike

21 at the top -- can we just see the top part?  It's hard

22 for me -- from, I think, 1996 four stripes, perfed.  And

23 then we have from 19 -- or from 2000, we have four

24 stripes as well.

25        And then we have a Skechers four-stripe with kind

Exhibit 1 - Page 210 of 262

1 of that same kind of court bottom.  Then we have a Tommy

2 Hilfiger from 2006 with four stripes and also perfing at

3 the bottom, with the same kind of a court bottom.

4        MR. RUDY:  All right.  Let's go to the next

5 demonstrative.

6 BY MR. RUDY:  (continuing)

7 Q. Describe what's on the left and right.

8 A. So we have Payless lot number accused 2244.  Then we

9 have a Reebok from 2004 that has also two stripes and

10 that same kind of court bottom.  Then we have a Stride

11 Rite shoe from 2005, with two stripes and kind of a court

12 bottom as well.

13        MR. RUDY:  And the next one, please.

14 BY MR. RUDY:  (continuing)

15 Q. Again, what's shown on the left?

16 A. So we have Payless lot number --

17        THE COURT REPORTER:  Repeat the lot number.  I'm

18 having trouble hearing you.  Could you move the

19 microphone over?

20        THE WITNESS:  Sorry.

21        Lot number 9481.  And then we have a Skechers

22 from 2000 -- I think 1, with four stripes; a Skechers

23 from also, it looks like 2001, with four stripes, with

24 that kind of a flat court bottom.  And we have a Skechers

25 from 2001 with -- it looks like five stripes, and then

Exhibit 1 - Page 211 of 262

Page 1742

1 another Skechers from 2002 with four stripes.

2       Then also we have a Stride Rite.  I think it's

3 2004, with four stripes; a Stride Rite from 2004 with

4 four stripes as well; and then another two Stride

5 Rite -- or a Stride Rite on the bottom, from 2004, more,

6 you know, four stripes; as well as then a Nike we looked

7 at earlier from 2000 -- I think 5, with four stripes.

8       MR. RUDY:  Thank you.  Let's move to the next

9 demonstrative.

10 BY MR. RUDY:  (continuing)

11 Q. What's shown on the left, Mr. Pfannenstiel?

12 A. It looks like we have two Payless accused lots of

13 3204 and 3205.  It looks like with kind of a more flat

14 gum bottom.

15      Then we have a Stride Rite two-stripe shoe from,

16 I think, 2004, two different colors, a pink one and a

17 blue.  We have a Tommy Hilfiger.  It looks like it's a

18 two-stripe with two kind of perfs, and then a red shoe

19 with two stripes and that same kind of -- more of a -- it

20 looks like a gum waffle bottom with a wrap toe.

21 Q. Thank you.

22      MR. RUDY:  So I don't think we need to go through

23 the rest of these, Amy.

24 BY MR. RUDY:  (continuing)

25 Q. Is it an accurate or fair statement to say that the

Exhibit 1 - Page 212 of 262

Page 1743

1 shoes in the Payless category A group have not only

2 stripe features, but also other stylistic features in

3 widespread use both --

4 A. Yes.

5 Q. -- in the past and currently by other companies?

6 A. That's true.

7 Q. All right.  Let's shift gears and turn our discussion

8 to a comparison of the accused shoes in this category A

9 to features already used by Payless in the last two or

10 three decades, as we talked about.

11 A. Okay.

12      MR. RUDY:  Could you bring up PO 1, please.

13 BY MR. RUDY:  (continuing)

14 Q. On the left you see accused shoes that are identified

15 by the exhibits, correct?

16 A. Correct.

17 Q. And are there features found in some of these

18 materials you described earlier?

19 A. Yes.  These are, again, from the ads from, you know,

20 the early -- we have seventies, you know, eighties.  The

21 shoes have, you know, cap toes, contrasting stripes, a

22 lot of the elements that are carried forward.

23      MR. RUDY:  Next demo.

24 BY MR. RUDY:  (continuing)

25 Q. Now, the shoes shown on the right here are the ones

Exhibit 1 - Page 213 of 262

Page 1744

1 we saw just a few minutes ago, correct --

2 A. That is correct.

3 Q. -- from store catalogs?

4 A. Yeah, from 1975.

5 Q. And what do you see on the left there?

6 A. We have Payless accused lots. We have -- if you pull

7 them up, we can do the lot numbers.

8        So Defendant's Exhibit 3046, 3057, and Payless

9 lots, same lots -- or Payless lots -- let me go back to

10 the lots. I'm sorry. So Payless lots 16087, 19411, and

11 I have no idea what that number is. Sorry.

12 Q. I think it's Exhibit 3100.

13 A. 23846.

14 Q. And the lot number is 23845?

15 A. 23845.

16 Q. And those striped features are found in these old

17 uses?

18 A. Yes. So you can see that several of these shoes have

19 cap toes, the same kind of wrapped bottoms, as well as

20 the contrast four stripes.

21 Q. Now, we're looking at Payless shoes that made use in

22 the past over the last few decades?

23 A. Yes.

24        MR. RUDY: Go to the next demonstrative, please.

25

Exhibit 1 - Page 214 of 262

Page 1745

1 BY MR. RUDY:  (continuing)

2 Q. Again on the right, this is a picture of footwear out

3 of an historic record at --

4 A. Yes.  This is a visual display guide, showing the

5 stores how to stack -- these are shell-toed.  These are

6 the four stripes we looked at earlier.  It's from a

7 display usage guide from the seventies.

8 Q. And what do you see on the left there?

9 A. Then we have the accused lots.  So we have 382,

10 26 -- I can't tell whether that's 26 or 2523.

11        I should take my glasses off.  That helps on this

12 one.  3065, and 23893.

13 Q. Okay.  Now, we're talking about Payless shoes here

14 accused of infringing the Superstar trade dress, correct?

15 A. Correct.

16 Q. And that's what I've dubbed Payless category C.

17        And you see on the right there, used by Payless

18 in the '94 period, shell toes, correct?

19 A. Right.

20        Well, you're talking about what's on the

21 right-hand screen?

22 Q. Yes.

23 A. That was in the seventies.

24 Q. I stand corrected, in the seventies.

25        MR. RUDY:  All right.  The next demonstrative,

Exhibit 1 - Page 215 of 262

Page 1746

1 please.

2 BY MR. RUDY:  (continuing)

3 Q. Now we're back to category A, Payless category A

4 shoes, the general stylistic compilation of miscellaneous

5 shoes.  Is that's what's shown on the left?

6 A. That's correct.

7 Q. And do those shoes have features that were used by

8 Payless in the past?

9 A. Yes, they are.

10 Q. And what do you see on the right there?

11 A. These are -- I think at this time -- these are Pro

12 Wing athletics.  This is from the mid-eighties television

13 ad for buy one, get one half price.

14 Q. Thank you.

15        MR. RUDY:  Next demonstrative?

16 BY MR. RUDY:  (continuing)

17 Q. What do you see on the left there?

18 A. So we have accused lots yet again, four different

19 lots, and then an example from an FSI.  I think this one

20 was from 1997 FSI.

21        MR. RUDY:  Next demonstrative?

22        THE WITNESS:  The same.  We have the four accused

23 lots; and then also from around the same time period, an

24 FSI, Payless FSI from 1997.

25        MR. RUDY:  Next one?

Exhibit 1 - Page 216 of 262

Page 1747

1        THE WITNESS:  These are also four-striped shoes

2 with more of the track cross country bottom, the

3 saw-toothed bottom.  They're in accused lots, four lots.

4        And then this is from the -- I think the early or

5 the mid seventies, early eighties, the Payless television

6 ad that we looked at earlier.

7        MR. RUDY:  Next?

8 BY MR. RUDY:  (continuing)

9 Q. What do you see on the left?

10 A. Similar, we have four accused lots of more of a, you

11 know, low track bottom, and then a Payless Pro Wing shoe

12 from the mid-eighties.

13        MR. RUDY:  Next?

14        THE WITNESS:  We have then, again, the two

15 stripes with, you know, kind of a saw-toothed bottom, and

16 then again a television ad from the mid-eighties with the

17 two-stripe ripple bottom.

18        MR. RUDY:  So we'll stop in this group here, Amy.

19 BY MR. RUDY:  (continuing)

20 Q. Is it a fair statement that the shoes in this Payless

21 category A -- that is, not ones accused of infringing the

22 Superstar trade dress and not ones accused of being

23 similar to the Performance and Originals adidas shoes,

24 but the remaining miscellaneous shoes --

25 A. I believe so.

Exhibit 1 - Page 217 of 262

Page 1748

1 Q. -- is it a fair statement that many of the features,

2 and certainly the stripes that were used on those shoes

3 have been used by Payless in the past?

4 A. Yes.

5 Q. Let's move ahead to talk about the elements of the

6 Superstar trade dress.

7         MR. RUDY:  Would you bring up this demonstrative?

8 BY MR. RUDY:  (continuing)

9 Q. What is shown up here on the screen?

10 A. It looks like we have an illustration of the trade

11 dress alleged infringements by adidas, so it's got the

12 components of the flat sole, the rubber shell toe, the

13 parallel stripes, small holes, and then kind of a colored

14 heel.

15 Q. So those are the features that make up their claimed

16 trade dress?

17 A. Correct.

18         MR. RUDY:  Let's turn to the next page in this

19 demonstrative.  Can you bring up this ELMO for me, Amy?

20 BY MR. RUDY:  (continuing)

21 Q. So for this comparison analysis, the features used by

22 the others in the past, I want to focus your attention

23 on --

24         THE COURT:  Did you want it upside down?

25         MR. RUDY:  Thank you.  That's what happens.  All

Exhibit 1 - Page 218 of 262

Page 1893

1 bottom of the shoe.  But the outsole was designed -- again, it

2 had the SmartFit logo on it.  And those are really kind of the

3 key characteristics.

4 Q.  Now, when you were in -- a buyer in kids' athletics, as

5 well as merchandise manager in kids' athletics, were you aware

6 of other companies that sold two- and four-stripe shoes?

7 A.  Absolutely.

8 Q.  Athletic shoes?

9 A.  Um-hmm.  Yeah.  Most of our competition.

10 Q.  And can you tell the jury some of those other companies

11 that sold two- and four-stripe athletic footwear during that

12 period?

13 A.  Sure.  You know, the companies that we consider our main

14 competition were Wal-Mart, Target, Kmart, Sears, Kohl's.  All

15 of those different types of companies.  Stride Rite.  Again,

16 all of those companies had different versions of striped shoes

17 on the marketplace.

18 Q.  Now, these vendors and agents that worked with Payless, did

19 they also sell two- and four-stripe footwear to other

20 companies?

21 A.  They did.

22 Q.  And which other companies?

23 A.  Again, just a lot of the companies I just named off.  The

24 Targets, the Wal-Marts, the Kmarts of the world.  Again, Sears,

25 Penneys, Kohl's, all of the -- kind of the mid-tier in the mass

Exhibit 1 - Page 219 of 262

Page 1894

1 market retailers.

2 Q.  Exhibit 3814 I think you have up on the witness stand with

3 you.  It might be the last shoe you have on the right side.

4 A.  Um-hmm.  Yes.

5 Q.  Have you seen that shoe before?

6 A.  I have, yeah.

7        I just saw this in the store at Nordstrom when I was

8 here in Portland this week.  So this is another example of a

9 two-stripe shoe that's in the marketplace (indicating).

10 Q.  Does that shoe -- how would you characterize that shoe?  Is

11 that one of those track flats?

12 A.  Yeah.  I would call it kind of a retro jogger track flat.

13 Q.  And when did you see that shoe?

14 A.  Just last week in the store.

15 Q.  Here in Portland?

16 A.  Correct.  In the Nordstrom's in Portland, a couple of

17 blocks from the hotel.

18        MR. MARTIN:  Thank you, Ms. Nauholz.  I have no

19 further questions.

20        THE COURT:  All right.  Cross-examination.

21                    CROSS-EXAMINATION

22 BY MR. HENN:

23 Q.  Ms. Nauholz, you joined Payless in February of 2003.

24 Right?

25 A.  That's correct.

Exhibit 1 - Page 220 of 262

Page 1967

1 A.  I think what they've identified -- what Payless would have

2 identified, that buyer would have identified in the market,

3 that stripe shoes are a trend that is important.  And they're

4 putting on the shoe -- a two-stripe or a four-stripe -- to be

5 consistent with a big merchandise idea or a trend that's in the

6 market.

7 Q.  Did it ever occur to you that by doing that, customers

8 would confuse four-stripe shoes with adidas shoes?

9 A.  I don't think customers confuse adidas and Payless shoes.

10 And there are many, many, many two- and four-stripe shoes out

11 in the market.  Many, by -- by a lot of different vendors.

12 Q.  And what about if somebody's walking down the street and

13 they see a person wearing Payless shoes?  Is it your intent, in

14 putting two- and four-stripe shoes -- or stripes on these

15 footwear, to cause someone else seeing those shoes to think

16 those are adidas shoes?

17 A.  Well, first off, Payless doesn't typically put the Payless

18 ShoeSource name on the outside of the shoe.  So if it's

19 somebody walking down the street, they're going to have a hard

20 time with that.

21       But it -- it -- in terms of two- and four-stripe

22 shoes, like I said, there's a lot of those in the market

23 manufactured by many different manufacturers.  And I think a

24 consumer would say, well, there's this trend in the mark.

25       But with respect to adidas, adidas has registered the

Exhibit 1 - Page 221 of 262

Page 1984

1            THE COURT:  That's fine.  Have them look at it, and do

2 it.

3            Now, the document that was up, that there was an

4 objection to and that you then withdrew, I couldn't read it.

5 It's just not clear enough up here to me.

6            And is that not going to be an issue or --

7            MR. BREWSTER:  It may be a modest issue, going

8 forward.

9            The annual reports for Payless from 2000 -- I'm sorry.

10 From 1999 through 2007, actually, will be in evidence.  I

11 believe they've all -- through 2006, have been offered thus

12 far.

13            There's a section in the annual report and a section

14 in the 10-K that describe legal proceedings.  And that

15 description of legal proceedings is offered through Payless's

16 lens.  It's their description of what's happened.  So you have

17 the lawsuit being filed.  We have all of these defenses.  The

18 Ninth Circuit has heard this case.  We've petitioned the

19 Supreme Court for review but -- et cetera, et cetera.

20            And I believe it's going to turn out that that -- that

21 portion of those exhibits would violate your Motion in Limine

22 with respect to the Ninth Circuit decision.

23            THE COURT:  Well, let's talk about just what you

24 intend to offer regarding the 1994 settlement agreement.

25            It has been discussed.  What more do you intend to

Exhibit 1 - Page 222 of 262

Page 1985

1 go -- go -- on the 1994 --

2         MR. RUDY:  Nothing more.

3         THE COURT:  What questions do you have of this

4 witness?

5         MR. RUDY:  Not -- nothing more for this witness.

6         THE COURT:  Okay.  What about other witnesses?

7         MR. RUDY:  I --

8         THE COURT:  Are you going to talk about the fact that

9 the '94 agreement and the fact that it wasn't -- well, I

10 mean --

11         MR. RUDY:  I think counsel has -- counsel's issue is

12 directed to a different one.  But I believe the only witness

13 who remains, who will talk about the '94 agreement, is Steve

14 Horace, the attorney who did the shoe reviews.

15         And that, of course, goes to state of mind intent.

16         THE COURT:  All right.

17         MR. RUDY:  But this issue up here, they -- they, I

18 think, are offering Payless annual reports into evidence.  I

19 think that was on their list -- their cross-examine list today.

20         But it made some mention, I believe, of the prior

21 rulings and summary judgment that were overturned by the Ninth

22 Circuit.  I believe that's what --

23         THE COURT:  Well, yes, I ruled on that.

24         MR. RUDY:  And I would have no intention -- that was

25 an oversight.  I thought he was worried about yet another --

Exhibit 1 - Page 223 of 262

Page 1986

1 we'll -- we'll happily not use that.

2          THE COURT:  No.  I just thought I would anticipate a

3 problem, but it doesn't sound like we have one.

4          MR. RUDY:  No.

5          MR. BREWSTER:  Your Honor, I think the issue which

6 came to light with that -- that point is that Payless has six

7 of these that are being offered through this witness's

8 testimony.  It's correct that we've also identified the

9 underlying 10-Ks that go with the annual reports.  Each of

10 those has in it a description of these legal proceedings as

11 described by Payless.  And I believe, to be consistent with

12 your ruling, we're going to want to redact that.

13          THE COURT:  They need to be redacted.  Whichever side

14 offers them, they need to be redacted.

15          Okay.  All right.  See you in the morning.

16          MR. RUDY:  Thank you.

17          THE CLERK:  Court is in recess.

18          (Court adjourned.)

19                              -0-

20

21

22

23

24

25

Exhibit 1 - Page 224 of 262

Page 2205

1 Q. And it's my understanding that you have a family

2 background with Stride Rite?

3 A. That's right.  My great-grandfather founded Stride

4 Rite in 1919.  And I'm the fourth generation at the

5 company.

6 Q. Stride Rite merged with Payless this year?

7 A. That's correct.

8 Q. Can you explain when that occurred?

9 A. The merger closed in August of 2007.

10 Q. What brands of shoes does Stride Rite sell?

11 A. The main brands in Stride Rite are Sperry Top-Sider;

12 Stride Rite children's shoes; Keds; Saucony, which is

13 running shoes.  We also have brands, Robies, which is

14 children's, Grasshoppers.  We operate Tommy Hilfiger

15 under license.  Those are the main brands.

16 Q. Let me show you some exhibits which have been

17 introduced evidence in this case.  The first one I'm

18 going to show you is the first few pages, Exhibit 2705.

19         MR. MARTIN:  Liz, could you pull up page 2 of

20 that document.

21 BY MR. MARTIN:  (continuing)

22 Q. Do you recognize this?

23 A. I recognize the brand as Grasshoppers, which is

24 another brand operated within Keds.

25 Q. And were these shoes available to the public for

Exhibit 1 - Page 225 of 262

1 sale?

2 A. My assumption is if advertising was created, that

3 they were available to the public, yes.

4 Q. Including that one in -- the one with the stripes on

5 it, in the middle there?

6 A. I assume that everything in the ad was offered to the

7 public.

8 Q. Exhibit 2706, can you identify -- I'm just going to

9 show you the first page of that.  That's a couple hundred

10 pages.  But can you identify what that exhibit is?

11 A. This looks like either a catalog offered to retailers

12 or possibly an advertisement to the consumer.

13 Q. And it might be easier if you refer to the -- we have

14 the actual exhibits.  Since these are a couple hundred

15 pages, rather than go through this, if you want to refer

16 to the exhibits off to the side, this is 2706.

17 A. Okay.  Yes, this is a catalog that would have been

18 offered to retailers.

19 Q. For Keds shoes?

20 A. For Keds shoes, that's correct.

21 Q. And 2708, same thing for Pro-Keds?

22 A. That's correct.  This is a catalog that would have

23 been offered to retailers for sale.

24 Q. 2709, same thing for Sperry?

25 A. Yes.  This is the fall 2005 catalog, also to

Exhibit 1 - Page 226 of 262

Page 2207

1 retailers.

2 Q. 2710, is that a compilation of catalogs for Stride

3 Rite?

4 A. Yes, that's correct.

5 Q. And 2711, is that a compilation of catalogs for the

6 Tommy Hilfiger footwear line?

7 A. Yes, they are.

8 Q. Now, to whom are these catalogs provided?

9 A. These would be provided to the sales force to then

10 show to their retail customers, to have them place orders

11 for the product.

12 Q. If a shoe is in a catalog, what does that tell you

13 about whether the shoe is being sold?

14 A. If a shoe makes it in a catalog, the assumption is

15 that it's going to be sold in stores.

16 Q. What if it's in an advertisement --

17 A. Even more so.

18 Q. -- in a magazine or the like?  What does that tell

19 you about it being sold to the public?

20 A. That it's an important shoe and that the company

21 wanted to market it.

22 Q. Let's go back, if we could, to Exhibit 2708 and page

23 10 of that document.  What are the shoes with the two

24 stripes that are depicted there?

25 A. Those two are called the Royal Plus.  And they were

Exhibit 1 - Page 227 of 262

Page 2208

1 also known over the years as the Royal Master.

2 Q. Tell the jury the history of the Keds Royal Plus or

3 the Pro-Keds, I guess.  That's a Pro-Keds?

4 A. Pro-Keds shoe, yes.

5        The Pro-Keds Royal Plus, slash, Royal Master came

6 about in the early 1970s, 1971, 1972 time frame.  It was

7 worn as performance basketball shoe on the court.  It was

8 worn by some very prominent basketball players of that

9 era:  Pete Maravich, Nate Archibald, Jo Jo White.

10        And then also around the late seventies, it

11 evolved from the basketball courts into street fashion,

12 particularly in New York City, and was worn by people who

13 were the forefathers of rap, of breakdancing, of graffiti

14 art.  That's -- that's the history of that shoe.

15 Q. When was it first sold?

16 A. I believe around 1972.

17 Q. And does Pro-Keds still sell that shoe today?

18 A. We do.

19 Q. What is your involvement with this shoe currently?

20 A. Well, I personally have sold the shoe to retailers

21 and overseen the sales force and have had oversight over

22 the product line management.

23 Q. Do you advertise this shoe currently?

24 A. Not really in paid advertising.

25 Q. What retailers do you sell the shoe to?

Exhibit 1 - Page 228 of 262

Page 2209

1 A. Well, everyone from, over the last few years, to

2 Finish Line, which is a national retailer.  We've sold it

3 to Nordstrom over the last couple of years, smaller

4 stores in New York, Los Angeles, across the country.

5 Q. Approximately how many retailers nationwide is that

6 shoe sold to?

7 A. Over a hundred retailer locations.

8 Q. And would those be across the nation?

9 A. Across the country, yes.

10 Q. Over the years, was that shoe advertised, from 1972

11 on?

12 A. Yes, it was.

13 Q. Extensively?

14 A. In the seventies, yes.  I mean, during my research on

15 the brand, I've come up with advertising around that

16 shoe.

17 Q. Now, there was a period of time, I understand, that

18 that shoe was not sold.

19 A. Yes.

20 Q. Tell the jury about that.

21 A. Yeah.  The Pro-Keds brand was not -- was not actively

22 marketed between 1987 and 1995, and then again from '97

23 to '02.

24 Q. Let's deal with that first time frame.  Why wasn't it

25 actively marketed then?

Exhibit 1 - Page 229 of 262

Page 2210

1 A. Well, at that time Pro-Keds was part of the Keds

2 brand.  And that was the time frame when athletic

3 endorsements became very popular, where it was necessary

4 to pay athletes a lot of money to wear your sneakers.

5 And Stride Rite, the parent company, didn't feel that

6 that was an investment that they wanted to make.  And at

7 the same time, Keds, as a women's brand, was starting to

8 take off.  The company decided to focus its resources on

9 women's Keds.

10 Q. And the second time frame, '97 to '02?

11 A. '97 to '02 were similar circumstances, that the brand

12 didn't really know what to do with Pro-Keds and focused

13 its efforts elsewhere.

14 Q. Is there a registration, a trademark registration,

15 that deals with the Pro-Keds Royal Plus?

16 A. Yes.

17 Q. What's the trademark?

18 A. The trademark, as I understand it, are two parallel

19 stripes on the side of a shoe, in conjunction with the

20 two stripes adjacent to the toe.

21 Q. When you talked about, earlier, about the Keds shoes.

22      MR. MARTIN:  Let's take a look at the Keds

23 catalog, Exhibit 2706, first of all, page 34.   And maybe

24 if we could call out, Liz, the top row of shoes.

25

Exhibit 1 - Page 230 of 262

Page 2211

1 BY MR. MARTIN:  (continuing)

2 Q. The two with the stripes there, the Jet and the Tour,

3 are you familiar with those shoes?

4 A. I recognize those shoes.

5 Q. And what is your involvement with those shoes?

6 A. I was working on Pro-Keds, within the Keds division

7 at the time, and I recognize these as being two important

8 Keds shoes discussed at sales meetings, trade shows,

9 et cetera.

10 Q. When were these shoes sold, approximately?

11 A. It looks like 2002.

12 Q. If you go back two pages to page 32, does that help

13 you refresh your recollection?

14 A. Okay.  Yes.  Fall, fall 2003.

15 Q. To whom were these shoes sold?

16 A. These would have been sold to Keds customers, large

17 and small.  The big customers are people like Macy's,

18 Kohl's, J.C. Penney.

19 Q. Let's take a look at Exhibit 2711.  And these are the

20 catalogs for the Tommy Hilfiger footwear, and I want to

21 direct your attention to page 6.

22      MR. MARTIN:  And if we could call out, Liz, the

23 shoes that appear on the bottom row.

24 BY MR. MARTIN:  (continuing)

25 Q. Mr. Slosberg, can you identify those shoes for us?

Exhibit 1 - Page 231 of 262

Page 2212

1 A. I can.  This is a style called the Spring.

2 Q. And what was your involvement with these shoes?

3 A. During this time frame, 2004, around then, in

4 addition to managing the Pro-Keds business, I was

5 responsible for selling excess inventory for the Tommy

6 Hilfiger brand, and I personally sold this style to

7 retailers like Marshalls, Ross, T.J. Maxx.

8 Q. And these were discount mass merchandise --

9 A. Yes.

10 Q. -- type merchants?

11          Was it sold across the country?

12 A. Yes.  It would have been sold to -- to their

13 distribution before I got involved with it at Macy's

14 again, and folks like that.

15 Q. And that was -- the time frame you said was 2000,

16 2004?

17 A. My recollection is not exactly sure.  Around 2004 is

18 when I would have been working on this.  It could have

19 been late 2003, also.

20 Q. Any efforts on the part of adidas that you're aware

21 of to stop the sale of any of the shoes that you've

22 identified?

23 A. Not that I'm aware of, other than the Royal -- than

24 the Royal Plus.

25 Q. Tell us what you know about that.

Exhibit 1 - Page 232 of 262

1 A. A total of 19 years.

2 Q. When you worked at Shoe Corp., did it sell athletic

3 shoes?

4 A. Yes.

5 Q. And were you involved in the sale of those athletic

6 shoes as an assistant buyer and buyer?

7 A. Absolutely.

8 Q. Did it sell athletic shoes that had stripes on it?

9 A. Plenty.

10 Q. Two and four stripes?

11 A. Only.

12 Q. To whom were those shoes sold?

13 A. We sold those shoes to -- at Shoe Corporation, they

14 were for our Gallenkamp shoe stores and a few of our

15 department stores that we leased departments in, and

16 retail sales were to the consumer in the American

17 marketplace.

18 Q. And did Shoe Corp. sell shoes with two and four

19 stripes on them continuously during the period of time

20 that you were there?

21 A. Yes.

22 Q. Where did you get those shoes, the two- and

23 four-striped shoes that were sold while you were at Shoe

24 Corp.?

25 A. Those shoes we purchased from import companies like

Exhibit 1 - Page 233 of 262

Page 2255

1 Mitsubishi or we would buy them from various factories

2 out of Taiwan and Korea.

3 Q. Now, during the entire period of time while you were

4 at Shoe Corp., were you ever aware of adidas complaining

5 about the sale of these two- and four-striped shoes?

6 A. Not early on at Shoe Corp., but later in my career

7 there, yes.

8 Q. Let's take a look, if we could, Mr. Weaver, at

9 Exhibit 3432, and specifically page 88 of that document.

10          Have you seen this catalog page before?

11 A. Yes, years ago.  I remember this.  I remember the

12 shoes in the stores, actually.

13 Q. And the shoes on the top, those have three stripes on

14 them.

15 A. Yes, they do.

16 Q. What do you recall about those shoes?

17 A. Those shoes were the style of the day and worn by

18 most of the kids and young adults in America.

19 Q. And what time frame are we talking about here?

20 A. To me, the Winner shoes, those must have been

21 mid-seventies, I would say.

22 Q. And the shoes at the bottom, those with the -- the

23 four stripes, what were those shoes, do you recall?

24 A. No.  The four-striped shoes, there were plenty of

25 those out, too.  The striped shoes that I'm looking at on

Exhibit 1 - Page 234 of 262

Page 2256

1 this page were just a series of fashion shoes of the time

2 period.

3 Q. Now, you testified previously that you left Shoe

4 Corp. in 1986?

5 A. Yes, 1986.

6 Q. And you went to Elan Polo right around then?

7 A. Yes.

8 Q. What jobs have you held at Elan Polo?

9 A. I was always been in charge of the athletic business.

10 I had a short tenure with children's footwear, but mostly

11 it's been athletic shoes.

12 Q. Now, did Elan Polo in the eighties, did it sell two-

13 and four-striped athletic footwear?

14 A. Yes.

15 Q. How about in the nineties?

16 A. Yes.

17 Q. Does it today?

18 A. Yes.

19 Q. Throughout this century, from the beginning of this

20 century, the 21st century?

21 A. Yes.  We continue to sell striped footwear, two and

22 four.

23 Q. And who does Elan Polo sell two- and four-striped

24 footwear to?

25 A. Wal-Mart, Kmart.  We sell two- and four-striped

Exhibit 1 - Page 235 of 262

Page 2257

1 footwear to Payless, Kohl's, and several other customers.

2          Let's see.  Can I remember --

3 Q. How about Target?

4 A. A lot of shoes to Target.

5 Q. Pick 'n Pay?

6 A. We have sold shoes when Pick 'n Pay was a company.

7 We sold striped shoes, two- and four-striped shoes to

8 Pick 'n Pay.

9 Q. Are there others to whom you've sold two- and

10 four-striped shoes?

11 A. Yes.  We've sold shoes, two- and four-striped shoes,

12 to Sears, J.C. Penney.

13 Q. Any others that you can recall?

14 A. Not that I can recall at this point.

15 Q. Are stripes on shoes, are they popular?

16 A. Yes.

17 Q. Why, in your estimation?

18 A. Well, in my estimation, stripes are popular on shoes.

19 Stripes are sporty.  They're a lifestyle.  And they

20 really are the pedestrian -- more the commonplace

21 component that we can use on footwear that keeps sports

22 in mind.

23 Q. Let's take a look at some examples.

24          MR. MARTIN:  We've got Exhibit 2710, if we could

25 pull that up, please, Liz, and page 89 specifically, the

Exhibit 1 - Page 236 of 262

Page 2258

1 shoe in the middle.

2 BY MR. MARTIN:  (continuing)

3 Q. Have you seen this shoe before?

4 A. Yes, I have.

5 Q. And in what context?

6 A. This shoe I remember seeing at Stride Rite stores and

7 some other department stores.

8 Q. Let's also take a look at page 199.  And this looks

9 to be the baby's version of the same shoe.

10 A. Yes, it is.

11 Q. And you've seen that before in retail?

12 A. Yes.

13      MR. MARTIN:  Exhibit 3418, please, page 1.

14 BY MR. MARTIN:  (continuing)

15 Q. Tell the jury about this shoe.

16 A. This is an interesting shoe.  It's mostly velcro,

17 with striped features to it.  This is an ideal that

18 reflects sport on casual shoes.  And the striping on

19 these shoes, these four stripes, just give a good flavor

20 to how sporty things can be.  And they used the fashion

21 trend, Lacoste did, of the moment and of the time period,

22 of stripes on this particular casual shoe.

23 Q. Now, is your company, are they selling a shoe that is

24 inspired by this shoe?

25 A. We have sold some shoes inspired by that.

Exhibit 1 - Page 237 of 262

1 Q. Let's look at Exhibit 3420.  What is this?  What does

2 this show?  This appears to be a page from a Zappos

3 catalog.

4 A. Here we have an athletic shoe with a toe bumper,

5 with, again, the commonality of what's going on as far as

6 a fashion trend is concerned, with cleaned-up white, with

7 stripes on it.

8 Q. Is that shoe currently being sold in the market?

9 A. Yeah.  This one I have seen very recently.  It's out

10 in the marketplace, shoes of that nature and that one.

11 Q. And who makes that shoe?

12 A. That is made by Mark Ecko, which is a subsidiary of

13 Skechers.

14 Q. Other than those who we've identified, are there

15 other companies that have two- and four-striped shoes out

16 in the market today?

17 A. Yes, of course.

18 Q. Can you name any of those others?

19 A. Well, of course Skechers, and of course there is New

20 Balance.  They have stripes on their shoes, by way of

21 two, on some of their unique items.  And there are

22 companies like British Knights, Avia, Asics have stripes.

23 Q. And you had earlier mentioned that Elan Polo sells

24 shoes to Wal-Mart?

25 A. Yes.

Exhibit 1 - Page 238 of 262

Page 2260

1        MR. MARTIN:  If we could, let's pull up, Liz,

2 Exhibit 3441, page 3.

3 BY MR. MARTIN:  (continuing)

4 Q. Now, the shoe on the far left side of this, the

5 striped shoe there, is that a shoe that Elan Polo sold to

6 Wal-Mart?

7 A. Yes, it is.

8 Q. During what period of time?

9 A. This has to be about 18 months, two years ago, 18 to

10 24 months ago.

11 Q. Can you give us an approximation as to the volume of

12 sales of that shoe to Wal-Mart?

13 A. In a two-year period, we sold approximately

14 $8 million worth of that shoe.

15 Q. How would you describe the toe box of that shoe?

16 A. Stitched.  It's a stitched toe box.

17 Q. Whatever the material is, it's stitched?

18 A. Yeah.  It's a stitched toe box on a leather toe,

19 leather material.

20 Q. Let me ask you this.  Is Elan Polo -- you mentioned

21 previously that you received some complaints from adidas.

22 Has Elan Polo ever been sued by adidas?

23 A. No, I don't believe sued, but we have -- we have

24 received, through the retailer, some infringement memos.

25 Q. Okay.  Has Elan Polo, to your knowledge, ever been a

Exhibit 1 - Page 239 of 262

1 A.  Yes.

2 Q.  How much money?

3 A.  60,000 dollars.

4 Q.  And did -- did adidas ask Payless to -- whether or not

5 adidas could make a public statement about the resolution of

6 this case?

7 A.  Yes.

8 Q.  Let's call up that paragraph, which I believe is on the

9 first page.

10        On page 3.  Page 3.  Page 3.  And it's the paragraph

11 that's indented.

12 A.  Yes, it said that they -- they could announce that adidas

13 and Payless reached an agreement to resolve the lawsuit, in

14 which adidas alleged that Payless sold footwear that infringed

15 the three-stripe trademark.  And that Payless has acknowledged

16 adidas's ownership in the three-stripe trademark for athletic

17 footwear.

18 Q.  So you were letting adidas tell the world that Payless

19 believed adidas had those rights in the three-stripes?

20 A.  Sure.

21 Q.  And would you have let adidas put this out, if didn't

22 believe that was true?

23 A.  No.

24 Q.  And did this settlement agreement restrict Payless's

25 ability -- did this settlement agreement restrict Payless's

Exhibit 1 - Page 240 of 262

Page 2318

1 ability to sell with two or four stripes in the future?

2 A.  If those shoes had serrated edges, like -- you know,

3 serrated like a saw, wavy edges, yes.

4 Q.  What about if they didn't have serrated edges?  Did

5 anything prevent you from selling two- or four-stripe shoes in

6 this agreement?

7 A.  No.

8 Q.  Now, wait a second.  This agreement that I'm look at

9 here -- and we heard from Mr. Brewster -- nothing in this

10 agreement says that Payless can sell two- or four-stripe shoes,

11 does it?

12 A.  Not explicitly, no.

13 Q.  Well, what led you to believe that that was okay?

14 A.  That's what we were agreeing to.  We were -- we were

15 resolving the stripe issue.  That's what we were trying to do.

16        And -- and the simplest way to do it was to say, X, Y,

17 and Z are prohibited.  And by -- and -- and that meant, under

18 my understanding -- and I think Mr. Erb's understanding -- that

19 what was outside of X, Y, and Z -- that is, two and four

20 straight-edge stripes -- was permitted.

21 Q.  Well, did Mr. Erb say or do anything that lead you to

22 believe that your interpretation was wrong?

23 A.  We discussed it, and he told me that we could stay out of

24 trouble with adidas if we followed this agreement.

25 Q.  Now, was there any time limitations on this settlement

Exhibit 1 - Page 241 of 262

Page 2343

1 to make sure that it complies with any agreement Payless has

2 with respect to stripes.

3          And there are two.  Then that would be the adidas

4 agreement we discussed earlier.  The stripes are not serrated.

5 So there's no problem, from that respect, with the adidas

6 agreement.  And it's not a -- a four -- it doesn't have four or

7 more stripes, and the stripes aren't connected to any kind of

8 D-ring, so the K-Swiss agreement wouldn't be implicated either.

9          So I would see, okay, there's no issue with

10 agreements.

11          Then I would look at potential issues -- my partner,

12 Bob Lambrechts, would be all over this.  But I would be

13 looking -- okay, this is -- assuming these fashion references

14 are pretty new designs -- and I think they were -- is there

15 anything on there that could be seen by consumers as indicating

16 source?  What's -- what's -- what are consumers likely to see

17 on this shoe and think it tells them where the shoe comes from?

18          And to my eye there was nothing on here that indicated

19 source.  And it's not likely that any consumer is going to be

20 confused by this two-stripe shoe, and it fully complies with

21 the agreement that I made with adidas a longtime ago.  So I

22 wouldn't have thought the stripes would be a problem.

23          The only other thing to look at, in particular, would

24 be this -- this particular stitching design.  And, see --

25 'cause -- 'cause it's a pretty complex -- I don't know if you

Exhibit 1 - Page 242 of 262

Page 2344

1 can see it.  But it's a pretty complex stitching design.  And I

2 would look at -- well, how does this refer to the fashion

3 references?  Because it's possible, if you have a new design,

4 with one of the fashion references, getting a design patent on

5 that.  And design patents you don't find out about until they

6 issue.

7          So for purposes of our review, if we're looking at

8 something which is a pretty trendy, new thing that has pretty

9 new fashion references, we're assuming that somebody may be

10 getting a design patent and making sure that our stitching

11 pattern is going to be quite distinguishable from theirs.

12 Q.  Now, Mr. Horace, maybe you can help us, because you do this

13 a lot.  But we've been hearing about trademark and trade dress

14 in this case.

15          What's a design patent?

16 A.  You can -- you can get a patent on the ornamental design --

17 a new ornamental design of a shoe.  It can't be something

18 that's been out there.

19          So adidas couldn't get a design patent on a

20 three-stripe mark -- on a three-stripe shoe, because they've

21 been using that for a long time.

22          But for an -- a new ornamental design of a shoe, you

23 can get design patents.  Some companies get lots of them.

24 Nike, Skechers, many others, get lots of them.

25          So it's something we always have to be aware of.  That

Exhibit 1 - Page 243 of 262

Page 2379

1 A.  It is.  And on the first page you can see that she said, I

2 did get Steve's voice mail to send our sample for lot 10287.

3        And then I just confirmed that she had received our

4 advice on it.

5        And you can see on, I guess, page 8 of this, the

6 images that I was looking at.  And they -- they weren't crystal

7 clear, and I wanted to be sure that we were in compliance with

8 our agreement.

9 Q.  Well, the shoe that -- that -- that was the inspiration for

10 this shoe was the adidas Superstar, wasn't it?

11 A.  Yes.

12 Q.  And you were indicating you were having problems with this

13 shoe, weren't you?

14 A.  I was indicating that I wanted to make sure the shoe

15 complied with our agreement with adidas by not having serrated

16 stripes.

17 Q.  Well, did you ultimately see the shoe?

18 A.  I did.

19        MR. SHAEFFER:  Your Honor, may I approach, and provide

20 him the shoe?

21        THE COURT:  You may.

22        MR. SHAEFFER:  And that's Exhibit 3024.

23 BY MR. SHAEFFER:

24 Q.  Can you identify that as the shoe that was the subject of

25 this shoe review?

Exhibit 1 - Page 244 of 262

Page 2380

1 A.  Yes.  This is lot 10287.

2 Q.  And can you just quickly walk us through your shoe review

3 analysis of this shoe?

4 A.  Sure.

5       The first -- the first question on the shoe -- because

6 the shoe has stripes -- does it comply with our agreement?

7 Does it comply with -- with our agreement with adidas?  The

8 answer is yes.  The stripes are straight.  It complies with our

9 agreement.  There's four of them.

10       We also made sure there's -- there's no possibility

11 that the space between the stripes could be seen as stripes.

12 So if we had just three rows of perforations, we would have

13 objected to that, because even though these aren't stripes,

14 maybe could see them as stripes.

15       So we -- we were very, very careful about anything

16 relating to three.  It drives the buyers nuts.

17       Then -- so we -- and is it -- are the -- are the

18 stripes connected with any D-rings, or something such that it

19 could implicate our prior agreement with K-Swiss?  They are

20 not.  So that doesn't come into play.

21       So then the only other question is, okay, on this

22 shoe -- or on the adidas counterpart to -- to -- to this shoe,

23 the adidas inspiration, is there anything else that's going to

24 tell people where this shoe comes from?  That could confuse

25 people about the source of the shoe?

Exhibit 1 - Page 245 of 262

Page 2381

1    And knowing that adidas had failed to register the

2 shell toe, knowing that I had two kinds of shoes with shell

3 toes in my closet, and that they provide functional support to

4 the toe, I didn't think -- and the other shoe reviewers didn't

5 think -- that this is a source indicating feature.  And that

6 people are going to be confused about where this four-stripe

7 shoe comes from because it has a shell toe.  So that's -- and

8 we look at it for that.

9    It's an old-style design.  So there's not going to be

10 any issue with the design patent, because the design patent

11 only covers new stuff, new kinds -- new designs.

12 Q.  Now, when I look at that shoe, I see that the toe's getting

13 kind of yellow.  Isn't that a problem?

14 A.  Yeah.  That happens with -- with all tennis shoes over

15 time.

16    This -- this is -- this was a 2001 shoe, so it's seven

17 years old.

18    I have an adidas shoe on my shelf that's -- that's

19 much yellower than this on the toe and around -- around here.

20 But it's not because there's necessarily anything wrong it.

21 It's because that's what happens to shoes after -- after years

22 and years.

23 Q.  Well, I would like to go back to Mr. Henn's letter, which

24 is Exhibit 539.

25    What was your reaction when you got that letter?  When

Exhibit 1 - Page 246 of 262

Page 2396

1 Q.  What was your review of this shoe?  Your trademark review?

2 A.  Trademark review was it was a low-to-moderate because it --

3 although the use of the four-stripe is implicated in the adidas

4 litigation -- which is our way of saying it's likely to be in

5 dispute -- per the settlement agreement it's permissible.

6          MR. SHAEFFER:  And if I may approach, your Honor, I

7 would like to provide the witness with the actual copy of lot

8 22743, which is Exhibit 3093.

9          THE COURT:  Go ahead.

10          MR. SHAEFFER:  Thank you.

11 BY MR. SHAEFFER:

12 Q.  And is that the version of the shoe that you were reviewing

13 at the time?

14 A.  Well, I'm not sure.

15 Q.  Well, if you notice the lot number, you're looking at lot

16 No. 22743.  Is that lot No. 22743?

17 A.  Yes, it is.

18 Q.  What were your conclusions with respect -- going to the

19 first page of this document, we're looking at -- at your

20 comments on the shoe.

21          What were your comments about the trade dress on the

22 shoe?

23 A.  Comments on the trade dress were that it was

24 low-to-moderate.  The use of stitched line on the toe was

25 suggestive, and litigation is ongoing between adidas and Steve

Exhibit 1 - Page 247 of 262

Page 2458

1 Q. Well, let's try one of those.  Let's look at 3621,

2 and let's go to page 2.

3        Can you tell me -- first, can you identify this

4 for me?

5 A. I'm sorry.  I'm still catching up.

6        Okay.  3621?

7 Q. Yes.

8 A. This is a collection of documents relating to a shoe

9 review for the green Toto jogger.

10 Q. And what was the inspiration for this shoe?

11 A. It was a Skechers shoe.

12 Q. And do you know whether or not this shoe is actually

13 at issue in this litigation?

14 A. It's my understanding that it is.

15 Q. So it's a shoe that wasn't even inspired by an adidas

16 shoe, but it's now being sued on in this case, to your

17 understanding?

18 A. Yes.

19 Q. And can we take a look at the shoe, which would be

20 beginning on page 9?  Can you all out an image for us

21 you'd like to see?

22 A. Usually we have side by sides, but I don't see them

23 in this particular one.

24 Q. What page are you looking at?

25 A. I'm looking at page 7 of 21, which is a top view.

Exhibit 1 - Page 248 of 262

Page 2459

1 Q. And can you briefly identify what your analysis was

2 with respect to the Payless shoe as inspired by the

3 Skechers shoe?

4 A. And maybe this side view -- all right.  If you look

5 at page 5, that gives you the side view.  And this was a

6 shoe that had stripes, so we had to be cognizant of our

7 agreements and make sure that those stripes weren't

8 serrated.  They were not.  A relatively simple shoe

9 otherwise, not anything that we would consider to be a

10 source-identifying feature on this shoe.

11        Skechers has a trademark registration, actually.

12 Stripes is actually a very crowded minefield.  There are

13 tens of trademark registrations, design patents.  It's

14 not like, if you don't do these stripes, you can do

15 anything.  There are a whole lot of things to be careful

16 to avoid that a whole lot of different companies own.

17        Skechers happens to own a particular trademark in

18 that particular fat-to-narrow stripe design, side stripe

19 design for the two stripes, and so that was something

20 that we had to be cognizant of.  And because our stripes

21 were the same width top to bottom, we decided that that

22 wasn't a concern.

23 Q. And you just mentioned that stripes were -- I think

24 your words were a "crowded minefield."  We've seen a few

25 trademarks for adidas.  Can you take a look at

Exhibit 1 - Page 249 of 262

Page 2578

1 when they saw it?

2 A.  No.  I -- I thought that it was an element that

3 unnecessarily brought the shoe closer.  I didn't think that it

4 necessarily was a protectable trade dress element.  But I

5 thought that it would be prudent to further distinguish the

6 shoe from how adidas does it.

7 Q.  Okay.  And if we could go back to page 2, in terms of the

8 trademark review there -- at the top section, here, trademark

9 review, there's an indication that it was a low-to-moderate

10 risk, and then four side stripes differentiate from three

11 stripes of branded shoe.  Correct?

12 A.  Yes.  That's what it says.

13 Q.  Okay.  And there's no mention of the 1994 agreement in this

14 August 2001 analysis.  Correct?

15 A.  No, but I didn't write this.  And, of course, we always

16 consider compliance with the agreement.  That's how we have

17 managed to comply with it for ten years.

18 Q.  Did Mr. Knops write this?

19 A.  14 years.

20       Yes.

21 Q.  Exhibit 3367.

22 A.  3367.

23       (Pause, referring.)  Okay.

24 Q.  It's an April 2006 shoe review for an update of the Payless

25 Propel, which was inspired by the adidas Tuscany adiRacer.

Exhibit 1 - Page 250 of 262

Page 2632

1 bottom of that paragraph?

2          THE COURT:  Yes, um-hmm.

3          MR. HENN:  (Pause, referring.)

4          Our understanding is that that's a reference to

5 Payless's commercial success with its use of the design

6 features.

7          So, for example, you may consider the fact that these

8 were particularly successful shoes when considering what the

9 royalty would have been had they been able to predict the

10 commercial success.

11          THE COURT:  Is that your understanding, as well?

12          MR. SHAEFFER:  Yes.  That would be our understanding.

13          THE COURT:  Okay.  Do you have any objection to that

14 language?

15          You didn't submit anything that I recall.

16          MR. SHAEFFER:  I -- at the time, I did not have any

17 objection to call something out.  I would like to check with my

18 colleagues.  But right now, I don't believe I have any

19 objection.

20          THE COURT:  All right.  Now, just a couple of

21 questions for Mr. Henn.

22          On the objections to the proposed instructions -- now,

23 page 58 of the objections filed by Payless -- and that's not

24 going to correspond with page 58 of the most recent ones.  They

25 argue about the use of a reasonable royalty.  Do you intend to

Exhibit 1 - Page 251 of 262

1 respond to that?  You mentioned the memo.

2          MR. HENN:  We do, your Honor.  We do.

3          This is -- obviously we're seeking reasonable royalty.

4 We think that this is an appropriate instruction with the

5 language --

6          THE COURT:  Well, let's -- I want to -- I had assumed

7 it was appropriate, and I've been proceeding on that basis.  So

8 that's why I'm a little unsure about your arguments.

9          MR. SHAEFFER:  Let me clarify, your Honor.

10          What we're -- the problem we have here is not with

11 their ability to use a reasonable royalty as a measure of their

12 actual damage.

13          As this instruction is drafted, the jury could avoid

14 the necessity of finding a fact of injury if they find that

15 they can come to a reasonable royalty calculation, they are

16 being instructed they can award based on that, without finding

17 there's been any actual injury to adidas.

18          So when you say injury -- the reasonable royalty

19 compensates for injury to reputation or injury to goodwill.

20 It's not an independent basis for the fact of injury.

21          THE COURT:  Well, in the instruction we say adidas has

22 the burden of proving actual damages by a preponderance of the

23 evidence.  So they have to prove actual damages.

24          And you can tell them they have to find that there has

25 been damage.  And then you get to the issue of how do you prove

Exhibit 1 - Page 252 of 262

Page 2634

1 the damage.  And in this case damage can be proved, once they

2 find it, by evidence of a reasonable royalty.  And that's what

3 it's intended to convey.

4        MR. SHAEFFER:  Well, we may want to add language in

5 there in determining the amount of actual damage.  If you put

6 the amount in that first -- in the clause after "in

7 determining," I would have no problem.

8        THE COURT:  In determining the amount of adidas'

9 actual damages.

10       Would you agree to that, Mr. Henn?

11       MR. HENN:  That's fine with us, your Honor.

12       THE COURT:  All right.  Good.

13       And then leave in 3.

14       Okay.  There will be some other ones, but I'll give

15 you -- we've got four minutes to use the facility and get back.

16       MR. HENN:  Your Honor, we'll try to get you our -- our

17 written responses by the end of the day or, at the latest,

18 first thing tomorrow.

19       THE COURT:  Okay.  Good.

20       THE CLERK:  Court is in recess.

21       THE COURT:  We'll take about ten minutes here.

22       MR. HENN:  Ten minutes.

23       (Recess taken.)

24       (Jurors enter.)

25       THE COURT:  All right.  You may continue.

Exhibit 1 - Page 253 of 262

1 understand what Payless' revenues, costs, and profits

2 might be for a set of shoes that have been accused of

3 infringing by adidas.  And then that case went dormant

4 for some period of time.

5        And then about early last year -- I think the

6 first time I was called was January of last year -- the

7 case started heating up again, and I was asked to come in

8 and update that information, because it looked like we

9 were going to have to go to court on this.

10 Q. And so what specifically were you asked to do and

11 what specifically are you going to talk to us about now?

12 A. Very specifically, I was asked to understand

13 what -- to help understand what were Payless' revenues

14 for the shoes in question, the ones that are accused by

15 adidas as being infringing on their marks; two, to

16 understand what costs contributed or assisted in selling

17 those shoes; and then ultimately, what profit did Payless

18 earn from selling these allegedly infringing shoes.

19 Q. And I think you helped me put together a summary

20 demonstrative of your conclusions.  Let's just go over

21 your conclusions first.

22        Would you go over your conclusions with us, after

23 you pour yourself some water?

24 A. Sure.  Thanks for giving me a little break there.

25        Well, overall, the pretax profit margin that

Exhibit 1 - Page 254 of 262

Page 2865

1 Payless earned on the accused shoes was a little less

2 than six percent, or 5.88 percent.  The average sales

3 price for the more that 30 million pairs of shoes in

4 question was $12.86.  The average cost that assisted in

5 the sale -- and there a number of categories in that --

6 was $12.12, leaving a pretax profit of 74 cents per pair

7 of shoes.

8 Q. Now, are you offering any opinion -- any opinions

9 here about whether any of the accused shoes actually

10 infringe any of adidas' rights?

11 A. No, I am not.

12 Q. And are you offering any opinion about whether adidas

13 should be awarded any damages in this case?

14 A. No, I'm not.

15 Q. And in connection with the work that you did and with

16 your colleagues at Grant Thornton, have you done anything

17 to assist the jury in reviewing the accused lots and

18 sales for those lots and the money involved in this?

19 A. Yes, I did.  In the reports that we prepared -- and

20 we prepared several, mainly updating information for

21 trial -- we've updated how much revenue was earned for

22 each lot, how many pairs were sold for each lot, and cost

23 information, et cetera.

24 Q. Well, let's put up Exhibit 2972, which I believe is

25 one of your reports.  And what we're going to give the

Exhibit 1 - Page 255 of 262

Page 2871

1 reasonable?

2 A. Well, this graphic hopefully helps explain that.

3        You know, the time period we're talking -- the

4 shoes we're talking about, $393 million sounds like a

5 really big number to me, and I'd certainly like to have

6 it, but in the grand scheme of what Payless' business is

7 over this eight-year period, it's less than two percent

8 of their revenue, 1.8 percent of their revenue.  And

9 Mr. Sickler's opinion is that 1.8 percent of revenue

10 drove, you know, 21 percent of what Payless has earned

11 over the eight-year period.

12 Q. Well, in your review of all the documents -- and

13 we'll get into what you reviewed -- is there anything

14 special or unique about these shoes that should cause

15 them to be 21 percent of the profits or earnings of

16 Payless during that time period?

17 A. No, there wasn't.

18        I mean, if the prices had been dramatically

19 higher, perhaps there would have been some better profit,

20 but the prices of these shoes are 12 to 14 cents a pair

21 higher than the overall Payless average, so basically the

22 same number.

23 Q. Mr. Sickler also said that if the jury doesn't adopt

24 his opinion, he had some alternatives.  Did you consider

25 his alternatives, which I think the first one is

Exhibit 1 - Page 256 of 262

1 alternative A, if we could put that one up?

2 A. Yes.

3 Q. Can you tell us about this demonstrative?

4 A. Well, again, you know, it's similar.  In his

5 alternative, Mr. Sickler's alternative A, again you have

6 1.8 percent of Payless' revenue accounting for 14 percent

7 of earning, and it doesn't really make sense to me.

8 Q. And then let's look at alternative B.  What was the

9 analysis there?

10 A. And, again, Mr. Sickler's analysis here is 1.8

11 percent of revenue drives a little more than three

12 percent of earnings.

13 Q. And I think you -- you talked that your profit margin

14 analysis was about a little over five percent, 5.8

15 percent?

16 A. Correct.

17 Q. And the reported profit margin for Payless is about

18 4.8 percent?

19 A. It's about 4.9, before tax.

20 Q. And then did you prepare another analysis that

21 compares Mr. Sickler's analysis to your analysis in terms

22 of profit margin?

23 A. Yes, I did.

24 Q. Let's put that one up.

25         Can you explain this to us?

Exhibit 1 - Page 257 of 262

1          MR. RUDY:  Your Honor, may -- may we take this up at

2 the next break?  Or before we leave --

3          THE COURT:  Well --

4          MR. RUDY:  -- take a look at it?

5          THE COURT:  I'm going to leave in the -- in effect,

6 the definition of gross revenue, gross revenue consists of

7 everything.  And the question is, will I follow it up with "The

8 parties have agreed."

9          And I think the parties have agreed, but I'm not going

10 to put that in there unless both of you agree to have those

11 figures in there.

12          MR. RUDY:  I would ask you to take it out, then.

13          THE COURT:  All right.  We won't do that.  You can

14 just argue.  And if the parties have agreed, you can tell the

15 jury the parties have agreed.

16          Okay.  Next one.  And this is your No. 55.  And this

17 is the damage instruction that covers punitive damages.

18          MR. RUDY:  Sure.

19          THE COURT:  Now, adidas argues that it should start

20 off by saying, "This instruction concerns adidas' state law

21 claims for unfair and deceptive trade practices, trademark

22 infringement, trade dress infringement, and dilution."  And

23 then it says, "And dilution under state law."

24          But I assume all you want in here is "And dilution

25 under state law," because we're referring only to state law

Exhibit 1 - Page 258 of 262

Page 2937

1 claims.

2          MR. HENN:  That's correct.

3          The prior instruction just listed unfair deceptive

4 trade practices and dilution.  And our understanding is that as

5 long as there's liability under any of the state law claims,

6 then it would support a finding --

7          THE COURT:  Well, I seem to read that in your

8 submission, Mr. Rudy -- the submission you made -- I don't

9 remember the words.  But it basically said that they could

10 recover under common law -- state law claims, that they -- they

11 could conceivably have a claim for trademark infringement under

12 state law -- state common law.  And, therefore, punitive

13 damages could be assessed.

14          And that's what we need to know, whether you agree

15 with that.  Because we'll have to change this instruction and

16 an earlier instruction.  I think it's No. 12.  Is that --

17          THE LAW CLERK:  Page 12.

18          MR. HENN:  While they're looking at that, your Honor,

19 one thing I am noticing while I am standing here is that this

20 should also list the state law claim for unfair competition,

21 which -- which is not listed in the current version.

22          But the case law that we cite in support of our

23 position specifically mentions claims for common law trademark

24 infringement and unfair competition.

25          THE COURT:  Take a look at your memorandum on the

Exhibit 1 - Page 259 of 262

1 punitive damage issue.  I'm not sure where I put it.  They

2 should have it.

3          MR. RUDY:  I apologize, your Honor.  My associate who

4 had a copy of that left court a while ago, and I don't think he

5 left one with me.

6          THE COURT:  Well, I bet they have it.

7          MR. HENN:  I think I've got a copy.

8          Is that it?

9          MR. RUDY:  So we have it, your Honor.  The question,

10 again, is?

11          THE COURT:  Well, as I recall, from reading that, is

12 that Payless concedes that there are common law claims and a

13 potential for a common law trademark infringement --

14 infringement claim under state common law.  And, therefore,

15 punitive damages, which are allowed under state law, would

16 apply.

17          You don't quite say it in black letter language, but

18 you basically concede it.

19          MR. ROCHE:  And you're right, your Honor.  In -- in

20 the brief we say to the extent that adidas can establish a

21 common law tort claim of common law trademark infringement, if

22 they meet all of the standards for punitive damage, then an

23 instruction that narrowly tailored may be appropriate.

24          THE COURT:  Right.  I think that we will adopt the

25 language requested by adidas on the instruction on punitive

Exhibit 1 - Page 260 of 262

Page 2939

1 damages.  I'm not telling you we're going to adopt all of it,

2 but we will include those claims.

3          Is that pretty much what you needed to know?

4          THE LAW CLERK:  Yes.

5          THE COURT:  Okay.  All right.  I -- we have everything

6 on the instructions then, Cindy?

7          THE LAW CLERK:  Yes.

8          THE COURT:  Okay.  Great.

9          MR. BREWSTER:  Your Honor, Mr. Rudy may need a moment

10 to respond to this, because it's sort of a spontaneous idea.

11          But I've taken the time that you all were talking

12 about jury instructions to look down in an effort -- I know

13 we're under the pressure of time -- in an effort to shorten

14 what's in the video designation.  And my suggestion would be

15 that we move -- skip a section here, move toward the end, play

16 that, and be done.

17          Mr. Rudy may need a moment to respond to that, to see

18 if there's material he --

19          THE COURT:  Where would you move to --

20          MR. BREWSTER:  I would probably jump us all the way to

21 page 201, your Honor.

22          THE COURT:  Well, we're at 146.

23          MR. BREWSTER:  I think I would save us about 45

24 minutes.  So --

25          THE COURT:  I don't know.  I've really been enjoying

Exhibit 1 - Page 261 of 262

Page 3251

1 inferior goods.  We believe it should be limited to offense of

2 goods.  That applies to 36.

3          We -- 37, again, is the use of -- a use of the -- of

4 design features, as opposed to a mark.

5          38, exception, again, to the reference of inferior

6 products is sufficient for tarnishment.

7          On damages, we believe willfulness needs to be proved

8 by clear and convincing evidence, as opposed to a mere

9 preponderance of the evidence.  And that is it.

10          THE COURT:  All right.  Well, thank you.

11          Well, it's been interesting.  (Laughter.)

12          If I remember correctly, the last trademark, trade

13 dress case I tried -- and I think I tried it -- involved cookie

14 stamps.  Cookie stamps.  A little bit different than this one.

15 I think we tried it in two or three days.  So --

16          MR. HENN:  Your Honor, I don't want to delay this any

17 longer.

18          With -- word had came back to us that you thought it

19 would be useful to give the jury those damages demonstratives

20 in something that would allow them to quickly access them.

21          We -- we have put together a notebook that has our

22 four exhibits -- our five exhibits that Mr. Brewster referenced

23 in the closing.  I didn't know if you had --

24          THE COURT:  Well, what I would like you to do is to

25 give that to counsel for the defense, and see if they have some

Exhibit 1 - Page 262 of 262